


FILED
7/30/2026
EE
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Teamsters Local Union No. 727 Health & Welfare Fund, by and through its Board of Trustees, John Coli Jr., Caleen Carter-Patton, Nick Micaletti, Mike Degard, Carl Tominberg, Robert Sheehy, Greg Youmons, and John McCarthy, | ) ) ) ) ) | Case No.    26-cv-8963 |
| | ) | Hon. Judge Charles P. Kocoras |
| and | ) ) ) | Magistrate Judge Heather K. McShain RANDOM / Cat. 3 |
| Teamsters Local Union No. 727 Legal and Educational Assistance Fund, by and through its Board of Trustees, John T. Coli, Jr., Michael DeGard, Caleen Carter-Patton, Nicholas Micaletti, John McCarthy, Gregory T. Youmans, Carl S. Tominberg and Robert Sheehy, | ) ) ) ) ) ) | |
| and | ) ) | |
| Parking Industry Labor Management Committee Trust, by its Trustees, John Coli, Jr., James Buczek, Michael Prussian, and Nicholas Micoletti, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| Heat Valet Parking Services Inc. and Jermell Brown, | ) ) | |
| Defendants. | ) | |

**<u>COMPLAINT</u>**

Plaintiffs Teamsters Local Union No. 727 Health and Welfare Fund, Teamsters Local Union No. 727 Legal and Educational Fund, and the Parking Industry Labor Management Committee Trust (collectively, "Plaintiffs" or the "Funds"), pursuant to the Employment Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1132 and 1145 and the Labor Management Relations Act of 1947, as amended (the "LMRA"), 29 U.S.C. §185,

1

complain as follows against Defendants Heat Valet Parking Services Inc. ("Heat Valet Parking") and Jermell Brown ("Brown").

## Nature of the Case

1. Defendant Heat Valet Parking knowingly violated ERISA and breached collective bargaining agreements ("CBAs") with Plaintiffs by failing and refusing to pay required contributions.

2. Defendant Brown owns and operates Heat Valet Parking. After an audit revealed materially deficient contributions by Heat Valet Parking, the parties reached a settlement by which Brown personally guaranteed Heat Valet Parking's obligations. Defendants made an initial payment on the settlement but failed to pay the balance.

3. Plaintiffs request a judgment that orders Defendants to: (a) pay amounts equal to all contributions found to be owed to each Plaintiff by a payroll audit conducted by Plaintiffs' auditors, less Defendants' initial payment; (b) pay any additional amounts that may be found due and owing to Plaintiffs during the pendency of this litigation; and (c) pay all interest, liquidated damages, audit fees, attorneys' fees, and costs owed to Plaintiffs.

## Jurisdiction, Venue, and Parties

4. This dispute arises under the laws of the United States.

5. The Court has jurisdiction over the claims against Heat Valet Parking pursuant to section 301(a) of the LMRA, 29 U.S.C. § 185(a). Jurisdiction also lies under Sections 502(a)(3), 502(e)(1), 502(g)(2) and Sections 515 of ERISA, 29 U.S.C. §§ 1132(a)(3), 1132(e)(1), 1132(g)(2) and 1145.

6. The claims against Brown individually and Heat Valet Parking arise from a common nucleus of operative fact. The Court has supplemental jurisdiction over the claims against Brown pursuant to 28 U.S.C. § 1367(a).

7. The Defendants in this action are in Cook County, Illinois. Jurisdiction in the Eastern Division of the U.S. District Court for the Northern District of Illinois is appropriate.

8. Venue is proper in this District pursuant to Section 301(a) of the LMRA, 29 U.S.C. § 185(a); Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2); and 28 U.S.C. § 1391(b).

9. **Plaintiff Welfare Fund.** Plaintiff Teamsters Local Union No. 727 Health & Welfare Fund ("Welfare Fund") is a jointly administered multiemployer welfare plan within the meaning of Section 302(c)(6) of the LMRA, 29 U.S.C. § 186(c)(6), and §§ 3(1) and 3(37)(A) of ERISA, 29 U.S.C. §§ 1002 and (37)(A). The Welfare Fund's business address is 1300 W. Higgins Road, Suite 303, Park Ridge, IL 60068.

10. The Welfare Fund is administered by a Board of Trustees in accordance with Section 302(c)(5) of the LMRA, 29 U.S.C. § 186(c)(5), and exists for the exclusive purpose of providing health care benefits to its participants and defraying the reasonable expenses of administering the welfare plan, in accordance with Section 404 of ERISA, 29 U.S.C. §1104.

11. The Welfare Fund receives contributions from employers who are parties to a collective bargaining agreement with the International Brotherhood of Teamsters Local Union No. 727 (the "Union").

12. John Coli Jr., Caleen Carter-Patton, Nick Micaletti, Mike Degard, Carl Tominberg, Robert Sheehy, Greg Youmons, and John McCarthy are Trustees of the Welfare Fund pursuant to the Welfare Fund's Agreement and Declaration of Trust ("Welfare Fund Trust Agreement"). *Exhibit A, Restated Agreement and Declaration of Trust of the Teamsters Local Union No. 727*

3

*Health and Welfare Fund*. Coli Jr., Carter-Patton, Micaletti, Degard, Tominberg, Sheehy, Youmons, and McCarthy are fiduciaries of the Welfare Fund as that term is defined in Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A).

13. The business address for Coli, Jr., Carter-Patton, DeGard, Micaletti, McCarthy, Youmans, Tominberg, and Sheehy as Trustees of the Welfare Fund is 1300 W. Higgins Road, Suite 303, Park Ridge, IL 60068.

14. **Plaintiff Legal Fund.** Plaintiff Teamsters Local Union No. 727 Legal & Educational Assistance Fund ("Legal Fund") is a jointly administered, multiemployer employee benefit fund within the meaning of Section 302(c)(6) of the LMRA, 29 U.S.C. § 186(c)(6), and Sections 3(1) and 3(37)(A) of ERISA, 29 U.S.C. §§ 1002 and (37)(A). The Legal Fund's business address is 1300 W. Higgins Road, Suite 303, Park Ridge, IL 60068.

15. The Legal Fund is administered by a Board of Trustees and exists for the exclusive purpose of providing legal and educational assistance to its participants and defraying the reasonable expenses of administering the Legal Fund, in accordance with Section 404 of ERISA, 29 U.S.C. §1104. The L&E Fund receives contributions from employers that are parties to a collective bargaining agreement with the Union.

16. Plaintiffs John Coli Jr., Caleen Carter-Patton, Nick Micaletti, Mike Degard, Carl Tominberg, Robert Sheehy, Greg Youmons, and John McCarthy are Trustees of the L&E Fund pursuant to the L&E Fund's Agreement and Declaration of Trust. *Exhibit B, Restated Agreement and Declaration of Trust of the Teamsters Local Union No. 727 Legal and Educational Assistance Fund*. Coli, Jr., Carter-Patton, DeGard, Micaletti, McCarthy, Youmans, Tominberg, and Sheehy are fiduciaries of the Plan as that term is defined in Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A).

17. The business address for these Plaintiffs as Trustees is 1300 W. Higgins Road, Suite 303, Park Ridge, IL 60068.

18. **Plaintiff Parking Industry Labor Management Committee Trust.** Plaintiff Parking Industry Labor Management Committee Trust is a fund established to support and fund the Parking Industry Labor Management Committee ("PILMC").

19. PILMC is a joint labor management committee, as defined by Section 6(b) of the Labor-Management Cooperation Act of 1978 (29 U.S.C. § 175a) and Section 302(c)(9) of the National Labor Relations Act (29 U.S.C. § 186(c)(9)).

20. PILMC's function is to promote the parking industry in Chicago, improve communication between representatives of labor and management, enhance economic development in the industry, and involve employees in decisions affecting their jobs, including improving communication with respect to subjects of mutual interest and concern.

21. The trustees of the PILMC Trust are John Coli, Jr., James Buczek, Michael Prussian, and Nicholas Micoletti. These Plaintiffs are fiduciaries of the Trust pursuant to Illinois law and the express terms of Article 5 of the Declaration of Trust, *Exhibit C,* that established the Trust.

22. The business address for these Plaintiffs as Trustees is 1300 W. Higgins Road, Suite 303, Park Ridge, IL 60068.

23. **Defendants Heat Valet Parking and Brown**. Defendant Heat Valet Parking is an Illinois corporation. Heat Valet Parking provides valet parking services to various businesses in Chicago.

24. Heat Valet Parking is an employer within the meaning of Section 301(a) of the LMRA, 29 U.S.C. § 185(a); and Section 3(5) of ERISA, 29 U.S.C. § 1002(5).

5

25.     Heat Valet Parking and the Funds agreed to and are bound by a Collective Bargaining Agreement ("CBA") with a term of July 1, 2023 to June 30, 2027 with the International Brotherhood of Teamsters, Local Union No. 727.  A copy of the CBA is attached as *Exhibit D*.

26.     Under the terms of the CBA, Defendant is obligated to make contributions to the Funds on behalf of individuals whose employment is covered by the CBA.

27.     The individuals covered by the CBA worked as parking valets.

28.     Defendant Brown owns Heat Valet Parking.  As alleged below, Brown guaranteed $30,000 of Heat Valet Parking's contributions owed to the Funds pursuant to a November 2025 Settlement Agreement.  *Exhibit E.*

### Collective Bargaining Agreement Obligations

29.     Article 19 of the CBA covers Defendant's obligations to the Welfare and L&E Funds.  Article 20 of the CBA sets out Defendant's obligation to contribute to the PILMC Trust.

30.     Section 19.1 of the CBA set forth the contribution rate to be paid by Defendant to the Welfare Fund on behalf of employees covered by the CBAs.

31.     Section 19.2 sets forth the contribution rate to be paid to the L&E Fund on behalf of employees covered by the CBAs.

32.     Section 20.1 sets forth the contribution rate to be paid to PILMC on behalf of employees covered by the CBAs.

### Trust Agreement Obligations

33.     By the execution of the CBA, Defendant authorized the "Trustees to enter into appropriate trust agreements necessary for the administration of such funds, and [t]hereby waiving all notice thereof and ratifying all actions already taken or to be taken by such Trustees within the scope of their authority."  *Exhibit D, § 19.5.*

34.     Article 6, Section 6.01(b) of the Funds' respective Trust Agreements include a provision for the collection of delinquent contributions, which states:

> The Trustees may compel and enforce the payment of Contributions in any manner which they deem proper but without limitation upon any rights and privileges the Union may have in this connection. *Exhibit A, Welfare Fund Trust Agreement p. 19, § 6.01(b); Exhibit C, PILMC Trust Agreement p. 20, § 6.01(b); Exhibit B, L&E Fund Trust Agreement pp. 18-19, § 6.01(b).*

35.     Article 6, Section 6.02 of the Funds' respective Trust Agreements provides in relevant part:

> The Trustees shall have the right to adopt rules and regulations relating to the collection of Employer Contributions, including provisions for time of payment, collection of interest, audit fees, attorneys' fees at the rate set by the Trustees in their sole discretion, costs, and liquidated damages as specified in this Section. An Employer in default as of the date established by the Collective Bargaining Agreement or the Trustees for payment of Contributions shall be liable for an additional amount of twenty percent (20%) of the delinquent payment or $50.00, whichever is greater, and interest at the rate set forth in the Plan or the rules and regulations [established by the Trustees].

36.     Additionally, Article 6, Section 6.03 of the Funds' respective Trust Agreements provides:

> Each Employer and its affiliated or related companies or businesses shall furnish to the Trustees on demand the names of all employees, their Social Security numbers, the time worked by each employee, the Contributions due or payable to the Trust Fund, and such other information, including cash journals, wage and payroll records, income tax records, and other business records, as the Trustees or their agents may reasonably require in connection with the administration of the Trust. The Trustees, or their authorized representative, shall have the right to examine and audit the pertinent books and records (as determined by the Trustees) of each employer and its affiliated or related companies whenever such examination is deemed necessary or advisable by the Trustees in connection with the proper administration of the Trust.

37. Consistent with the Funds' Trust Agreements, the Trustees of each Plaintiff Fund established a policy for the collection of contributions which requires employers to submit signed remittance reports together with their monthly contributions. *Exhibit F, Collection Policy.*

38. The Trustees for Plaintiffs also established a policy for conducting payroll audits of employers. *Exhibit G, Audit Policy.*

39. Copies of Plaintiffs' Collection Policy and the Audit Policy were provided to Defendant.

40. Plaintiffs' Audit Policy permits Plaintiffs to select employers for an audit. *Exhibit G, Audit Policy § I.*

41. Confirmation of the precise number of contributions owed by an employer and the accuracy of hours reported is achieved by a payroll audit.

42. Defendant is obligated to submit to payroll audits to determine the accuracy of the information provided and contributions paid to Plaintiff Funds.

43. Consistent with the Plaintiffs' Trust Agreements, the Plaintiffs' Trustees commissioned an audit of Defendant Heat Valet Parking's records for the period of October 1, 2022 through August 21, 2023 ("Audit") to determine whether the company was compliant in its contribution obligations to the Funds. A copy of the Audit Report is attached as *Exhibit H*.

44. The Audit Report found that Heat Valet Parking had failed to pay $27,887.27 in contributions due under the CBA, plus additional damages and interest owed by statute.

45. Plaintiff sent the Audit Report, which is a request for payment in the amount of $36,215.93, on July 29, 2025. *Exhibit I.*

46. Defendants did not contest Plaintiffs' demand for payment, but stated that they were unable to pay because of unrelated financial challenges.

8

47. In October 2025, the parties entered into a Settlement Agreement by which Heat Valet Parking would pay $30,000 to settle its outstanding obligations to the Funds. *Exhibit* E. The Funds agreed to release Heat Valet Parking and Brown from any additional liability related to the Audit upon payment in full of the settlement.

48. Brown personally guaranteed Heat Valet Parking's obligations to the Funds up to $30,000. *Id.*

49. Defendants made an initial payment of $6,000 to the Funds under the Settlement Agreement but paid nothing after that.

50. After granting Defendants several extensions, the Funds made a final demand for payment on February 12, 2026. *Exhibit J.* Defendants failed to pay.

### ERISA Enforcement

51. Section 404 of ERISA, 29 U.S.C. § 1104 imposes a duty on fiduciaries to determine the contributions owed to the plan as well as a responsibility to assure full and prompt collection of all contributions owed to the plan.

52. Section 515 of ERISA, 29 U.S.C. § 1145, states that "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement."

53. Section 502(g)(2) of ERISA, 29 U.S.C. § 1132(g)(2), further provides that "[i]n any action under this title by a fiduciary for or on behalf of a plan to enforce section 515 in which a judgment in favor of the plan is awarded, the court shall award the plan – (A) the unpaid contributions, (B) interest on the unpaid contributions, (C) an amount equal to the greater of (i) interest on the unpaid contributions, or (ii) liquidated damages provided for under the plan in an

9

amount not in excess of 20% (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A), (D) reasonable attorney's fees and costs of the action, to be paid by Defendant, and (E) such other legal or equitable relief as the court deems appropriate."

## COUNT I
## Unpaid Contributions – Health and Welfare Fund

54.    Plaintiffs reallege paragraphs 1 through 53.

55.    Pursuant to the CBAs executed by Defendant, the Defendant is obligated to pay contributions to the PILMC Fund on behalf of all employees performing bargaining unit work.

56.    Consistent with the Plaintiffs' Trust Agreements, the Plaintiffs' Trustees had an audit conducted of Defendant's records for the period of October 1, 2022 through August 31, 2023 to determine whether the Company was compliant in its contribution obligations to the Welfare Fund.

57.    The Audit found that Defendant is delinquent in contributions to the Welfare Fund in the amount of $19,380.71.  See *Exhibit H.*

58.    Through the date of the audit, interest on the delinquent contributions to the Welfare Fund totals $1,524.54.  Interest will continue to accrue until the contributions are paid in full.

59.    Defendant owes liquidated damages, as discovered by the Audit, to the Welfare Fund in the amount of $3,876.14.  See *Ex. A* § 6.02; 29 U.S.C. § 1132(g)(2)(C); *Ex. H*.  Liquidated damages may increase where the accruing interest due on the delinquent contributions exceeds this amount.  *Id*. (providing that liquidated damages shall be either (a) 20% of delinquent contributions or (b) the interest due thereon, whichever is greater).

60.     Pursuant to Section 6.02 of the Welfare Fund's Trust Agreement (*Exhibit A*) and 29 U.S.C. § 1132(g)(2)(D), Defendant is required to reimburse the Fund for reasonable attorneys' fees and costs, including audit fees, that the Fund incurs to collect the contributions owed. Defendant owes the Welfare Fund payroll audit fees in the amount of $444.00.

61.     The Welfare Fund has demanded payment of the amounts owed, but the Defendant has failed and/or refused to pay the contributions.

62.     The Welfare Fund has been economically harmed by the Defendant's failure to make contribution payments as required by the CBAs and the Trust Agreement.

63.     Defendant's failure and refusal to pay contributions to the Welfare Fund as required by the CBA violates section 515 of ERISA, 29 U.S.C. § 1145.

WHEREFORE, Plaintiff Welfare Fund prays that the Court grant the following relief:

A.  Final judgment in favor of Plaintiff and against Defendant ordering the Defendant to pay all contributions owed to the Welfare Fund, plus interest, liquidated damages, audit fees, and reasonable attorney's fees and costs;

B.  Final judgment in favor of Plaintiff and against Defendant for any additional contribution amounts that may be found due and owing to the Welfare Fund during the pendency of this litigation, together with interest, liquidated damages, audit fees, reasonable attorney's fees and costs; and

C.  That the Court order such other relief that the Court deems just and appropriate.

## COUNT II
## Unpaid Contributions – PILMC

64.     Plaintiffs reallege paragraphs 1 through 53.

11

65.     The Audit revealed that the Defendant is delinquent in its contributions to the PILMC Trust in the amount of $240. *Exhibit H.* Although the delinquency to the Trust is minimal, it is part of a substantial debt that Defendants owe the Funds.

66.     Through the conclusion of the audit, interest on delinquent contributions owed to the PILMC Trust as discovered in the Audit totals $18.01. Interest will continue to accrue until the contributions are paid in full. *Exhibit H.*

67.     Defendant owes liquidated damages, as discovered by the Audit, to the PILMC Trust in the amount of $48.00. *See Exhibit C,* § 6.02; 29 U.S.C. § 1132(g)(2)(C); *Exhibit H.* Liquidated damages may increase where the accruing interest due on the delinquent contributions exceeds this amount. *See Id.* (providing that liquidated damages shall be either (a) 20% of delinquent contributions or (b) the interest due thereon, whichever is greater).

68.     Pursuant to Section 6.02 of the PILMC Trust Agreement (Exhibit C) and 29 U.S.C. § 1132(g)(2)(D), Defendant is obligated to reimburse PILMC reasonable attorneys' fees and costs, including audit fees, that the Fund incurs to collect the contributions owed. The Defendant owes PILMC payroll audit fees in the amount of $6.00.

69.     Plaintiffs have demanded payment of the amounts owed, but Defendant has failed and/or refused to pay the contributions.

70.     The PILMC Fund has been economically harmed by the Defendant's failure to make contribution payments as required by the CBAs and the Trust Agreement.

71.     The Defendant's failure and refusal to pay contributions to PILMC as required by the CBA violates section 515 of ERISA, 29 U.S.C. § 1145.

WHEREFORE, Plaintiff PILMC Fund prays that the Court grant the following relief:

A.  Final judgment in favor of Plaintiff and against Defendant ordering Defendant to pay all contributions owed to Plaintiff, plus interest, liquidated damages, audit fees, and reasonable attorney's fees and costs;

B.  Final judgment in favor of Plaintiff and against Defendant for any additional contribution amounts that may be found due and owing to Plaintiff during the pendency of this litigation, together with interest, liquidated damages, audit fees, reasonable attorney's fees and costs; and

C.  Such other relief that the Court deems just and appropriate.

**COUNT III**
**Unpaid Contributions – Legal and Educational Assistance Fund**

72.  Plaintiffs reallege paragraphs 1 through 53.

73.  The Audit revealed that Defendant is delinquent in contributions to the L&E Fund in the amount of $8,266.56.  See *Exhibit H*.

74.  Through the date of the audit, interest on the delinquent contributions owed to the L&E Fund totals $608.66.  Interest will continue to accrue until the contributions are paid in full. *Id*.

75.  Defendant owes liquidated damages, as discovered by the Audit, to the L&E Fund in the amount of $1,653.31.  *See* Ex. B § 6.02; 29 U.S.C. § 1132(g)(2)(C).  Liquidated damages may increase where the accrued interest due on the delinquent contributions exceeds this amount. *Id*. (providing that liquidated damages shall be either (a) 20% of delinquent contributions or (b) the interest due thereon, whichever is greater).

76.  Pursuant to Section 6.02 of Exhibit B and 29 U.S.C. § 1132(g)(2)(D), Defendant is required to reimburse the Fund reasonable attorneys' fees and costs, including audit fees, that the

13

Fund incurs to collect the contributions owed. The Defendant owes the L&E Fund payroll audit fees in the amount of $150.00.

77. The L&E Fund demanded payment of the amounts owed, but Defendant failed and refused to pay the contributions.

78. The L&E Fund has been economically harmed by Defendant's failure to make contribution payments as required by the CBA and the Trust Agreement.

79. Defendant's failure and refusal to pay contributions to the L&E Fund as required by the CBA violates section 515 of ERISA, 29 U.S.C. § 1145.

WHEREFORE, Plaintiff L&E Fund prays that the Court grant the following relief:

A. Final judgment in favor of Plaintiff and against Defendant ordering the Defendant to pay all contributions owed to L&E Fund, plus interest, liquidated damages, audit fess, and reasonable attorney's fees and costs;

B. Final judgment in favor of Plaintiff and against Defendant for any additional contribution amounts that may be found due and owing to the L&E Fund during the pendency of this litigation, together with interest, liquidated damages, audit fees, reasonable attorney's fees and costs;

C. Such other relief that the Court deems just.

**COUNT IV**
**Contribution Shortages, Interest and Liquidated Damages for Late-Paid**
**Contributions Under Federal Common Law – Plaintiff Welfare Fund**

80. The Welfare Fund realleges paragraphs 1-63.

81. Pursuant to the CBA and Welfare Fund Trust Agreement, Defendant is contractually obligated to pay contributions, and interest and liquidated damages to the Welfare Fund for late-paid contributions.

82. As of September 21, 2023, the date of the Audit, Defendant owed the Welfare Fund $25,225.39 for delinquent contributions, audit fees, interest and liquidated damages for work performed in the months of October 1, 2022 through August 31, 2023. *Exhibit H.*

83. The Welfare Fund demanded payment of the contributions, interest and liquidated damages owed, but the Defendant failed and refused to pay.

84. The Welfare Fund has been economically harmed by Defendant's failure to pay these contributions, audit fees, interest and liquidated damages as required by the CBA and the Welfare Fund Trust Agreement.

85. The Defendant's failure and refusal to pay these contributions, audit fees, interest and liquidated damages that Defendant incurred constitutes a material violation of the CBA and the Welfare Fund Trust Agreements.

WHEREFORE, Plaintiff Welfare Fund prays that the Court grant the following relief:

A. That the Court enter judgment in favor of the Welfare Fund and ordering Defendant to pay all delinquent contributions for July 1, 2022 through August 31, 2023 and related interest, liquidated damages, and fees;

B. Such other relief that the Court deems just.

### COUNT V
### Contribution Shortages, Interest and Liquidated Damages for Late-Paid Contributions Under Federal Common Law – Plaintiff PILMC

86. Plaintiff PILMC realleges paragraphs 1-53 and 65-71.

87. Pursuant to the CBA and PILMC Trust Agreement, Defendant Heat Valet Parking is obligated to pay contributions, audit fees, interest and liquidated damages to the PILMC Fund for late-paid contributions.

88.	As of September 21, 2023, the date of the Audit, Defendant owed the PILMC $312.01 for delinquent contributions, audit fees, interest and liquidated damages for work performed in the months of October 1, 2022 through August 31, 2023.  *Exhibit H.*

89.	PILMC has demanded payment of the contributions, audit fees, interest and liquidated damages owed, but Defendant has failed and/or refused to pay.

90.	PILMC has been economically harmed by Defendant's failure to pay these contributions, audit fees, interest and liquidated damages as required by the CBA and the PILMC Fund Trust Agreement.

91.	The Defendant's failure and refusal to pay these contributions, audit fees, interest and liquidated damages that Defendant incurred constitutes a material violation of the CBA and the PILMC Fund Trust Agreements.

WHEREFORE, Plaintiff PILMC prays that the Court grant the following relief:

A.	That the Court enter judgment in favor of PILMC and ordering Defendant Heat Valet Parking to pay all delinquent contributions for October 1, 2022 through August 31, 2023 and related interest, liquidated damages, and fees;

B.	Such other relief that the Court deems just and appropriate.

**COUNT VI**
**Contribution Shortages, Interest and Liquidated Damages for Late-Paid**
**Contributions Under Federal Common Law – Plaintiff L&E Fund**

92.	The L&E Fund realleges paragraphs 1-53 and 73-79.

93.	Pursuant to the CBA and L&E Fund Trust Agreement, Defendant Heat Valet Parking is obligated to pay contributions, audit fees, interest and liquidated damages to the L&E Fund for late-paid contributions.

94.     Through the date of the Audit, Defendant owed the L&E Fund $10,678.53 for delinquent contributions, audit fees, interest and liquidated damages. *Exhibit H.*

95.     The L&E Fund demanded payment of the contributions, interest and liquidated damages owed, but Defendant failed and refused to pay.

96.     The L&E Fund has been economically harmed by Defendant's failure to pay these contributions, audit fees, interest and liquidated damages as required by the CBA and the L&E Fund Trust Agreement.

97.     The Defendant's failure and refusal to pay these contributions, audit fees, interest and liquidated damages that Defendant incurred constitutes a violation of the CBA and the L&E Fund Trust Agreements.

WHEREFORE, Plaintiff L&E Fund prays that the Court grant the following relief:

A.  That the Court enter judgment in favor of the Plaintiff and ordering Defendant Heat Valet Parking to pay all delinquent contributions f and related interest, liquidated damages, and fees;

B.  Such other relief that the Court deems just and appropriate.

## COUNT VII
### Breach of Settlement Agreement against Heat Valet Parking

98.     The Funds reallege paragraphs 1-53.

99.     When the parties entered into the Settlement Agreement, Heat Valet's outstanding debt to the Funds was $36,215.93

100.    The Funds and Heat Valet Parking agreed to compromise Heat Valet's Parking's delinquency for $30,000.  The parties memorialized their agreement in a Settlement Agreement. *Exhibit E.*

17

101. The Settlement Agreement obligated Heat Valey Parking to make two initial $6,000 payments, with eighteen monthly installments of $1,000 until the debt was extinguished.

102. Heat Valet Parking made one payment of $6,000 but, despite numerous demands from the Funds, paid nothing after that.

103. Heat Valet Parking's failure to pay is a material breach of the Settlement Agreement.

104. As stated in Section 4 of the Settlement Agreement, Heat Valet Parking is now liable for the full balance of its delinquent contributions, plus liquidated damages and interest to through the date of the Audit—$36,215.93. Heat Valet Parking is entitled to a $6,000 credit against this sum, leaving a total debt of $30,215.93.

WHEREFORE, the Funds request a final judgment in their favor and against Heat Valet Parking for $30,215.93, pre- and post-judgment interests, attorney's fees, costs of suit, and such other relief as the Court deems just.

## COUNT VIII
### Breach of Settlement Agreement against Brown

105. The Funds reallege paragraphs 1-53.

106. Brown agreed through Section 5 of the Settlement Agreement to be personally liable to the Funds for any payment default of Heat Valet Parking.

107. After Heat Valet Parking failed to pay the Settlement Agreement, the Funds demanded that Brown pay the money due from Heat Valet Parking.

108. Brown failed and refused to pay.

109. Brown's failure to pay is a material breach of the Settlement Agreement.

WHEREFORE, the Funds request a final judgment in their favor and against Brown for $30,215.93, pre- and post-judgment interests, attorney's fees, costs of suit, and such other relief as the Court deems just.

**COUNT IX**
**Confession of Judgment**

110.    The Funds reallege paragraphs 1 through 53.

111.    Section 3 of the Settlement Agreement defines an "Event of Default" to include, among other things, Heat Valet Parking's failure to timely pay any amount due under the Settlement Agreement. *Exhibit E, Settlement Agreement § 3.*

112.    Section 4 of the Settlement Agreement, entitled "Funds' Right to Entry of Judgment," provides that upon an Event of Default, the Funds may serve Heat Valet Parking, with a copy to Brown, a ten-calendar-day notice of default specifying the Event of Default, and that Heat Valet Parking has the right to cure by paying the full amount due within that ten-calendar-day period. *Id. § 4.*

113.    Section 4 further provides that upon Heat Valet Parking's failure to cure a default within the ten-calendar-day period, the Funds "shall be entitled to bring suit or motion in Federal Court and shall be immediately entitled to judgment of the full Audit Balance ($36,215.93) less payments made and any other amounts due hereunder, plus any additional amounts due the Funds including, without limitation, interest, liquidated damages, the Funds' attorney fees and court costs, and further audit expenses."

114.    Section 7 of the Settlement Agreement, entitled "Confession of Judgment," provides that if Heat Valet Parking fails to cure any Event of Default within the ten-calendar-day cure period, Heat Valet Parking irrevocably appoints any attorney of any Court of Record in Illinois as attorney for Heat Valet Parking to appear on its behalf, waive issuance and service of

process, waive trial by jury, and confess judgment in favor of the Funds and against Heat Valet Parking for the amounts then due, together with costs of suit and the Funds' attorneys' fees, and to waive and release all errors and the right of appeal, and to consent to immediate execution on the judgment. *Id. § 7.*

115. The Warrant of Attorney attached to the Settlement Agreement, executed by Brown individually and on behalf of Heat Valet Parking irrevocably authorizes and empowers the Clerk of Court or any designated attorney to appear for and confess judgment against Heat Valet Parking upon the occurrence of a default, for such sums as are or may become due under the Settlement Agreement, with ten (10) days' prior notice by the Funds, with costs of suit, without stay of execution, and with an amount for lien priority purposes including all reasonable attorneys' fees and costs as provided under Section 502(g)(2) of ERISA, 29 U.S.C. § 1132(g)(2). *Id., Warrant of Attorney.*

116. The Settlement Agreement further provides that Heat Valet Parking agrees "that a true, accurate, and clearly legible photocopy or scanned version of this instrument shall be sufficient for purposes of entering and confirming the confessed judgment; the original signed version shall not be required," and that the confession-of-judgment remedy "shall be in addition to any and all other remedies available to the Funds." *Id. § 7.*

117. The Settlement Agreement recites that the parties "have had the opportunity to consult with and receive the benefit of legal counsel," that they "read and understand" the Settlement Agreement, and that they "executed this Settlement Agreement voluntarily" and "acknowledge and intend to be fully and legally bound by it." *Id. § 9.b; WHEREFORE Clause.*

118. Heat Valet Parking's failure to pay the monthly installments due under the Settlement Agreement, as alleged above, is an Event of Default under Section 3(a) of the Settlement Agreement.

119. Consistent with Section 4 of the Settlement Agreement, on February 12, 2026, the Funds served Heat Valet Parking and Brown written notice of default and demanded payment. *Exhibit J.*

120. More than ten (10) calendar days have passed since the Funds' February 12, 2026 notice of default, and Heat Valet Parking has neither cured the default nor paid any part of the amount demanded.

121. Heat Valet Parking's uncured default entitles the Funds, under Sections 4 and 7 of the Settlement Agreement and the accompanying Warrant of Attorney, to entry of judgment by confession against Heat Valet Parking for the full Audit Balance of $36,215.93, less the $6,000.00 Initial Payment actually made, leaving a principal balance of $30,215.93, plus interest, liquidated damages, the Funds' attorneys' fees, court costs, and further audit expenses as provided in the Settlement Agreement.

WHEREFORE, the Funds request that the Court enter judgment by confession in their favor and against Defendant Heat Valet Parking Service Inc., pursuant to Sections 4 and 7 of the Settlement Agreement and the Warrant of Attorney, for $30,215.93, plus pre- and post-judgment interest, liquidated damages, the Funds' reasonable attorneys' fees, costs of suit, further audit expenses, and such other relief as the Court deems just.

*Counsel to Plaintiffs Teamsters Local Union No. 727 Benefit Funds and Trustees*

By: */s/ Scott Browdy*

21

One of their Attorneys

CTM Legal Group
77 W. Washington St., Suite 2120
Chicago, Il 60602
P: 312-818-6700
F: 312-492-4804
SBrowdy@ctmlegalgroup.com

## CERTIFICATE OF SERVICE

I, Scott Browdy, hereby certify that I have this 30th day of June, 2026 forwarded a copy of the Complaint and exhibits in the foregoing matter to the persons listed below, by certified mail, postage prepaid, United States Postal Service: Keith Sonderling, Acting Secretary U.S. Department of Labor Office of Public Affairs 200 Constitution Ave., N.W. Room S-1032 Washington, DC 20210; Scott Bessent, Secretary United States Department of Treasury 1500 Pennsylvania Avenue, N.W. Washington, D.C. 20220.

Dated: July 28, 2026          */s/ Scott Browdy*

# Exhibit A

RESTATED AGREEMENT AND DECLARATION OF TRUST
OF THE
TEAMSTERS LOCAL UNION NO. 727
HEALTH AND WELFARE FUND

THIS RESTATED AGREEMENT AND DECLARATION OF TRUST (herein sometimes referred to as the "Restated Agreement") is made and entered into as of this 25th day of July , 2000, by and between the Trustees, JOHN T. COLI, BECKY STRZECHOWSKI, THOMAS J. MORIARTY and DAVID WOLPIN, who, with their successors designated in the manner herein provided, are hereinafter called the "Trustees" or "Board of Trustees."

WITNESSETH

WHEREAS, the Union and Employers are parties to Collective Bargaining Agreements requiring periodic payments by Employers of Contributions for the purpose of providing and maintaining hospitalization, medical, dental, vision, life insurance, disability benefits, and other welfare benefits ("health & welfare benefits") to Participants; and

WHEREAS, a Trust Agreement was adopted and a Trust Fund established in order to fund health & welfare benefits pursuant to the terms of the "Health and Welfare Plan" or "Plan"; said Trust and Plan to conform with applicable provisions of the Labor-Management Relations Act of 1947, as amended, and other applicable federal laws, and to qualify as a "qualified trust" and as an "exempt trust," pursuant to the Internal Revenue Code; and

WHEREAS, the signatory Trustees, who were appointed pursuant to the terms of the Trust Agreement, desire to update the aforesaid Trust Agreement into a Restated Agreement and Declaration of Trust and to make such changes as may be appropriate for the continued viability of the Trust Fund; and

WHEREAS, said Trustees are authorized by the Trust Agreement to enact this

Restatement;

NOW, THEREFORE, the Trustees hereby accept and adopt all of the provisions of this Restated Agreement. The Trustees declare that they will receive and hold the Contributions, and any other money or property which may come into their hands as Trustees, with the powers and duties and for the uses and purposes as hereinafter set forth:

## ARTICLE ONE

## NAME

This Trust Fund shall be designated and known as the "TEAMSTERS LOCAL UNION NO. 727 HEALTH AND WELFARE FUND" and is sometimes referred to herein as the "Trust", "Fund", " Health and Welfare Fund" or "Trust Fund".

## ARTICLE TWO

## PURPOSES

2.01. The purpose of the Trust Fund is to provide, for the sole and exclusive benefit of eligible Participants and their Dependents, coverage for hospitalization, medical, dental and vision benefits, life insurance, disability benefits and such other benefits of like nature as shall be permissible under applicable Federal or state laws.

2.02. The Trustees intend, within the terms of this Restated Agreement and acting within their exclusive discretion, to provide the maximum amount of benefits possible, consistent with good business practice, after taking into consideration the reasonable reserves to be established. The Trustees shall have the exclusive authority to increase or decrease the various types of benefits which in their judgment can best be provided from the Fund's assets. All of the parties intend that the benefits are limited to those which can be financed as a result of Contributions and investment earnings. It is expressly understood and agreed that there is no liability upon the Union, any Employer or association, or the Trustees for the furnishing of any specific type or

2

amount of benefit to Participants or Dependents.

## ARTICLE THREE

## DEFINITION OF TERMS

Unless the context clearly indicates otherwise, the following terms shall be construed as hereinafter defined:

3.01. The term "Union" shall mean Auto Livery Chauffeurs, Embalmers, Funeral Directors, Apprentices, Ambulance Drivers and Helpers, Taxi Cab Drivers, Miscellaneous Garage Employees, Car Washers, Greasers, Polishers and Wash Rack Attendants Union, Local No. 727, an affiliate of the International Brotherhood of Teamsters ("I.B.T.").

3.02. The term "Employer" shall mean all employers who are obligated to make Contributions to the Trust Fund pursuant to the terms of any Collective Bargaining Agreement. For the purposes of the Plan only, the Union, this Trust Fund ("Health and Welfare Fund"), the Teamsters Local Union No. 727 Pension Fund (" Pension Fund"), and the Teamsters Local Union No. 727 Legal and Educational Assistance Fund ("Legal and Educational Assistance Fund") will be considered Employers with respect to the officers and employees of each for whom Contributions are paid, but shall not participate in the selection or removal of Employer Trustees as hereinafter provided.

3.03. The term "Employee" shall mean any individual who is represented for collective bargaining purposes by the Union, employed by an Employer, and/or for whom the Employer is obligated to make a Contribution to this Fund; provided, however, that the Trustees may set up standards for eligibility for benefits. In addition, provided the requisite Contributions are made, the term "Employee" may include the following: (a) employees engaged in any capacity by an Employer who are accepted for participation by the Trustees; and (b) the Trustees, officers and employees of this Fund, the Pension Fund, the Legal and Educational Assistance Fund, and the Union.

3

3.04. The term "Participant" shall mean any Employee who has satisfied the Plan's eligibility requirements to receive health & welfare benefits provided by the Plan, as well as any eligible Dependents.

3.05. The terms "Trustees" or "Board" shall mean the Trustees designated in this Restated Agreement together with their successors designated and appointed in accordance with the terms and procedures of this Trust Agreement.

3.06. The term "Trust Agreement" shall mean this Restated Agreement and Declaration of Trust, including any amendments, modifications, revisions or extensions hereof.

3.07. The terms "Fund", or " Health and Welfare Fund" or "Trust Fund" shall mean the funds held in trust for the purposes of this Trust Agreement, and shall consist of all monies due the Trust as Contributions, and any other property or income received and held by the Trustees for the uses and purposes set forth in this Trust Agreement.

3.08. The term "Dependents" shall mean the spouse of an Employee or an unmarried child of an Employee, all as determined in detail by such rules and regulations as the Trustees may adopt from time to time.

3.09. The term "Contributions" shall mean the payments required to be made by Employers to the Trust Fund pursuant to Collective Bargaining Agreements. Employees may not contribute to the Trust Fund in order to obtain or maintain eligibility under the Health and Welfare Plan, except as required by law.

3.10. The terms "Plan" or " Health and Welfare Plan" shall mean the Teamsters Local Union No. 727 Health and Welfare Plan, and any program, rules or regulations established by the Trustees, as from time to time amended, concerning benefits to be provided eligible Participants. The Trustees may adopt more than one Plan with different benefits, contribution levels, and other provisions. If more than one Plan is adopted, each shall be covered by the term "Plan" or " Health and Welfare Plan" as used in this Trust Agreement.

3.11. The term "Custodian" shall mean the bank or trust company, if any, selected by the Board of Trustees to hold the assets comprising the Trust Fund or to perform such functions in the administration of the Plan and the administration and investment of the Trust Fund as the Trustees may designate.

3.12. The term "Collective Bargaining Agreement" shall mean any collective bargaining agreement in force and effect from time to time between the Union and any association or any Employer which provides for Contributions to the Trust Fund. Such term shall also be deemed to include other written agreements by which any person or an Employer is obligated to make Contributions to the Trust Fund.

3.13. The term "Code" means the Internal Revenue Code of 1986, as amended.

3.14. The term "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

## ARTICLE FOUR

## APPOINTMENT, REMOVAL, VOTING, AND RESIGNATION OF TRUSTEES

4.01. The Trust Fund shall be administered by a Board of Trustees consisting of four Trustees, two of whom shall be designated as Employer Trustees and shall be appointed by the Employers or their representative, and two of whom shall be designated as Union Trustees and shall be appointed by the Union.

Thomas J. Moriarty and David Wolpin have been appointed as the Employer Trustees. John T. Coli and Becky Strzechowski have been appointed as the Union Trustees.

The number of Trustees may be increased or decreased by unanimous action of the Trustees so long as there is always an equal number of Employer and Union Trustees.

4.02. (a) Each Trustee shall serve until his death, incapacity, resignation,

5

removal, or replacement as herein provided.

(b)     A Trustee may resign at any time by giving at least ten (10) days' notice in writing to the remaining Trustees. The notice shall state the date the resignation shall take effect and the resignation shall be effective on that date unless a successor Trustee has been appointed, in which event the resignation shall take effect as of the date the successor files the written acceptance provided for under Section 4.05 of this Article.

4.03.   Any Union Trustee may be removed from office by the Union at any time. An Employer Trustee may be removed from office at any time by a weighted vote of the Employers who have made Contributions to the Fund during the three months preceding the voting.  Each such Employer shall have a number of votes equal to the amount of Contributions (other than delinquent Contributions) paid by that Employer during said three-month period.  Such vote shall be conducted whenever a request is supported by Employers who have contributed at least twenty-five percent (25%) of the Contributions (other than delinquent Contributions) received by the Fund during the three (3) months preceding the request.

Removal of a Trustee shall be evidenced by an instrument in writing signed by an accredited representative of the Union or the Employers, whichever initiated such action, and said instrument shall be delivered to all the Trustees.

4.04.   (a)     In the event of the death, removal, incapacity to act or resignation of an Employer Trustee, a successor Employer Trustee shall be appointed by the remaining  Employer Trustee, if any.  If no Employer Trustee is serving, nominations shall be solicited and an election shall be conducted in accordance with the procedures set forth in Section 4.03.  In the event of the death, removal, incapacity to act or resignation of a Union Trustee, a successor Union Trustee shall be appointed by the Union.

(b)     Any successor Trustee, by whomsoever designated, shall file his written

6

acceptance with the Board of Trustees and he shall thereupon become vested with all the duties, powers, rights, responsibilities and properties of a Trustee. No vacancy or vacancies in the office of Trustee shall impair the power of the remaining Trustees to administer the affairs of the Trust pending the filling of any vacancy or vacancies. Any Trustee who has resigned or who has been removed from office shall execute all necessary instruments.

4.05. A Trustee upon signing this Trust Agreement, or upon written acceptance filed with the Board in the case of any successor Trustee, shall be deemed to accept the Trust created and established by this Trust Agreement, to consent to act as Trustee, and to agree to administer the Trust Fund as provided herein.

4.06. The Trustees shall select from among the Trustees a Chairman and a Secretary, one of whom shall be an Employer Trustee and the other a Union Trustee. The term of office for such officers shall be for two (2) years or until his or their successors have been elected.

4.07. No successor Trustee shall be liable or responsible for any acts or defaults of any other Trustee or predecessor Trustee, or for any losses or expenses resulting from or occasioned by anything done or neglected to be done in the administration of the Trust Fund prior to his becoming a Trustee. A successor Trustee shall not be required to inquire into or take any notice of the prior administration of the Trust Fund.

4.08. The Trustees shall serve without compensation for their services hereunder as Trustees, but they may be reimbursed for expenses properly and actually incurred for Trust business; provided, however, that to the extent permitted by law, Trustees who are not receiving full-time pay from an Employer or the Union because of work performed on a particular day may be paid reasonable compensation, including fringe benefits and reasonable expenses, for services rendered as a Trustee on said day. The amount of compensation to be paid shall be established by the Trustees from

7

time to time.

4.09. (a) Regular meetings of the Trustees may be held at such time or times as may be established by the Trustees but not less than annually. Meetings may also be held at any time without notice if all of the Trustees consent. Meetings may be held in conjunction with Trustee meetings of other Trust Funds covering Participants. Special meetings may be called at any time by the Chairman or the Secretary of the Board, upon giving five (5) days' written notice to all other Trustees. Notice may be waived by agreement of all Trustees. Minutes of all meetings shall be kept, but not necessarily verbatim and copies thereof shall be furnished to the Trustees.

(b)     Any action by the Trustees may be taken either at a meeting, by a phone poll, in a conference call, or in writing without a meeting. Concurrence of all the Trustees, evidenced by their written signatures, shall be required for action taken without a meeting.

(c)     Two Trustees shall constitute a quorum at any regular or special meeting of the Trustees, provided that one Union Trustee and one Employer Trustee are present.

(d)     Unless otherwise specified herein, the concurring vote of a majority of the Trustees present and voting shall be required to carry any motion or resolution. Each Union Trustee and each Employer Trustee shall be entitled to cast one (1) vote on each motion or resolution; provided, however, that the vote of any absent Trustee shall be allocated among the group of Trustees of which he is a member so that both groups will have an equal number of votes.

(e)     A deadlock of the Trustees shall be deemed to exist if a quorum is not present at two successive properly scheduled meetings, or if the vote of the Trustees is equal on any proposal. Whenever a deadlock exists, the Trustees shall first seek mediation in an endeavor to break such deadlock, and if that proves unavailing (or if the Trustees agree to waive mediation), either group of Trustees may advise the other

8

group of Trustees that they wish to submit the deadlocked issue for arbitration by an impartial person to be selected by the Trustees. Should they fail to agree on the impartial person within ten (10) days, any Trustee may petition the American Arbitration Association for a list of five (5) impartial arbitrators experienced in employee benefit fund disputes. The Trustee groups shall alternately and expeditiously strike names from said list and the remaining name shall be the impartial arbitrator. The order of striking shall be determined by chance. The arbitrator's decision shall be final and binding on the Trustees and his fees and expenses, as well as the joint expenses incidental to his activities and the arbitration, shall be paid from the Trust Fund.

4.10. (a) The Health and Welfare Fund and the Board of Trustees shall be bound by the signatures of the Chairman and Secretary. In addition, any instrument may be executed on behalf of the Board by one or more Trustees designated for that purpose by the Board, or by the signature of any other person or persons designated for that purpose by the Board.

(b) Upon the signing of any instrument by an authorized person, all persons, partnerships, corporations or associations may rely thereon that such instrument has been duly authorized by action of the Board of Trustees.

## ARTICLE FIVE
### POWERS, DUTIES AND OBLIGATIONS OF THE TRUSTEES

5.01. The Trustees shall supervise the operation of the Trust and shall conduct the business and activities of the Trust. The Trustees shall hold, manage, care for, and protect the Trust Fund and shall collect the income and Contributions made to the Fund.

5.02. The Trustees are hereby empowered to do all acts, whether or not expressly authorized herein, which the Trustees may deem necessary to accomplish the general objectives of maintaining the Plan and Trust solely in the interest of the Participants and for the exclusive purpose of (1) providing benefits to Participants; and

9

(2) defraying reasonable expenses of administering the Plan and Trust.

5.03. The Trustees are authorized, empowered and directed to invest and reinvest the funds of the Trust in any property or undivided interest therein, including but not limited to bonds, notes, real estate, common and preferred stocks, and interests in trusts, including common trust funds, without being limited by any statute or rule of law concerning investments by trustees. The Trustees may sell or otherwise dispose of such securities or property at any time and may, in their sole discretion, invest the Trust Fund or any part thereof in group contracts, and such other forms of contracts, if the contracts are issued by insurance companies authorized to do business in the State of Illinois, for the purpose of providing for all or a part of the benefits provided under this Trust. The Trustees shall have power (in addition to, and not in limitation of, common law and statutory authority) to exercise in respect to any stocks, bonds, or other property, real or personal, all such rights, powers, and privileges as might be lawfully exercised by any person owning similar stocks, bonds, or other property in his own right.

All or any part of the Trust assets may be invested in any collective investment trust fund qualified as tax exempt under Section 501(a) of the Internal Revenue Code, or amendments thereof, which is then maintained by any bank or trust company whether or not acting as a trustee, co-trustee, or agent for the Trustees hereunder. The document governing each such collective investment trust, as amended from time to time, shall govern any investment therein, and is hereby made a part of this Trust Agreement.

The Trustees shall have the power to borrow from any bank, savings and loan association, insurance company, or any other money lending firm or institution, such sums, and on such terms and conditions, which the Trustees may from time to time determine. The Trustees may hypothecate, mortgage, pledge or otherwise collateralize or secure any indebtedness so created with assets of this Trust; provided, however, that

10

any resolution presented to the Trustees pursuant to the powers contained in this paragraph must be adopted by the affirmative vote of not less than three-fourths of the Trustees, regardless of the number of Trustees present at any meeting.

Such investment actions shall be taken with the care, skill, prudence and diligence, under the circumstances then prevailing, that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. Such actions shall include the diversification of the Fund's investments so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so, and all such actions shall be in accordance with the documents and instruments governing the Trust and Plan insofar as such documents and instruments are consistent with applicable law.

If one or more Investment Managers have been appointed in accordance with the terms of this Restated Agreement, no Trustee shall be liable for the acts or omissions of any such Investment Manager(s) or under any obligation to invest or otherwise manage any asset of the Fund which is subject to the management of any such Investment Manager.

5.04. The Trustees are hereby empowered to allocate fiduciary responsibilities among the Trustees and to designate persons other than Trustees to carry out fiduciary responsibilities as provided in this Restated Agreement. The power to allocate fiduciary responsibility shall not apply to the application of the responsibility to manage the assets of the Fund other than the power to appoint an Investment Manager or Managers.

The Trustees shall have exclusive authority and discretion to manage and control the assets of the Fund except to the extent that such authority to manage, acquire, or dispose of the assets of the Fund is delegated to one or more Investment Managers in accordance with the following paragraph.

The Trustees are empowered to appoint an Investment Manager(s) to manage, acquire, or dispose of any assets of the Fund. An "Investment Manager" is any

11

fiduciary who has been designated by the Trustees to manage, acquire or dispose of any assets of the Fund, who has acknowledged in writing that it is a fiduciary with respect to the Fund and who is: (i) registered as an investment adviser under the Investment Advisers Act of 1940; or (ii) is a bank, as defined in that Act; or (iii) is an insurance company qualified to perform such services under the laws of more than one state.

5.05. The Board and each Trustee, to the extent permitted by applicable law, shall be fully protected in acting upon any instrument, certificate or paper believed by them to be genuine and to be signed or presented by the proper person or persons and shall be under no duty to make any investigation of, or inquiry as to, any statement contained in such record, but may accept the same as conclusive evidence of the truth of the statements therein contained.

No Trustee shall be liable for any acts or defaults of any prior Trustee, any other Trustee, any other fiduciary, any party in interest or any other person except to the extent required by applicable law; it being the intent and purpose of the parties hereto that, to the extent permitted by law, each Trustee shall be liable only for his own acts or omissions occurring during his term of service as Trustee.

5.06. The cost and expenses of any action, suit or proceeding brought by or against the Board or any Trustee, including counsel fees, shall be paid from the Trust Fund if permitted by law, except in relation to matters as to which it shall be adjudged in such action, suit or proceeding that the Board or such Trustee was acting in bad faith or was grossly negligent in the performance of his duties hereunder.

5.07. No individual or person may act as agent for the Fund or the Plan unless specifically authorized by this Restated Agreement or in writing by the Trustees. Neither an Employer nor the Union, or any representative of an Employer or the Union, in such capacity, is authorized to interpret the Plan or Trust Agreement, nor can any such person act as agent of the Trustees. Only the Board of Trustees is authorized to

12

interpret the Plan or Trust Agreement.

5.08. The Trustees shall keep true and accurate books of account and a record of all their transactions, meetings and the actions taken at such meetings or by informal action of the Trustees.

5.09. The Trustees shall procure an audit of the books of the Trust by a Certified Public Accountant not less frequently than once for each fiscal year and a copy of each such audit shall be furnished, upon request, to each Trustee, and a copy of such audit shall be kept available for inspection by authorized persons during business hours at the office of the Trustees for the time required by law and/or for the time required by the rules and regulations of the Fund.

5.10. The Trustees are hereby authorized to formulate and promulgate any and all necessary rules and regulations which they deem necessary or desirable to facilitate the proper administration of the Trust or Plan. All rules and regulations adopted by majority action of the Trustees for the administration of the Trust Fund shall be final and binding upon all parties hereto, all parties dealing with the Trust, and all persons claiming any benefits hereunder. The Trustees shall have the exclusive authority and discretion to interpret and apply this Trust Agreement and the Health and Welfare Plan, including questions involving eligibility for benefits and the standard of proof to be required in any matter, and all such interpretations and applications shall be final and binding upon all parties and claimants. Benefits under the Plan will be paid only if the Board of Trustees determines in its discretion that the individual is entitled to the benefits.

5.11. The Trustees shall use and apply the Trust Fund for the following purposes:

(a) To pay or provide for the payment of all expenses of collecting the Contributions and administering the affairs of this Trust, including the employment of such administrative, custodial, legal, actuarial, accounting, expert, and clerical

13

assistance as may be necessary, the purchase or the lease of such premises as may be necessary for the operation of the affairs of the Trust, and the purchase or lease of such materials, supplies and equipment as the Trustees in their discretion find necessary or appropriate to the performance of their duties.

(b)     To pay or provide for benefits to eligible Participants and their Dependents.

(c)     To pay or provide for the payment of expenses incidental to the operation of an office, as well as incidental matters affecting Participants and their interests, such as attendance at Union-related activities concerning Participants and their Dependents.

(d)     To pay or provide for the payment of expenses and lawful compensation of Trustees and/or Fund employees in connection with attendance at educational conferences and seminars.

5.12.   The receipt of the Trustees for any money or property received by them shall discharge the person or persons paying or transferring the same.

5.13.   All Trust Funds not invested shall be deposited by the Trustees in such depository or depositories ("Custodian") as the Trustees shall from time to time select and any such deposit or deposits shall be made in the name of the Trust.  Any Trustee authorized to deposit, transfer or withdraw funds held in a trust account(s) shall have the authority to transfer, by wire or phone, such funds to a benefit or checking account.

Except as provided otherwise by Resolution of the Trustees, all such funds may be disbursed by check or draft signed by at least one Employer Trustee and one Union Trustee.

To the extent permitted by law, no Trustee shall be liable in any manner for any loss to the Fund occasioned by the fault or negligence of any Custodian selected by the Trustees in good faith and in the exercise of reasonable business judgment.

5.14.   The Trustees are empowered to determine the terms and conditions upon which either an additional craft or class of employees or an additional employer and its

14

employees may participate in the Fund, and to enter into reciprocal agreements with trustees of other trust funds when to do so, in the opinion of the Trustees, would effectuate the purposes of this Trust Agreement.

5.15. Statements, documents, or notices to the Trustees, the Union, or any Employer hereunder shall, unless otherwise specified, be sufficient if in writing and delivered to or sent by pre-paid first class mail or by facsimile.

5.16. The Trustees are hereby empowered, in addition to such other powers as are set forth herein or conferred by law:

(a) To formulate, adopt and administer one or more Health and Welfare Plans, for the exclusive benefit of eligible Participants and, thereafter, to amend said Plans whenever the Trustees deem it advisable. The Trustees may provide for benefits for the Dependents of Participants. The Health and Welfare Plan and all amendments thereto shall be filed by the Trustees as part of the records and minutes of the Trustees. Any benefits provided to a Participant, and/or Dependent, shall be paid solely out of the assets of the Trust Fund.

(b) To promulgate and establish rules and regulations for the administration and operation of the Health and Welfare Plan in order to effectuate the purposes thereof; and in pursuance thereof (but without limitation on the powers of the Trustees by reason of such enumeration), to formulate and establish the conditions of eligibility, qualifications for benefits, the method of providing benefits, and any and all matters which they, in their discretion, may deem necessary or proper to effectuate the purposes and intent of the Health and Welfare Plan. No rule or regulation shall conflict with the terms of this Trust Agreement.

(c) To enter into any and all contracts and agreements for carrying out the terms of this Restated Agreement and for the administration of the Trust Fund and to do all acts as they, in their discretion, may deem necessary or advisable, and such contracts, agreements and acts shall be binding and conclusive on the parties and the

15

Participants.

(d) To keep property and securities registered in the name of the Trustees or in the name of the Custodian or a nominee(s), or in unregistered or bearer form, without disclosure of any fiduciary relationship.

(e) To establish and accumulate as part of the Trust Fund a reserve or reserves adequate, in the opinion of the Trustees, to carry out the purposes of the Trust and Plan.

(f) To pay out of the funds of the Trust all real and personal property taxes, income taxes and other taxes of any and all kind levied or assessed under existing or future laws upon or in respect to the Trust Fund or any money, property or securities forming a part thereof.

(g) To compromise, arbitrate, settle, adjust or release any suit or legal proceeding, claim, debt, damage or understanding due or owing from or to the Health and Welfare Fund on such terms and conditions as the Trustees, in their sole discretion, may deem advisable.

(h) To consult with legal counsel with respect to the meaning or construction of this Restated Agreement and the Plan, or their obligations and duties hereunder, or with respect to any action or proceeding, or any question of law, and shall be fully protected, to the extent permitted by law, with respect to any action taken or omitted by them in good faith pursuant to the advice of counsel. Legal counsel may, but need not be, counsel to the Union or any Employer.

(i) To do all acts, whether or not expressly authorized herein, which the Trustees deem necessary or proper.

5.17. The Trustees shall provide for fidelity bonds, in such form and amounts as may be required by statute, for their fiduciaries and every person who handles funds or other property of the Trust Fund. If no such statutory requirement shall exist, such bonds shall be in such form and amounts as the Trustees may determine. In addition,

the Trustees may purchase insurance for their fiduciaries and for themselves to cover liabilities or losses occurring by reason of the act or omission of a fiduciary; provided, however, that any such insurance policies shall be in the form and manner permitted by law.

5.18. The Board may employ a Fund Manager who may, but need not be, a Trustee, and delegate to such Fund Manager the authority to act upon all matters in connection with the administration of the Trust and Plan, including the authorization to execute those documents which, in the sole discretion of the Trustees, are deemed necessary for the day-to-day administration of the Trust and Plan; the responsibility of accounting for the Contributions made to the Trust Fund and the collection of delinquent Contributions; and such other function as the Board may deem advisable. Any Fund Manager so appointed may be employed part-time, may provide similar services for other funds and may engage in unrelated employment activities.

5.19. The Trustees shall have and maintain an office in the State of Illinois which shall be deemed the situs of the Trust Fund, and which may be in the office building of the Union.

5.20. It is further agreed and understood that there is no liability upon the Union, any Employer, the Trustees, or the Fund for the direct payment of any benefit which has been contracted for by the Trustees in the case of a default of any insurance carrier or otherwise. In the event of any failure or omission by any insurance carrier to pay any benefit, the sole right of any Participant or Dependent hereunder shall be to assert a claim against said insurance company.

5.21. The Union and the Employers assume no obligation or responsibility to any person for any act or failure to act of the Trustees, the attorneys, any insurance company, or any Participant. The Trustees shall have no obligation or responsibility regarding any action required by the Collective Bargaining Agreement, the Plan or this Trust Agreement to be taken by the Union or the Employers, any insurance company, or

17

any other person, or for the result of the failure of any of the above to act. Any person or entity providing professional services to any Participant or Dependent shall maintain professional liability insurance or agree in writing to indemnify and hold harmless the Trustees for any liability imposed upon the Trustees as result of the actions of the professional.

5.22. In order to be eligible for any hospital, surgical, medical, or disability benefits payable to or on behalf of any Employee or Dependent who is a Participant with respect to an injury or illness for which the Employee or Dependent has a right of recovery against any person, company, policy, or organization, the Participant (including the Employee or spouse on behalf of a minor Dependent) shall reimburse the Fund to the full extent of such payments, regardless of whether it is the Employee or the Dependent who makes the recovery or receives the settlement or is entitled to the recovery or settlement. The Trustees may provide for the offset of future claims of any Employee or Dependent to recoup any sum not reimbursed. The Employee, Dependent, and his/her attorney shall be required to sign an Agreement to Repay and to furnish such information and to execute and deliver such documents deemed necessary in order to determine whether the Fund is entitled to reimbursement. The Agreement to Repay shall include the Employee's, Dependent's, and attorney's agreement that no attorney's fees shall be deducted from the Fund's recovery and that this Agreement to Repay shall be governed by federal law and the terms of the Trust Agreement and Plan. Included in the right to reimbursement is the right to be subrogated to all such rights as the Employee or Dependent may have, but the right to recovery shall be independent of any right of subrogation. The Trustees determined that the substantive benefits provided under the Plan would be adversely affected by the Fund's inability to enforce the provisions of this Section.

18

## ARTICLE SIX

## CONTRIBUTIONS

6.01. (a) The Contributions of the Employers shall be made to the Fund, in accordance with the various Collective Bargaining Agreements with the Union and with the rules and regulations adopted by the Trustees, provided that such Contributions shall be subject to acceptance by the Trustees. Each Employer agrees that there shall be an absolute obligation to the Trust Fund, and such obligation shall not be subject to a set-off or counterclaim which the Employer may have for any liability of the Union. The Trustees shall give consideration to the contribution rate in determining the benefits of any Plan maintained or adopted. Non-payment by an Employer of any Contributions as required by its Collective Bargaining Agreement shall not relieve any other Employer of its own obligation to make Contributions. Employees may not contribute to the Trust Fund in order to obtain or maintain eligibility under the Health and Welfare Plan, except as required by law.

(b) The Trustees may compel and enforce the payment of Contributions in any manner which they may deem proper but without limitation upon any rights and privileges the Union may have in this connection. Expenses incurred in the collection of such Contributions shall be paid from the Trust Fund, even though such expenses are subject to reimbursement by the delinquent Employer.

6.02. The failure of an Employer to pay Contributions by the date established by the Collective Bargaining Agreements or, if no date is set by the Collective Bargaining Agreement, by the rules and regulations adopted by the Trustees shall constitute a violation of the applicable Collective Bargaining Agreement between such Employer and the Union, as well as a violation of the Employer's obligations hereunder.

The Trustees shall have the right to adopt rules and regulations relating to the collection of Employer Contributions, including provisions for time of payment, collection of interest, audit fees, attorneys' fees at the rate set by the Trustees in their sole

discretion, costs, and liquidated damages as specified in this Section. An Employer in default as of the date established by the Collective Bargaining Agreement or the Trustees for payment of Contributions shall be liable for an additional amount of twenty percent (20%) of the delinquent payment or $50.00, whichever is greater, and interest at the rate set forth in the Plan or the rules and regulations. In the absence of a rate set forth in the Plan or rules and regulations, the interest rate used each month shall be the prime rate plus one percent (1%), as reported in the Wall Street Journal on the first business day of each month. Liquidated damages shall compensate the Fund for some or all of the damages arising from lost earnings, administrative costs, uncertainties causing difficulties in forecasting earnings and managing investments, the disruptive effects to the benefit system of unequal performance of obligations among Employers, and the potential liability of Trustees for transactions prohibited by federal law.

The Trustees may require a delinquent Employer or new Employer to deposit with the Trustees, in cash, or by a bond with corporate surety, an amount not to exceed three (3) months' estimated Contributions, as determined by the Trustees.

The Trustees may waive all or part of the liquidated damages and interest where Contributions are found by the Trustees to have been delinquent as a result of clerical errors or administrative problems beyond the control of an Employer and where there have been good faith efforts by the Employer to comply with the applicable rules and regulations for payment of Contributions.

6.03. Each Employer and its affiliated or related companies or businesses shall furnish to the Trustees on demand the names of all employees, their Social Security numbers, the time worked by each employee, the Contributions due or payable to the Trust Fund, and such other information, including cash journals, wage and payroll records, income tax records, and other business records, as the Trustees or their agents may reasonably require in connection with the administration of the Trust. The

20

Trustees, or their authorized representative, shall have the right to examine and audit the pertinent books and records (as determined by the Trustees) of each Employer and its affiliated or related companies whenever such examination is deemed necessary or advisable by the Trustees in connection with the proper administration of the Trust. All Employers shall annually furnish to the Trustees, if requested by them, a statement showing whether (a) the Employer is a corporation and the names of all of its officers and shareholders (and the percentage of stock held by each) or (b) if not a corporation, a statement showing that it is a partnership or an individual proprietorship and furnishing the names of the partners or the name of the individual proprietor.

6.04. Nothing in this Restated Agreement shall prevent a Contribution which is made by an Employer by a mistake of fact or law to be returned by the Trustees to such Employer, upon written request, within twelve months after the Trustees determine that the Contribution was made by such a mistake.

6.05. The Trustees may require Employers to deposit with the Trustees, in advance as a guarantee for the payment of monthly contributions, an amount to be determined by the Trustees as a condition to such Employer's participation herein and to require that said guarantee be continuously maintained by such Employer as a condition to the continued participation herein.

## ARTICLE SEVEN
## CONTROVERSIES AND DISPUTES

7.01. In any controversy, claim, demand, suit at law or other proceeding between any Employee, Dependent, or any other persons and the Trustees, the Trustees shall be entitled to rely upon any facts appearing in the records of the Trustees, any instruments on file with the Trustees, with the Union, affiliated employee benefit funds, or with any Employer, any facts certified to the Trustees by the Union or any Employer, any facts which are of public record, and any other evidence pertinent to

21

the issue involved.

7.02.  All questions or controversies arising in any manner between any parties or persons in connection with the Trust Fund or its operation, whether as to any claim for any benefits by an Employee, Dependent or any other person, or whether as to the construction of the language or meaning of the rules and regulations adopted by the Trustees or this instrument, or as to any writing, decision, instrument or accounts in connection with the operation of the Trust Fund shall be submitted to the Board of Trustees for decision.  The decision of a majority of the Board shall be binding upon all persons dealing with the Trust Fund or claiming any benefit thereunder.

## ARTICLE EIGHT
## SPENDTHRIFT CLAUSE

No monies, property, equity or interest of any nature whatsoever in the Trust Fund, or in any benefits or monies payable therefrom, shall be subject, in any manner by any Participant, Dependent, or person claiming through such person, to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, garnishment, mortgage, lien or charge, and any attempt to cause the same to be subject thereto shall be null and void.  If a Participant or Dependent shall attempt to or shall alienate, sell, transfer, assign, pledge, mortgage or otherwise encumber his benefits under the  Health and Welfare Plan or any part thereof, or if by reason of his bankruptcy or other event happening at any time, such benefits would devolve upon anyone else or would not be enjoyed by him, the Trustees in their discretion may terminate his interest in any such benefit and hold it to, or apply it for, the benefit of such Participant, or his Dependent, in such manner as the Trustees may deem proper.

22

## ARTICLE NINE

## PAYMENT TO PERSONS UNDER LEGAL DISABILITY

If any benefit payments become payable to a person under legal disability or to a person not adjudicated incompetent but who, by reason of mental or physical disability, is unable in the opinion of the Trustees to administer properly such payments, then such payments may be paid out by the Trustees for the benefit of such person in any of the following ways:

(a)    Directly to any such person;

(b)    To the legally appointed guardian or conservator of such person;

(c)    To any spouse, child, parent, brother or sister of such person for his welfare, support and maintenance;

(d)    By the Trustees using such payments directly for the support, maintenance and welfare of any such person.

The Trustees shall have no duty or obligation to see that any such payments are used or applied for the purpose or purposes for which paid.

## ARTICLE TEN

## AMENDMENT OF AGREEMENT

It is anticipated that in the administration of this Trust conditions may arise that are not foreseen at the time of the execution of this Restated Agreement. It is the intention of the parties that the power of amendment, which is hereinafter given, be exercised in order to carry out the provisions of this Trust, among which is to pay the largest benefits possible which are consistent with the number of Participants becoming and likely to become eligible for such payments, the amount of funds which are available and which will probably become available, and sound actuarial practice. Therefore, the Trustees are given the power to amend this Restated Agreement by majority vote at any time, and from time to time, and all parties to the Trust and all

23

persons claiming an interest thereunder shall be bound thereby.

No Participant or any other person shall have any vested interest or right in the Trust Fund or in any payments from the Trust Fund, except to the extent granted by the Health and Welfare Plan. The Trustees shall have full authority, if consistent with federal law, to amend, repeal, add to, or take away any right or payment, retroactive or otherwise, that they deem proper for the preservation of this Trust Fund; provided, however, in no event shall the Trust Fund be used for any purpose other than the purposes set forth in this Restated Agreement and for the purposes of paying the necessary expenses incurred in the administration of this Trust.

## ARTICLE ELEVEN
### TERMINATION AND MERGER OF TRUST

11.01. In the event the obligation of all Employers to make Contributions shall cease, or the Trust Fund, in the opinion of the Trustees, is inadequate to carry out the intent and purposes of the Trust, the Trustees shall apply the Trust Funds to the payment of expenses and to the purposes specified in Article Two so far as possible; any balance of the Trust Fund which cannot be applied shall be applied to such other uses as, in the opinion of the Trustees, will best accomplish the purposes for which the Trust was established. Upon the disbursement of the entire Trust Fund, the Trust shall terminate. In no event, upon termination, shall any assets of the Trust Fund revert to any Employer.

11.02. In the event this Trust is subject to the rule against perpetuities as existing in the law of the State of Illinois, at the time in this Article fixed for the termination of the Trust, the Trust shall terminate twenty (20) years after the date of the death of the last of the Participants covered by this Restated Agreement at the time of the execution of this Restated Agreement.

11.03. Upon termination, the Trustees shall notify the Union and each Employer

24

contributing to the Fund, and any other person, partnership, corporation or association with whom they are dealing, and shall continue as Trustees for the purpose of dissolution.

11.04. In lieu of the distribution and liquidation upon termination as set forth in Section 11.01, the Trustees may, after all obligations of the Trust have been satisfied, turn over any surplus monies and property in the Fund to any future health and welfare trust that may be created by and between Employers and the Union pursuant to collective bargaining agreements.

11.05. In addition to any other authority granted under this Trust Agreement, the Trustees shall have the authority to merge this Trust Fund with another trust fund providing for the same or similar benefits. The terms and conditions of such a merger shall be within the sole discretion of the Trustees.

## ARTICLE TWELVE

## MISCELLANEOUS

12.01. In no event shall the Employers, directly or indirectly, receive any refund of Contributions, except as provided in Section 6.04, participate in the disposition of the Trust Fund, or receive any benefits from the Trust Fund. Upon payment to the Trustees, all responsibilities of the Employers for Contributions shall cease and the Employers shall have no responsibilities for the acts of the Trustees. No Participant or Dependent shall have any individual right, title, interest or claim against any Employer, Employer's Contribution, or the Trust Fund, except as may be expressly provided for in this Restated Agreement.

12.02. The Trustees shall be entitled, at any time, to have a judicial settlement of their accounts and judicial determination of any questions in connection with their duties and obligations under this Trust, or in connection with the administration or distributions thereof.

25

12.03. In the event any question or dispute shall arise as to the proper person or persons to whom any payments shall be made hereunder, the Trustees may withhold such payment until an adjudication of such question or dispute, satisfactory to the Trustees in their sole discretion, is made or the Trustees have been adequately indemnified against loss.

12.04. Where used in this Restated Agreement, words in the masculine shall be read and construed as in the feminine and words in the singular shall be read and construed as though used in the plural, in all cases where such construction would so apply.

12.05. The Article titles are included solely for convenience and shall, in no event, be construed to affect or modify any part of the provisions of this Restated Agreement or be construed as part thereof.

12.06. This Restated Agreement shall in all respects be construed according to, and be governed by, the laws of the State of Illinois, except as may be otherwise provided by federal law.

12.07. Neither this Trust Agreement nor any amendments thereto, nor any rules and regulations adopted for the administration of the same, nor any award of any arbitrator appointed hereunder shall modify the Collective Bargaining Agreements between the Union and any association or any Employer or add to or alter the obligations of the Employers or the Union thereunder. The provisions of this paragraph shall in no event be subject to amendment.

12.08. No Employer nor the Union shall at any time, and under any circumstances or conditions, have any financial obligations under this Trust or the Health and Welfare Plan other than the payment of any required Contributions and such other amounts as may be provided for under Article Six.

26

## ARTICLE THIRTEEN

## SAVINGS CLAUSE

Should any provision of this Restated Agreement be held to be unlawful, such fact shall not adversely affect the other provisions herein contained, or the application of said provisions, unless such illegality shall make impossible the functioning of the Trust or Plan. Except to the extent required by law, no Trustee shall be held liable for any act done or performed in pursuance of any provision hereof prior to the time such act or provisions shall be held unlawful by a court of competent jurisdiction.

IN WITNESS WHEREOF, the Trustees have caused this Restated Agreement to be executed this 25th day of July, 2000.

UNION TRUSTEES:

EMPLOYER TRUSTEES:

27

## Amendment to the Restated Agreement and Declaration of Trust of the Teamsters Local Union No. 727 Health and Welfare Fund

Whereas, the Board of Trustees has the authority to amend the Restated Agreement and Declaration of Trust of the Teamsters Local Union No. 727 Health and Welfare Fund, and

Whereas, the Board of Trustees desires to increase the number of Trustees representing contributing employers and Local 727,

Now, therefore, it is hereby resolved effective February 24, 2005, that Article Four is amended, in part, to provide as follows:

## ARTICLE FOUR

## APPOINTMENT, REMOVAL, VOTING, AND RESIGNATION OF TRUSTEES

4.01. The Trust Fund shall be administered by a Board of Trustees consisting of six (6) Trustees, three (3) of whom shall be designated as Employer Trustees, and three (3) of whom shall be designated as Union Trustees.

Thomas J. Moriarty and Carl Tominberg have been appointed as the Employer Trustees. John T. Coli and Becky Strzechowski have been appointed as the Union Trustees. Effective February 24, 2005, the incumbent Employer Trustees shall have the authority to appoint the third Employer Trustee; the Union Trustee shall be appointed by the Union.

The number of Trustees may be increased or decreased by unanimous action of the Trustees so long as there is always an equal number of Employer and Union Trustees.

4.02. (a)    Each Trustee shall serve until his death, incapacity, resignation, removal, or replacement as herein provided.

(b)    A Trustee may resign at any time by giving at least then (10) days' notice in writing to the remaining Trustees.  The notice shall state the date the resignation shall take effect and the resignation shall be effective on that date.

4.03.  Any Union Trustee may be removed from office by the Union at any time. An Employer Trustee may be removed from office by the unanimous vote of the other two (2) Employer Trustees.

Removal of a Trustee shall be evidenced by an instrument in writing signed by an accredited representative of the Union or by the Employer Trustees, whichever initiated such action, and said instrument shall be delivered to all the Trustees.

4.04. (a)    In the event of the death, removal, incapacity to act, or resignation of an Employer Trustee, a successor Trustee(s) shall be appointed by the remaining Employer Trustee(s).  In the event of the death, removal, incapacity to act, or resignation of a Union Trustee, a successor Union Trustee shall be appointed by the Union.

(b)    Any successor Trustee, by whomsoever designated, shall file his written acceptance with the Board of Trustees and he shall thereupon become vested with all the duties, powers, rights, responsibilities and properties of a Trustee.  No vacancy or vacancies in the office of Trustee shall impair the power of the remaining Trustees to administer the affairs of the Trust pending the filling of any vacancy or vacancies.  Any Trustee who has resigned or who has been removed from office shall execute all necessary instruments.

2

3

This Amendment is approved and adopted this 24th day of February 2005.

**UNION TRUSTEES**                                    **EMPLOYER TRUSTEES**

3

**Amendment to the Restated Agreement and
Declaration of Trust of the
Teamsters Local Union No. 727
Health and Welfare Fund**

Whereas, the Board of Trustees has the authority to amend the Restated Agreement and Declaration of Trust of the Teamsters Local Union No. 727 Health and Welfare Fund, and

Whereas, the Board of Trustees desires to allow employee contributions,

Now, therefore, it is hereby resolved that effective November 21, 2006, that Article SIX is amended, in part, to provide as follows:

## ARTICLE SIX

## CONTRIBUTIONS

6.01. (a) The Contributions of the Employers shall be made to the Fund, in accordance with the various Collective Bargaining Agreements with the Union and with the rules and regulations adopted by the Trustees, provided that such Contributions shall be subject to acceptance by the Trustees. Each Employer agrees that there shall be an absolute obligation to the Trust Fund, and such obligation shall not be subject to a set-off or counterclaim which the Employer may have for any liability of the Union. The Trustees shall give consideration to the contribution rate in determining the benefits of any Plan maintained or adopted. Non-payment by an Employer of any Contributions as required by its Collective Bargaining Agreement shall not relieve any other Employer of its own obligation to make Contributions. Employees may contribute to the Trust in order to establish or maintain eligibility in accordance with rules established by the Trustees from time to time.

-1-

This Amendment is approved and adopted this 21st day of November 2006.

UNION TRUSTEES:                    EMPLOYER TRUSTEES:

**Amendment No. 3 to the Restated Agreement and
Declaration of Trust of the
Teamsters Local Union No. 727
Health and Welfare Fund**

Whereas, the Board of Trustees has the authority to amend the Restated Agreement and Declaration of Trust of the Teamsters Local Union No. 727 Health and Welfare Fund, and

Whereas, the Board of Trustees desires to increase number of Trustees representing contributing employers and Local 727,

Now, therefore, it is hereby resolved that effective December 19, 2007, that Article Four is amended, in part, to provide as follows:

## ARTICLE FOUR

## APPOINTMENT, REMOVAL, VOTING, AND RESIGNATION OF TRUSTEES

4.01. The Trust Fund shall be administered by a Board of Trustees consisting of eight (8) Trustees, four (4) of whom shall be designated as Employer Trustees, and four (4) of whom shall be designated as Union Trustees.

Thomas J. Moriaty, Carl Tominberg and Greg Youmans have been appointed as the Employer Trustees. John T. Coli and Becky Stzechowski have been appointed as the Union Trustees. Effective December 19, 2007, the incumbent Employer Trustees shall have the authority to appoint the fourth Employer Trustee; the Union Trustees shall be appointed by the Union.

The number of Trustees may be increased or decreased by unanimous action of the Trustees so long as there is always an equal number of Employer and Union Trustees.

4.03. Any Union Trustee may be removed from office by the Union at any time. An Employer Trustee may be removed from office by the unanimous vote of the other three (3) Employer Trustees.

Removal of a Trustee shall be evidenced by an instrument in writing signed by an accredited representative of the Union or by the Employer Trustees, whichever initiated such action, and said instrument shall be delivered to all the Trustees.

This Third Amendment is approved and adopted this 19th day of December 2007.

UNION TRUSTEES:                              EMPLOYER TRUSTEES:

-2-

## Amendment No. 4 to the Restated Agreement and
## Declaration of Trust of the
## Teamsters Local Union No. 727 Health and Welfare Fund

Whereas, the Board of Trustees has the authority to amend the Restated Agreement and Declaration of Trust of the Teamsters Local Union No. 727 Health and Welfare Fund, and

Whereas, the Board of Trustees desires to clarify the potential sources of contributions to the Trust,

Now, therefore, it is hereby resolved that effective November 1, 2011, that Article Six, section 6.01(a) is amended, to replace the existing text with the following:

## ARTICLE SIX

## CONTRIBUTIONS

6.01. (a) The Contributions of the Employers shall be made to the Fund, in accordance with the various Collective Bargaining Agreements with the Union and with the rules and regulations adopted by the Trustees, provided that such Contributions shall be subject to acceptance by the Trustees. Each Employer agrees that there shall be an absolute obligation to the Trust Fund, and such obligation shall not be subject to a set-off or counterclaim which the Employer may have for any liability of the Union. The Trustees shall give consideration to the contribution rate in determining the benefits of any Plan maintained or adopted. Non-payment by an Employer of any Contributions as required by its Collective Bargaining Agreement shall not relieve any other Employer of its own obligation to make Contributions. Employees may not contribute to the Trust Fund in order to obtain or maintain eligibility under the Health and Welfare Plan, except in the case of Supplemental Contributions and COBRA continuation coverage.

This Fourth Amendment is approved and adopted this 1st day of November 2011.

UNION TRUSTEES:                    EMPLOYER TRUSTEES:

-2-

Amendment No. 5 to the Restated Agreement and
Declaration of Trust of the
Teamsters Local Union No. 727 Health and Welfare Fund

Whereas, the Board of Trustees has the authority to amend the Restated Agreement and Declaration of Trust of the Teamsters Local Union No. 727 Health and Welfare Fund, and

Whereas, the Board of Trustees desires to revise certain definitions.

Now, therefore, it is hereby resolved that Article Three is amended to read as follows:

## ARTICLE THREE

## DEFINITION OF TERMS

3.02    The term "Employer" shall mean all employers who have a Collective Bargaining Agreement or other written agreement with the Union or Other Labor Organization which requires Contributions be made to the Trust Fund.   For the purposes of the Plan only, the Union, this Trust Fund ("Health and Welfare Fund"), the Teamsters Local Union No. 727 Pension Fund ("Pension Fund"), and the Teamsters Local Union No. 727 Legal and Educational Assistance Fund ("Legal and Educational Assistance Fund") will be considered Employers with respect to the officers and employees of each for whom Contributions are paid, but shall not participate in the selection or removal of Employer Trustees as hereinafter provided.

3.12    The term "Collective Bargaining Agreement" shall mean any collective bargaining agreement in force and effect from time to time between the Union or Other Labor Organization and any association or any Employer which provides for Contributions to the Trust Fund.  Such term shall also be deemed to include other written agreements by which any person or an Employer is obligated to make Contributions to the Trust Fund.

3.15.   The term "Other Labor Organization" shall mean any labor organization which has been accepted by the Trustees for participation in the Plan.  An Employer obligated to contribute to the Trust Fund pursuant to a written Agreement with an Other Labor Organization

shall be accepted for participation only upon the execution of a Participation Agreement acceptable to the Trustees.

This Amendment No. 5 is approved this 25th day of April 2012.

UNION TRUSTEES:                          EMPLOYER TRUSTEES:

_____                  _____

_____                  _____

_____                  _____

727HW Amendment No. 5 TA                  -2-

## Amendment No. 6 to the Restated Agreement and
## Declaration of Trust of the
## Teamsters Local Union No. 727 Health and Welfare Fund

Whereas, the Board of Trustees has the authority to amend the Restated Agreement and Declaration of Trust of the Teamsters Local Union No. 727 Health and Welfare Fund, and

Whereas, the Board of Trustees desires to clarify the potential sources of contributions to the Trust;

Now, therefore, it is hereby resolved that effective November 1, 2012, that Article Six, Section 6.01(a) is amended, to replace the existing text as follows:

## ARTICLE SIX

## CONTRIBUTIONS

6.01. (a) The Contributions of the Employers shall be made to the Fund, in accordance with the various Collective Bargaining Agreements with the Union and with the rules and regulations adopted by the Trustees, provided that such Contributions shall be subject to acceptance by the Trustees. Each Employer agrees that there shall be an absolute obligation to the Trust Fund, and such obligation shall not be subject to a set-off or counterclaim which the Employer may have for any liability of the Union. The Trustees shall give consideration to the contribution rate in determining the benefits of any Plan maintained or adopted. Non-payment by an Employer of any Contributions as required by its Collective Bargaining Agreement shall not relieve any other Employer of its own obligation to make Contributions. Employees may not contribute to the Trust Fund in order to obtain or maintain eligibility under the Health and Welfare Plan, except in the case of Supplemental Contributions, COBRA continuation coverage, and for those participants employed by a public sector employer who are permitted to self-pay for continuing eligibility for health coverage after retirement pursuant to an applicable state law (to the extent permitted by the Trustees).

**Therefore**, this Sixth Amendment is approved and adopted this 1st day of November 2012.

UNION TRUSTEES:                    EMPLOYER TRUSTEES:

727HW/Amendment No. 6 -2-

Amendment No. 7 to the Restated Agreement and
Declaration of Trust of the
Teamsters Local Union No. 727 Health and Welfare Fund

Whereas, the Board of Trustees has the authority to amend the Restated Agreement and Declaration of Trust of the Teamsters Local Union No. 727 Health and Welfare Fund, and

Whereas, the Board of Trustees desires to clarify the potential sources of contributions to the Trust with respect to Employees covered by the collective bargaining agreement, in effect from July 1, 2013 through June 30, 2018, commonly referred to as the "Valet Agreement";

Now, therefore, it is hereby resolved that: (1) effective May 1, 2016, Article Six, Section 6.01(a) is amended to add a new sentence to the end thereof as set forth below; and (2) effective upon the expiration of the current Valet Agreement on June 30, 2018, Article Six, Section 6.01(a) shall revert to the language in effect before the adoption of this Amendment No. 7 by deleting the last sentence thereof as added by this Amendment and set forth below:

## ARTICLE SIX
## CONTRIBUTIONS

6.01.(a) The Contributions of the Employers shall be made to the Fund, in accordance with the various Collective Bargaining Agreements with the Union and with the rules and regulations adopted by the Trustees, provided that such Contributions shall be subject to acceptance by the Trustees. Each Employer agrees that there shall be an absolute obligation to the Trust Fund, and such obligation shall not be subject to a set-off or counterclaim which the Employer may have for any liability of the Union. The Trustees shall give consideration to the contribution rate in determining the benefits of any Plan maintained or adopted. Non-payment by an Employer of any Contributions as required by its Collective Bargaining Agreement shall not relieve any other Employer of its own obligation to make Contributions. Employees may not contribute to the Trust Fund in order to obtain or maintain eligibility under the Health and Welfare Plan, except in the case of Supplemental Contributions, COBRA continuation coverage, and for those participants employed by a public sector employer who are permitted to self-pay for continuing eligibility for health coverage after retirement pursuant to an applicable state law (to the extent permitted by the Trustees). Notwithstanding the above, for the period commencing May 1, 2016 through June 30, 2018, the Fund shall accept Contributions from Employees covered by the collective bargaining agreement, in effect from July 1, 2013 through June 30, 2018, commonly referred to as the "Valet Agreement," for the purpose of obtaining dependent child health care coverage under the Bronze Plan for the dependent children of such Employees, provided the Employer of such Employees has entered into a separate Letter of Understanding with the Union providing for such Contributions through the expiration date of the Valet Agreement on June 30, 2018.

Therefore, this Seventh Amendment is approved and adopted this 27th day of July, 2016.

UNION TRUSTEES:

EMPLOYER TRUSTEES:

**Eighth Amendment to the Restated Agreement and
Declaration of Trust of the
Teamsters Local Union No. 727 Health and Welfare Fund**

Whereas, the Board of Trustees has the authority to amend the Restated Agreement and Declaration of Trust of the Teamsters Local Union No. 727 Health and Welfare Fund, and

Whereas, the Board of Trustees deems it prudent to change the appointing authority of the Employer Trustees to be the Funeral Directors Services Association of Greater Chicago as set forth in the original trust document and subsequent restatement as well as the Apartment Building Owners and Managers Association,

Now, therefore, it is hereby resolved effective March 1, 2023, that Sections 4.01 through 4.05, and Section 4.08 of Article Four are amended and replaced in their entirety to provide as follows:

## ARTICLE FOUR

## APPOINTMENT, REMOVAL, VOTING, AND RESIGNATION OF TRUSTEES

4.01. The Trust Fund shall be administered by a Board of Trustees consisting of eight (8) Trustees. Four (4) of whom shall be designated as Employer Trustees, two (2) of whom shall be appointed by the Funeral Directors Services Association of Greater Chicago ("FDSA"), and two (2) of whom shall be appointed by the Apartment Building Owners and Managers Association ("ABOMA"). Four (4) of whom shall be designated as Union Trustees and shall be appointed by the Union.

The number of Trustees may be increased or decreased by unanimous action of the Trustees so long as there is always an equal number of Employer and Union Trustees.

1

In the event the FDSA is unable or unwilling to appoint an Employer Trustee, ABOMA shall assume the FDSA's appointment authority. In the event that ABOMA is unable or unwilling to appoint an Employer Trustee, the FDSA shall assume ABOMA's appointment authority.

4.02. (a) Each Trustee shall serve until his death, incapacity, resignation, or replacement, as provided herein.

(b) A Trustee may resign at any time by giving at least ten (10) days' notice in writing to the remaining Trustees. The notice shall state the date the resignation shall take effect and the resignation shall be effective on that date unless a successor Trustee has been appointed, in which event the resignation shall take effect as of the date the successor files the written acceptance provided for under this Article.

4.03. In the event of the death, incapacity to act, resignation or removal of a Trustee, his successor Trustee shall be appointed by the party having responsibility for the appointment and designation of such Trustee. Any successor Trustee, by whomsoever designated, shall file his written acceptance with the Board of Trustees and he shall thereupon become vested with all the duties, powers, rights, responsibilities, and properties of a Trustee hereunder. No vacancy or vacancies in the office of Trustee shall impair the power of the remaining Trustees to act in the manner herein provided to administer the affairs of the Trust pending the filling of any vacancy or vacancies.

4.04. The Union, at any time, may remove a Union Trustee and appoint a successor Trustee to fill any vacancy. The FDSA, at any time, may remove an Employer Trustee appointed by it and appoint a successor Trustee to fill any vacancy. ABOMA, at any time, may remove an Employer Trustee appointed by it and appoint a successor

2

Trustee to fill any vacancy. Removal of a Trustee shall be evidenced by an instrument in writing signed by an accredited representative of the Union, the FDSA or ABOMA, whichever initiated such action, and said instrument shall be delivered to all the Trustees.

4.05. Any successor Trustee, by whomsoever designated, shall file his written acceptance with the Board of Trustees and he shall thereupon become vested with all the duties, powers, rights, responsibilities, and properties of a Trustee. Any Trustee who has resigned or who has been removed from office shall execute all necessary instruments. A Trustee upon signing this Trust Agreement, or upon written acceptance filed with the Board in the case of any successor Trustee, shall be deemed to accept the Trust created and established by this Trust Agreement, to consent to act as Trustee, and to agree to administer the Trust Fund as provided herein.

4.08. The Trustees shall serve without compensation for their services hereunder as Trustees, but they may be reimbursed for expenses properly and actually incurred for Trust business; provided, however, that to the extent permitted by law, Trustees who are not receiving full-time pay from an Employer, the FDSA, ABOMA, or the Union because of work performed on a particular day may be paid reasonable compensation, including fringe benefits and reasonable expenses, for services rendered as a Trustee on said day. The amount of compensation to be paid shall be established by the Trustees from time to time.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Signature page follows*

3

IN WITNESS WHEREOF, the Trustees have caused this Eighth Amendment to be approved and adopted this 24th day of February 2023.

UNION TRUSTEES:                                    EMPLOYER TRUSTEES:

_____                          _____

_____                          _____

_____                          _____

_____                          Carl Tominberg / RJL

4

# Exhibit B

## RESTATED AGREEMENT AND DECLARATION OF TRUST
## OF THE
## TEAMSTERS LOCAL UNION NO. 727
## LEGAL AND EDUCATIONAL ASSISTANCE FUND

THIS RESTATED AGREEMENT AND DECLARATION OF TRUST (herein sometimes referred to as the "Restated Agreement") is made and entered into as of this 25th day of July , 2000, by and between the Trustees, JOHN T. COLI, BECKY STRZECHOWSKI, THOMAS J. MORIARTY and DAVID WOLPIN, who, with their successors designated in the manner herein provided, are hereinafter called the "Trustees" or "Board of Trustees."

### WITNESSETH

WHEREAS, the Union and Employers are parties to Collective Bargaining Agreements requiring periodic payments by Employers of Contributions for the purpose of providing and maintaining a legal and educational assistance plan ("Legal and Educational Assistance Plan") for certain qualified employees covered by and entitled to the benefits of those collective bargaining agreements and for dependents of such employees; and

WHEREAS, in order to implement and carry out the provisions of the Plan, the Board of Trustees intend to meet the requirements of a tax exempt organization under Section 501(c)(9) of the Internal Revenue Code of 1986 or under any comparable section or sections of future legislation which amends, supplements, or supersedes said section; and

WHEREAS, it is desired that the Trust will conform to the applicable requirements of Sections 302(c)(7) and (8) of the Labor Management Relations Act of 1947, as amended, which permits trust funds for the purpose of defraying the costs of education and legal services, and of the Employee Retirement Income Security Act (ERISA) of 1974, as amended; and

WHEREAS, the signatory Trustees, who were appointed pursuant to the terms of the Trust Agreement, desire to update the aforesaid Trust Agreement into a Restated Agreement and Declaration of Trust and to make such changes as may be appropriate for the continued viability of the Trust Fund; and

WHEREAS, said Trustees are authorized by the Trust Agreement to enact this Restatement;

NOW, THEREFORE, the Trustees hereby accept and adopt all of the provisions of this Restated Agreement. The Trustees declare that they will receive and hold the Contributions, and any other money or property which may come into their hands as Trustees, with the powers and duties and for the uses and purposes as hereinafter set forth:

## ARTICLE ONE

## NAME

This Trust Fund shall be designated and known as the "TEAMSTERS LOCAL UNION NO. 727 LEGAL AND EDUCATIONAL ASSISTANCE FUND" and is sometimes referred to herein as the "Trust", "Fund", "Legal and Educational Assistance Fund" or "Trust Fund".

## ARTICLE TWO

## PURPOSES

2.01 The purpose of this Trust is (1) to assist Participants and their Dependents in obtaining competent, professional legal services and advice on personal legal matters, as funded by payments from the Trust Fund to a cooperating attorney or attorneys selected in the manner prescribed by the Trustees; provided, however, that no payments shall be used to finance legal services against the Union, an Employer, the Trustees, the Trust Fund or the Teamsters Local Union No. 727 Pension Fund or Health and Welfare Fund; and (2) to assist Participants and their Dependents in pursuing a

2

higher education.

2.02. The Trustees intend, within the terms of this Restated Agreement and acting within their exclusive discretion, to provide the maximum amount of benefits possible, consistent with good business practice, after taking into consideration the reasonable reserves to be established. The Trustees shall have the exclusive authority to increase or decrease the various types of benefits which in their judgment can best be provided from the Fund's assets. All of the parties intend that the benefits are limited to those which can be financed as a result of Contributions and investment earnings. It is expressly understood and agreed that there is no liability upon the Union, any Employer or association, or the Trustees for the furnishing of any specific type or amount of benefit to the Participants or Dependents.

## ARTICLE THREE
## DEFINITION OF TERMS

Unless the context clearly indicates otherwise, the following terms shall be construed as hereinafter defined:

3.01. The term "Union" shall mean Auto Livery Chauffeurs, Embalmers, Funeral Directors, Apprentices, Ambulance Drivers and Helpers, Taxi Cab Drivers, Miscellaneous Garage Employees, Car Washers, Greasers, Polishers and Wash Rack Attendants Union, Local No. 727, an affiliate of the International Brotherhood of Teamsters ("I.B.T.").

3.02. The Term "Employer" shall mean all employers who are obligated to make Contributions to the Trust Fund pursuant to the terms of any Collective Bargaining Agreement. For the purposes of the Plan only, the Union, this Trust Fund, the Teamsters Local Union No. 727 Health and Welfare Fund ("Health and Welfare Fund"), and the Teamsters Local Union No. 727 Pension Fund (" Pension Fund") will be considered Employers with respect to the officers and employees of each for whom

3

Contributions are paid, but shall not participate in the selection or removal of Employer Trustees as hereinafter provided.

3.03. The term "Employee" shall mean any individual who is represented for collective bargaining purposes by the Union, employed by an Employer, and/or for whom the Employer is obligated to make a Contribution to this Fund; provided, however, that the Trustees may set up standards for eligibility for benefits. In addition, provided the requisite Contributions are made, the term "Employee" may include the following: (a) employees engaged in any capacity by an Employer who are accepted for participation by the Trustees; and (b) the Trustees, officers and employees of this Fund, the Pension Fund, the Health and Welfare Fund, and the Union.

3.04. The term "Participant" shall mean any Employee who has satisfied the Plan's eligibility requirements to receive legal or educational assistance benefits provided by the Plan.

3.05. The terms "Trustees" or "Board" shall mean the Trustees designated in this Restated Agreement together with their successors designated and appointed in accordance with the terms and procedures of this Trust Agreement.

3.06. The term "Trust Agreement" shall mean this Restated Agreement and Declaration of Trust, including any amendments, modifications, revisions or extensions hereof.

3.07. The terms "Fund", or " Legal and Educational Assistance Fund" or "Trust Fund" shall mean the funds held in trust for the purposes of this Trust Agreement, and shall consist of all monies due the Trust as Contributions, and any other property or income received and held by the Trustees for the uses and purposes set forth in this Trust Agreement.

3.08. The term "Dependents" shall mean the spouse of an Employee and an unmarried child of an Employee, all as determined in detail by such rules and regulations as the Trustees may adopt from time to time.

4

3.09. The term "Contributions" shall mean the payments required to be made by Employers to the Trust Fund pursuant to Collective Bargaining Agreements. Employees may not contribute to the Trust Fund in order to obtain or maintain eligibility under the Legal and Educational Assistance Plan, except as required by law.

3.10. The terms "Plan" or " Legal and Educational Assistance Plan" shall mean the Teamsters Local Union No. 727 Legal and Educational Assistance Plan, and any program, rules or regulations established by the Trustees, as from time to time amended, concerning benefits to be provided Participants and Dependents. The Trustees may adopt more than one Plan with different benefits, contribution levels, and other provisions. If more than one Plan is adopted, each shall be covered by the term "Plan" or " Legal and Educational Assistance Plan" as used in this Trust Agreement.

3.11. The term "Custodian" shall mean the bank or trust company, if any, selected by the Board of Trustees to hold the assets comprising the Trust Fund or to perform such functions in the administration of the Plan and the administration and investment of the Trust Fund as the Trustees may designate.

3.12. The term "Collective Bargaining Agreement" shall mean any collective bargaining agreement in force and effect from time to time between the Union and any association or any Employer which provides for Contributions to the Trust Fund. Such term shall also be deemed to include other written agreements by which any person or an Employer is obligated to make Contributions to the Trust Fund.

3.13. The term "Code" means the Internal Revenue Code of 1986, as amended.

3.14. The term "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

## ARTICLE FOUR

## APPOINTMENT, REMOVAL, VOTING, AND RESIGNATION OF TRUSTEES

4.01. The Trust Fund shall be administered by a Board of Trustees consisting of

5

four Trustees, two of whom shall be designated as Employer Trustees and shall be appointed by the Employers or their representative, and two of whom shall be designated as Union Trustees and shall be appointed by the Union.

Thomas J. Moriarty and David Wolpin have been appointed as the Employer Trustees. John T. Coli and Becky Strzechowski have been appointed as the Union Trustees.

The number of Trustees may be increased or decreased by unanimous action of the Trustees so long as there is always an equal number of Employer and Union Trustees.

4.02. (a) Each Trustee shall serve until his death, incapacity, resignation, removal, or replacement as herein provided.

(b) A Trustee may resign at any time by giving at least ten (10) days' notice in writing to the remaining Trustees. The notice shall state the date the resignation shall take effect and the resignation shall be effective on that date unless a successor Trustee has been appointed, in which event the resignation shall take effect as of the date the successor files the written acceptance provided for under Section 4.05 of this Article.

4.03. Any Union Trustee may be removed from office by the Union at any time. An Employer Trustee may be removed from office at any time by a weighted vote of the Employers who have made Contributions to the Fund during the three months preceding the voting. Each such Employer shall have a number of votes equal to the amount of Contributions (other than delinquent Contributions) paid by that Employer during said three-month period. Such vote shall be conducted whenever a request is supported by Employers who have contributed at least twenty-five percent (25%) of the Contributions (other than delinquent Contributions) received by the Fund during the three (3) months preceding the request.

Removal of a Trustee shall be evidenced by an instrument in writing signed by an

6

accredited representative of the Union or the Employers, whichever initiated such action, and said instrument shall be delivered to all the Trustees.

4.04. (a) In the event of the death, removal, incapacity to act, or resignation of an Employer Trustee, a successor Employer Trustee shall be appointed by the remaining Employer Trustee, if any. If no Employer Trustee is serving, nominations shall be solicited and an election conducted in accordance with the procedures set forth in Section 4.03. In the event of the death, removal, incapacity to act, or resignation of a Union Trustee, a successor Union Trustee shall be appointed by the Union.

(b) Any successor Trustee, by whomsoever designated, shall file his written acceptance with the Board of Trustees and he shall thereupon become vested with all the duties, powers, rights, responsibilities and properties of a Trustee. No vacancy or vacancies in the office of Trustee shall impair the power of the remaining Trustees to administer the affairs of the Trust pending the filling of any vacancy or vacancies. Any Trustee who has resigned or who has been removed from office shall execute all necessary instruments.

4.05. A Trustee upon signing this Trust Agreement, or upon written acceptance filed with the Board in the case of any successor Trustee, shall be deemed to accept the Trust created and established by this Trust Agreement, to consent to act as Trustee, and to agree to administer the Trust Fund as provided herein.

4.06. The Trustees shall select from among the Trustees a Chairman and a Secretary, one of whom shall be an Employer Trustee and the other a Union Trustee. The term of office for such officers shall be for two (2) years or until his or their successors have been elected.

4.07. No successor Trustee shall be liable or responsible for any acts or defaults of any other Trustee or predecessor Trustee, or for any losses or expenses resulting from or occasioned by anything done or neglected to be done in the administration of the Trust Fund prior to his becoming a Trustee. A successor Trustee

7

shall not be required to inquire into or take any notice of the prior administration of the Trust Fund.

4.08. The Trustees shall serve without compensation for their services hereunder as Trustees, but they may be reimbursed for expenses properly and actually incurred for Trust business; provided, however, that to the extent permitted by law, Trustees who are not receiving full-time pay from an Employer or the Union because of work performed on a particular day may be paid reasonable compensation, including fringe benefits and reasonable expenses, for services rendered as a Trustee on said day. The amount of compensation to be paid shall be established by the Trustees from time to time.

4.09. (a) Regular meetings of the Trustees may be held at such time or times as may be established by the Trustees but not less than annually. Meetings may also be held at any time without notice if all of the Trustees consent. Meetings may be held in conjunction with Trustee meetings of other Trust Funds covering Participants. Special meetings may be called at any time by the Chairman or the Secretary of the Board, upon giving five (5) days' written notice to all other Trustees. Notice may be waived by agreement of all Trustees. Minutes of all meetings shall be kept, but not necessarily verbatim and copies thereof shall be furnished to the Trustees.

(b) Any action by the Trustees may be taken either at a meeting, by a phone poll, in a conference call, or in writing without a meeting. Concurrence of all the Trustees, evidenced by their written signatures, shall be required for action taken without a meeting.

(c) Two Trustees shall constitute a quorum at any regular or special meeting of the Trustees, provided that one Union Trustee and one Employer Trustee are present.

(d) Unless otherwise specified herein, the concurring vote of a majority of the Trustees present and voting shall be required to carry any motion or resolution. Each Union Trustee and each Employer Trustee shall be entitled to cast one (1) vote on each

8

motion or resolution; provided, however, that the vote of any absent Trustee shall be allocated among the group of Trustees of which he is a member so that both groups will have an equal number of votes.

(e) A deadlock of the Trustees shall be deemed to exist if a quorum is not present at two successive properly scheduled meetings, or if the vote of the Trustees is equal on any proposal. Whenever a deadlock exists, the Trustees shall first seek mediation in an endeavor to break such deadlock, and if that proves unavailing (or if the Trustees agree to waive mediation), either group of Trustees may advise the other group of Trustees that they wish to submit the deadlocked issue for arbitration by an impartial person to be selected by the Trustees. Should they fail to agree on the impartial person within ten (10) days, any Trustee may petition the American Arbitration Association for a list of five (5) impartial arbitrators experienced in employee benefit fund disputes. The Trustee groups shall alternately and expeditiously strike names from said list and the remaining name shall be the impartial arbitrator. The order of striking shall be determined by chance. The arbitrator's decision shall be final and binding on the Trustees and his fees and expenses, as well as the joint expenses incidental to his activities and the arbitration, shall be paid from the Trust Fund.

4.10. (a) The Legal and Educational Assistance Fund and the Board of Trustees shall be bound by the signatures of the Chairman and Secretary. In addition, any instrument may be executed on behalf of the Board by one or more Trustees designated for that purpose by the Board, or by the signature of any other person or persons designated for that purpose by the Board.

(b) Upon the signing of any instrument by an authorized person, all persons, partnerships, corporations or associations may rely thereon that such instrument has been duly authorized by action of the Board of Trustees.

9

## ARTICLE FIVE

## POWERS, DUTIES AND OBLIGATIONS OF THE TRUSTEES

5.01. The Trustees shall supervise the operation of the Trust and shall conduct the business and activities of the Trust. The Trustees shall hold, manage, care for, and protect the Trust Fund and shall collect the income and Contributions made to the Fund.

5.02. The Trustees are hereby empowered to do all acts, whether or not expressly authorized herein, which the Trustees may deem necessary to accomplish the general objectives of maintaining the Plan and Trust solely in the interest of the Participants and Dependents and for the exclusive purpose of (1) providing benefits to Participants and their Dependents; and (2) defraying reasonable expenses of administering the Plan and Trust.

5.03. The Trustees are authorized, empowered and directed to invest and reinvest the funds of the Trust in any property or undivided interest therein, including but not limited to bonds, notes, real estate, common and preferred stocks, and interests in trusts, including common trust funds, without being limited by any statute or rule of law concerning investments by trustees. The Trustees may sell or otherwise dispose of such securities or property at any time and may, in their sole discretion, invest the Trust Fund or any part thereof in group contracts, and such other forms of contracts, if the contracts are issued by insurance companies authorized to do business in the State of Illinois, for the purpose of providing for all or a part of the benefits provided under this Trust. The Trustees shall have power (in addition to, and not in limitation of, common law and statutory authority) to exercise in respect to any stocks, bonds, or other property, real or personal, all such rights, powers, and privileges as might be lawfully exercised by any person owning similar stocks, bonds, or other property in his own right.

All or any part of the Trust assets may be invested in any collective investment trust fund qualified as tax exempt under Section 501(a) of the Internal Revenue Code,

10

or amendments thereof, which is then maintained by any bank or trust company whether or not acting as a trustee, co-trustee, or agent for the Trustees hereunder. The document governing each such collective investment trust, as amended from time to time, shall govern any investment therein, and is hereby made a part of this Trust Agreement.

The Trustees shall have the power to borrow from any bank, savings and loan association, insurance company, or any other money lending firm or institution, such sums, and on such terms and conditions, which the Trustees may from time to time determine. The Trustees may hypothecate, mortgage, pledge or otherwise collateralize or secure any indebtedness so created with assets of this Trust; provided, however, that any resolution presented to the Trustees pursuant to the powers contained in this paragraph must be adopted by the affirmative vote of not less than three-fourths of the Trustees, regardless of the number of Trustees present at any meeting.

Such investment actions shall be taken with the care, skill, prudence and diligence, under the circumstances then prevailing, that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. Such actions shall include the diversification of the Fund's investments so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so, and all such actions shall be in accordance with the documents and instruments governing the Trust and Plan insofar as such documents and instruments are consistent with applicable law.

If one or more Investment Managers have been appointed in accordance with the terms of this Restated Agreement, no Trustee shall be liable for the acts or omissions of any such Investment Manager(s) or under any obligation to invest or otherwise manage any asset of the Fund which is subject to the management of any such Investment Manager.

5.04. The Trustees are hereby empowered to allocate fiduciary responsibilities

among the Trustees and to designate persons other than Trustees to carry out fiduciary responsibilities as provided in this Restated Agreement. The power to allocate fiduciary responsibility shall not apply to the application of the responsibility to manage the assets of the Fund other than the power to appoint an Investment Manager or Managers.

The Trustees shall have exclusive authority and discretion to manage and control the assets of the Fund except to the extent that such authority to manage, acquire, or dispose of the assets of the Fund is delegated to one or more Investment Managers in accordance with the following paragraph.

The Trustees are empowered to appoint an Investment Manager(s) to manage, acquire, or dispose of any assets of the Fund. An "Investment Manager" is any fiduciary who has been designated by the Trustees to manage, acquire or dispose of any assets of the Fund, who has acknowledged in writing that it is a fiduciary with respect to the Fund, and who is: (i) registered as an investment adviser under the Investment Advisers Act of 1940; or (ii) is a bank, as defined in that Act; or (iii) is an insurance company qualified to perform such services under the laws of more than one state.

5.05. The Board and each Trustee, to the extent permitted by applicable law, shall be fully protected in acting upon any instrument, certificate or paper believed by them to be genuine and to be signed or presented by the proper person or persons and shall be under no duty to make any investigation of, or inquiry as to, any statement contained in such record, but may accept the same as conclusive evidence of the truth of the statements therein contained.

No Trustee shall be liable for any acts or defaults of any prior Trustee, any other Trustee, any other fiduciary, any party in interest or any other person except to the extent required by applicable law; it being the intent and purpose of the parties hereto that, to the extent permitted by law, each Trustee shall be liable only for his own acts or omissions occurring during his term of service as Trustee.

12

5.06. The cost and expenses of any action, suit or proceeding brought by or against the Board or any Trustee, including counsel fees, shall be paid from the Trust Fund if permitted by law, except in relation to matters as to which it shall be adjudged in such action, suit or proceeding that the Board or such Trustee was acting in bad faith or was grossly negligent in the performance of his duties hereunder.

5.07. No individual or person may act as agent for the Fund or the Plan unless specifically authorized by this Restated Agreement or in writing by the Trustees. Neither an Employer nor the Union, or any representative of an Employer or the Union, in such capacity, is authorized to interpret the Plan or Trust Agreement, nor can any such person act as agent of the Trustees. Only the Board of Trustees is authorized to interpret the Plan or Trust Agreement.

5.08. The Trustees shall keep true and accurate books of account and a record of all their transactions, meetings and the actions taken at such meetings or by informal action of the Trustees.

5.09. The Trustees shall procure an audit of the books of the Trust by a Certified Public Accountant not less frequently than once for each fiscal year and a copy of each such audit shall be furnished, upon request, to each Trustee, and a copy of such audit shall be kept available for inspection by authorized persons during business hours at the office of the Trustees for the time required by law and/or for the time required by the rules and regulations of the Fund.

5.10. The Trustees are hereby authorized to formulate and promulgate any and all necessary rules and regulations which they deem necessary or desirable to facilitate the proper administration of the Trust or Plan. All rules and regulations adopted by majority action of the Trustees for the administration of the Trust Fund shall be final and binding upon all parties hereto, all parties dealing with the Trust, and all persons claiming any benefits hereunder. The Trustees shall have the exclusive authority and discretion to interpret and apply this Trust Agreement and the Legal and Educational

13

Assistance Plan, including questions involving eligibility for benefits and the standard of proof to be required in any matter, and all such interpretations and applications shall be final and binding upon all parties and claimants. Benefits under the Plan will be paid only if the Board of Trustees determines in its discretion that the individual is entitled to the benefits.

5.11. The Trustees shall use and apply the Trust Fund for the following purposes:

(a) To pay or provide for the payment of all expenses of collecting the Contributions and administering the affairs of this Trust, including the employment of such administrative, custodial, legal, actuarial, accounting, expert, and clerical assistance as may be necessary, the purchase or the lease of such premises as may be necessary for the operation of the affairs of the Trust, and the purchase or lease of such materials, supplies and equipment as the Trustees in their discretion find necessary or appropriate to the performance of their duties.

(b) To pay or provide for benefits to eligible Participants and their Dependents.

(c) To pay or provide for the payment of expenses incidental to the operation of an office, as well as incidental matters affecting Participants and their interests, such as attendance at Union-related activities concerning Participants and their Dependents.

(d) To pay or provide for the payment of expenses and lawful compensation of Trustees and/or Fund employees in connection with attendance at educational conferences and seminars.

5.12. The receipt of the Trustees for any money or property received by them shall discharge the person or persons paying or transferring the same.

5.13. All Trust Funds not invested shall be deposited by the Trustees in such depository or depositories ("Custodian") as the Trustees shall from time to time select and any such deposit or deposits shall be made in the name of the Trust. Any Trustee authorized to deposit, transfer or withdraw funds held in a trust account(s) shall have

14

the authority to transfer, by wire or phone, such funds to a benefit or checking account.

Except as provided otherwise by Resolution of the Trustees, all such funds may be disbursed by check or draft signed by at least one Employer Trustee and one Union Trustee.

To the extent permitted by law, no Trustee shall be liable in any manner for any loss to the Fund occasioned by the fault or negligence of any Custodian selected by the Trustees in good faith and in the exercise of reasonable business judgment.

5.14. The Trustees are empowered to determine the terms and conditions upon which either an additional craft or class of employees or an additional employer and its employees may participate in the Fund, and to enter into reciprocal agreements with trustees of other trust funds when to do so, in the opinion of the Trustees, would effectuate the purposes of this Trust Agreement.

5.15. Statements, documents, or notices to the Trustees, the Union, or any Employer hereunder shall, unless otherwise specified, be sufficient if in writing and delivered to or sent by pre-paid first class mail or by facsimile.

5.16. The Trustees are hereby empowered, in addition to such other powers as are set forth herein or conferred by law:

(a) To formulate, adopt and administer one or more Legal and Educational Assistance Plans, for the exclusive benefit of Participants and, thereafter, to amend said Plans whenever the Trustees deem it advisable. The Trustees may provide for benefits for the Dependents of Employees. The Plan and all amendments thereto shall be filed by the Trustees as part of the records and minutes of the Trustees. Any benefits provided to a Participant, and/or Dependent, shall be paid solely out of the assets of the Trust Fund.

(b) To promulgate and establish rules and regulations for the administration and operation of the Legal and Educational Assistance Plan in order to effectuate the purposes thereof; and in pursuance thereof (but without limitation on the powers of the

15

Trustees by reason of such enumeration), to formulate and establish the conditions of eligibility, qualifications for benefits, the method of providing benefits, and any and all matters which they, in their discretion, may deem necessary or proper to effectuate the purposes and intent of the Plan. No rule or regulation shall conflict with the terms of this Trust Agreement.

(c) To enter into any and all contracts and agreements for carrying out the terms of this Restated Agreement and for the administration of the Trust Fund and to do all acts as they, in their discretion, may deem necessary or advisable, and such contracts, agreements and acts shall be binding and conclusive on the parties, Participants, and Dependents.

(d) To keep property and securities registered in the name of the Trustees or in the name of the Custodian or a nominee(s), or in unregistered or bearer form, without disclosure of any fiduciary relationship.

(e) To establish and accumulate as part of the Trust Fund a reserve or reserves adequate, in the opinion of the Trustees, to carry out the purposes of the Trust and Plan.

(f) To pay out of the funds of the Trust all real and personal property taxes, income taxes and other taxes of any and all kind levied or assessed under existing or future laws upon or in respect to the Trust Fund or any money, property or securities forming a part thereof.

(g) To compromise, arbitrate, settle, adjust or release any suit or legal proceeding, claim, debt, damage or understanding due or owing from or to the Fund on such terms and conditions as the Trustees, in their sole discretion, may deem advisable.

(h) To consult with legal counsel with respect to the meaning or construction of this Restated Agreement and the Plan, or their obligations and duties hereunder, or with respect to any action or proceeding, or any question of law, and shall be fully protected,

16

to the extent permitted by law, with respect to any action taken or omitted by them in good faith pursuant to the advice of counsel. Legal counsel may, but need not be, counsel to the Union or any Employer.

(i) To do all acts, whether or not expressly authorized herein, which the Trustees deem necessary or proper.

5.17. The Trustees shall provide for fidelity bonds, in such form and amounts as may be required by statute, for their fiduciaries and every person who handles funds or other property of the Trust Fund. If no such statutory requirement shall exist, such bonds shall be in such form and amounts as the Trustees may determine. In addition, the Trustees may purchase insurance for their fiduciaries and for themselves to cover liabilities or losses occurring by reason of the act or omission of a fiduciary; provided, however, that any such insurance policies shall be in the form and manner permitted by law.

5.18. The Board may employ a Fund Manager who may, but need not be, a Trustee, and delegate to such Fund Manager the authority to act upon all matters in connection with the administration of the Trust and Plan, including the authorization to execute those documents which, in the sole discretion of the Trustees, are deemed necessary for the day-to-day administration of the Trust and Plan; the responsibility of accounting for the Contributions made to the Trust Fund and the collection of delinquent Contributions; and such other function as the Board may deem advisable. Any Fund Manager so appointed may be employed part-time, may provide similar services for other funds and may engage in unrelated employment activities.

5.19. The Trustees shall have and maintain an office in the State of Illinois which shall be deemed the situs of the Trust Fund, and which may be in the office building of the Union.

5.20. It is further agreed and understood that there is no liability upon the Union, any Employer, or the Trustees for the direct payment of any benefit which has been

17

established by the Trustees.

5.21. The Union and the Employers assume no obligation or responsibility to any person for any act or failure to act of the Trustees, the attorneys, any insurance company, or any Participant. The Trustees shall have no obligation or responsibility regarding any action required by the Collective Bargaining Agreement, the Plan or this Trust Agreement to be taken by the Union or the Employers, any insurance company, or any other person, or for the result of the failure of any of the above to act. Any person or entity providing professional services to any Participant or Dependent shall maintain professional liability insurance or agree in writing to indemnify and hold harmless the Trustees for any liability imposed upon the Trustees as a result of the actions of the professional.

## ARTICLE SIX

## CONTRIBUTIONS

6.01. (a) The Contributions of the Employers shall be made to the Fund, in accordance with the various Collective Bargaining Agreements with the Union and with the rules and regulations adopted by the Trustees, provided that such Contributions shall be subject to acceptance by the Trustees. Each Employer agrees that there shall be an absolute obligation to the Trust Fund, and such obligation shall not be subject to a set-off or counterclaim which the Employer may have for any liability of the Union. The Trustees shall give consideration to the contribution rate in determining the benefits of any Plan maintained or adopted. Non-payment by an Employer of any Contributions as required by its Collective Bargaining Agreement shall not relieve any other Employer of its own obligation to make Contributions. Employees may not contribute to the Trust Fund in order to obtain or maintain eligibility under the Legal and Educational Assistance Plan, except as required by law.

(b) The Trustees may compel and enforce the payment of Contributions in

any manner which they may deem proper but without limitation upon any rights and privileges the Union may have in this connection. Expenses incurred in the collection of such Contributions shall be paid from the Trust Fund, even though such expenses are subject to reimbursement by the delinquent Employer.

6.02. The failure of an Employer to pay Contributions by the date established by the Collective Bargaining Agreements or, if no date is set by the Collective Bargaining Agreement, by the rules and regulations adopted by the Trustees shall constitute a violation of the applicable Collective Bargaining Agreement between such Employer and the Union, as well as a violation of the Employer's obligations hereunder.

The Trustees shall have the right to adopt rules and regulations relating to the collection of Employer Contributions, including provisions for time of payment, collection of interest, audit fees, attorneys' fees at the rate set by the Trustees in their sole discretion, costs, and liquidated damages as specified in this Section. An Employer in default as of the date established by the Collective Bargaining Agreement or the Trustees for payment of Contributions shall be liable for an additional amount of twenty percent (20%) of the delinquent payment or $50.00, whichever is greater, and interest at the rate set forth in the Plan or the rules and regulations. In the absence of a rate set forth in the Plan or rules and regulations, the interest rate used each month shall be the prime rate, plus one percent (1%), as reported in the Wall Street Journal on the first business day of each month. Liquidated damages shall compensate the Fund for some or all of the damages arising from lost earnings, administrative costs, uncertainties causing difficulties in forecasting earnings and managing investments, the disruptive effects to the benefit system of unequal performance of obligations among Employers, and the potential liability of Trustees for transactions prohibited by federal law.

The Trustees may require a delinquent Employer or new Employer to deposit with the Trustees, in cash, or by a bond with corporate surety, an amount not to exceed

19

three (3) months' estimated Contributions, as determined by the Trustees.

The Trustees may waive all or part of the liquidated damages and interest where Contributions are found by the Trustees to have been delinquent as a result of clerical errors or administrative problems beyond the control of an Employer and where there have been good faith efforts by the Employer to comply with the applicable rules and regulations for payment of Contributions.

6.03. Each Employer and its affiliated or related companies or businesses shall furnish to the Trustees on demand the names of all employees, their Social Security numbers, the time worked by each employee, the Contributions due or payable to the Trust Fund, and such other information, including cash journals, wage and payroll records, income tax records, and other business records, as the Trustees or their agents may reasonably require in connection with the administration of the Trust. The Trustees, or their authorized representative, shall have the right to examine and audit the pertinent books and records (as determined by the Trustees) of each Employer and its affiliated or related companies whenever such examination is deemed necessary or advisable by the Trustees in connection with the proper administration of the Trust. All Employers shall annually furnish to the Trustees, if requested by them, a statement showing whether (a) the Employer is a corporation and the names of all of its officers and shareholders (and the percentage of stock held by each) or (b) if not a corporation, a statement showing that it is a partnership or an individual proprietorship and furnishing the names of the partners or the name of the individual proprietor.

6.04. Nothing in this Restated Agreement shall prevent a Contribution which is made by an Employer by a mistake of fact or law to be returned by the Trustees to such Employer, upon written request, within twelve months after the Trustees determine that the Contribution was made by such a mistake.

6.05. The Trustees may require Employers to deposit with the Trustees, in advance as a guarantee for the payment of monthly contributions, an amount to be

20

determined by the Trustees as a condition to such Employer's participation herein and to require that said guarantee be continuously maintained by such Employer as a condition to the continued participation herein.

# ARTICLE SEVEN
## CONTROVERSIES AND DISPUTES

7.01. In any controversy, claim, demand, suit at law or other proceeding between any Employee, Dependent, or any other persons and the Trustees, the Trustees shall be entitled to rely upon any facts appearing in the records of the Trustees, any instruments on file with the Trustees, with the Union, affiliated employee benefit funds, or with any Employer, any facts certified to the Trustees by the Union or any Employer, any facts which are of public record, and any other evidence pertinent to the issue involved.

7.02. All questions or controversies arising in any manner between any parties or persons in connection with the Trust Fund or its operation, whether as to any claim for any benefits by an Employee, Dependent or any other person, or whether as to the construction of the language or meaning of the rules and regulations adopted by the Trustees or this instrument, or as to any writing, decision, instrument or accounts in connection with the operation of the Trust Fund shall be submitted to the Board of Trustees for decision. The decision of a majority of the Board shall be binding upon all persons dealing with the Trust Fund or claiming any benefit thereunder.

# ARTICLE EIGHT
## SPENDTHRIFT CLAUSE

No monies, property, equity or interest of any nature whatsoever in the Trust Fund, or in any benefits or monies payable therefrom, shall be subject, in any manner by any Participant, Dependent, or person claiming through such person, to anticipation,

21

alienation, sale, transfer, assignment, pledge, encumbrance, garnishment, mortgage, lien or charge, and any attempt to cause the same to be subject thereto shall be null and void. If a Participant or Dependent shall attempt to or shall alienate, sell, transfer, assign, pledge, mortgage or otherwise encumber his benefits under the Legal and Educational Assistance Plan or any part thereof, or if by reason of his bankruptcy or other event happening at any time, such benefits would devolve upon anyone else or would not be enjoyed by him, the Trustees in their discretion may terminate his interest in any such benefit and hold it to, or apply it for, the benefit of such Participant, or his Dependent, in such manner as the Trustees may deem proper.

## ARTICLE NINE

## PAYMENT TO PERSONS UNDER LEGAL DISABILITY

If any benefit payments become payable to a person under legal disability or to a person not adjudicated incompetent but who, by reason of mental or physical disability, is unable in the opinion of the Trustees to administer properly such payments, then such payments may be paid out by the Trustees for the benefit of such person in any of the following ways:

(a)     Directly to any such person;

(b)     To the legally appointed guardian or conservator of such person;

(c)     To any spouse, child, parent, brother or sister of such person for his welfare, support and maintenance;

(d)     By the Trustees using such payments directly for the support, maintenance and welfare of any such person.

The Trustees shall have no duty or obligation to see that any such payments are used or applied for the purpose or purposes for which paid.

22

## ARTICLE TEN

## AMENDMENT OF AGREEMENT

It is anticipated that in the administration of this Trust conditions may arise that are not foreseen at the time of the execution of this Restated Agreement. It is the intention of the parties that the power of amendment, which is hereinafter given, be exercised in order to carry out the provisions of this Trust, among which is to pay the largest benefits possible which are consistent with the number of Participants and Dependents becoming and likely to become eligible for such payments, the amount of funds which are available and which will probably become available, and sound actuarial practice. Therefore, the Trustees are given the power to amend this Restated Agreement by majority vote at any time, and from time to time, and all parties to the Trust and all persons claiming an interest thereunder shall be bound thereby.

No Participant or any other person shall have any vested interest or right in the Trust Fund or in any payments from the Trust Fund, except to the extent granted by the Legal and Educational Assistance Plan. The Trustees shall have full authority, if consistent with federal law, to amend, repeal, add to, or take away any right or payment, retroactive or otherwise, that they deem proper for the preservation of this Trust Fund; provided, however, in no event shall the Trust Fund be used for any purpose other than the purposes set forth in this Restated Agreement and for the purposes of paying the necessary expenses incurred in the administration of this Trust.

## ARTICLE ELEVEN

## TERMINATION AND MERGER OF TRUST

11.01. In the event the obligation of all Employers to make Contributions shall cease, or the Trust Fund, in the opinion of the Trustees, is inadequate to carry out the intent and purposes of the Trust, the Trustees shall apply the Trust Funds to the payment of expenses and to the purposes specified in Article Two so far as possible;

23

any balance of the Trust Fund which cannot be applied shall be applied to such other uses as, in the opinion of the Trustees, will best accomplish the purposes for which the Trust was established. Upon the disbursement of the entire Trust Fund, the Trust shall terminate. In no event, upon termination, shall any assets of the Trust Fund revert to any Employer.

11.02. In the event this Trust is subject to the rule against perpetuities as existing in the law of the State of Illinois, at the time in this Article fixed for the termination of the Trust, the Trust shall terminate twenty (20) years after the date of the death of the last of the Participants covered by this Restated Agreement at the time of the execution of this Restated Agreement.

11.03. Upon termination, the Trustees shall notify the Union and each Employer contributing to the Fund, and any other person, partnership, corporation or association with whom they are dealing, and shall continue as Trustees for the purpose of dissolution.

11.04. In lieu of the distribution and liquidation upon termination as set forth in Section 11.01, the Trustees may, after all obligations of the Trust have been satisfied, turn over any surplus monies and property in the Fund to any future trust with similar purpose that may be created by and between Employers and the Union pursuant to collective bargaining agreements.

11.05. In addition to any other authority granted under this Trust Agreement, the Trustees shall have the authority to merge this Trust Fund with another trust fund providing for the same or similar benefits. The terms and conditions of such a merger shall be within the sole discretion of the Trustees.

## ARTICLE TWELVE

## MISCELLANEOUS

12.01. In no event shall the Employers, directly or indirectly, receive any refund

24

of Contributions, except as provided in Section 6.04, participate in the disposition of the Trust Fund, or receive any benefits from the Trust Fund. Upon payment to the Trustees, all responsibilities of the Employers for Contributions shall cease and the Employers shall have no responsibilities for the acts of the Trustees. No Participant or Dependent shall have any individual right, title, interest or claim against any Employer, Employer's Contribution, or the Trust Fund, except as may be expressly provided for in this Restated Agreement.

12.02. The Trustees shall be entitled, at any time, to have a judicial settlement of their accounts and judicial determination of any questions in connection with their duties and obligations under this Trust, or in connection with the administration or distributions thereof.

12.03. In the event any question or dispute shall arise as to the proper person or persons to whom any payments shall be made hereunder, the Trustees may withhold such payment until an adjudication of such question or dispute, satisfactory to the Trustees in their sole discretion, is made or the Trustees have been adequately indemnified against loss.

12.04. Where used in this Restated Agreement, words in the masculine shall be read and construed as in the feminine and words in the singular shall be read and construed as though used in the plural, in all cases where such construction would so apply.

12.05. The Article titles are included solely for convenience and shall, in no event, be construed to affect or modify any part of the provisions of this Restated Agreement or be construed as part thereof.

12.06. This Restated Agreement shall in all respects be construed according to, and be governed by, the laws of the State of Illinois, except as may be otherwise provided by federal law.

12.07. Neither this Trust Agreement nor any amendments thereto, nor any rules

25

and regulations adopted for the administration of the same, nor any award of any arbitrator appointed hereunder shall modify the Collective Bargaining Agreements between the Union and any association or any Employer or add to or alter the obligations of the Employers or the Union thereunder. The provisions of this paragraph shall in no event be subject to amendment.

12.08. No Employer nor the Union shall at any time, and under any circumstances or conditions, have any financial obligations under this Trust or the Legal and Educational Assistance Plan other than the payment of any required Contributions and such other amounts as may be provided for under Article Six.

## ARTICLE THIRTEEN

## SAVINGS CLAUSE

Should any provision of this Restated Agreement be held to be unlawful, such fact shall not adversely affect the other provisions herein contained, or the application of said provisions, unless such illegality shall make impossible the functioning of the Trust or Plan. Except to the extent required by law, no Trustee shall be held liable for any act done or performed in pursuance of any provision hereof prior to the time such act or provisions shall be held unlawful by a court of competent jurisdiction.

IN WITNESS WHEREOF, the Trustees have caused this Restated Agreement to be executed this 25th day of July, 2000.

UNION TRUSTEES:                              EMPLOYER TRUSTEES:

_____                      _____

_____                      _____

26

**Amendment to the Restated Agreement and
Declaration of Trust of the
Teamsters Local Union No. 727
Legal and Educational Assistance Fund**

Whereas, the Board of Trustees has the authority to amend the Restated Agreement and Declaration of Trust of the Teamsters Local Union No. 727 Legal and Educational Assistance Fund, and

Whereas, the Board of Trustees desires to increase the number of Trustees representing contributing employers and Local 727,

Now, therefore, it is hereby resolved effective February 24, 2005, that Article Four is amended, in part, to provide as follows:

## ARTICLE FOUR

## APPOINTMENT, REMOVAL, VOTING, AND RESIGNATION OF TRUSTEES

4.01. The Trust Fund shall be administered by a Board of Trustees consisting of six (6) Trustees, three (3) of whom shall be designated as Employer Trustees, and three (3) of whom shall be designated as Union Trustees.

Thomas J. Moriarty and Carl Tominberg have been appointed as the Employer Trustees. John T. Coli and Becky Strzechowski have been appointed as the Union Trustees. Effective February 24, 2005, the incumbent Employer Trustees shall have the authority to appoint the third Employer Trustee; the Union Trustee shall be appointed by the Union.

The number of Trustees may be increased or decreased by unanimous action of the Trustees so long as there is always an equal number of Employer and Union Trustees.

4.02. (a)    Each Trustee shall serve until his death, incapacity, resignation, removal, or replacement as herein provided.

(b)    A Trustee may resign at any time by giving at least then (10) days' notice in writing to the remaining Trustees.  The notice shall state the date the resignation shall take effect and the resignation shall be effective on that date.

4.03.  Any Union Trustee may be removed from office by the Union at any time. An Employer Trustee may be removed from office by the unanimous vote of the other two (2) Employer Trustees.

Removal of a Trustee shall be evidenced by an instrument in writing signed by an accredited representative of the Union or by the Employer Trustees, whichever initiated such action, and said instrument shall be delivered to all the Trustees.

4.04. (a)    In the event of the death, removal, incapacity to act, or resignation of an Employer Trustee, a successor Trustee(s) shall be appointed by the remaining Employer Trustee(s).    In the event of the death, removal, incapacity to act, or resignation of a Union Trustee, a successor Union Trustee shall be appointed by the Union.

(b)    Any successor Trustee, by whomsoever designated, shall file his written acceptance with the Board of Trustees and he shall thereupon become vested with all the duties, powers, rights, responsibilities and properties of a Trustee.  No vacancy or vacancies in the office of Trustee shall impair the power of the remaining Trustees to administer the affairs of the Trust pending the filling of any vacancy or vacancies.  Any Trustee who has resigned or who has been removed from office shall execute all necessary instruments.

2

3

This Amendment is approved and adopted this 24th day of February 2005.

**UNION TRUSTEES**                    **EMPLOYER TRUSTEES**

3

**Amendment No. 2 to the Restated Agreement and
Declaration of Trust of the
Teamsters Local Union No. 727
Legal and Educational Assistance Fund**

Whereas, the Board of Trustees has the authority to amend the Restated Agreement and Declaration of Trust of the Teamsters Local Union No. 727 Legal and Educational Assistance Fund, and

Whereas, the Board of Trustees desires to increase number of Trustees representing contributing employers and Local 727,

Now, therefore, it is hereby resolved that effective December 19, 2007, that Article Four is amended, in part, to provide as follows:

## ARTICLE FOUR

## APPOINTMENT, REMOVAL, VOTING, AND RESIGNATION OF TRUSTEES

4.01. The Trust Fund shall be administered by a Board of Trustees consisting of eight (8) Trustees, four (4) of whom shall be designated as Employer Trustees, and four (4) of whom shall be designated as Union Trustees.

Thomas J. Moriaty, Carl Tominberg and Greg Youmans have been appointed as the Employer Trustees. John T. Coli and Becky Stzechowski have been appointed as the Union Trustees. Effective December 19, 2007, the incumbent Employer Trustees shall have the authority to appoint the fourth Employer Trustee; the Union Trustees shall be appointed by the Union.

The number of Trustees may be increased or decreased by unanimous action of the Trustees so long as there is always an equal number of Employer and Union Trustees.

4.03. Any Union Trustee may be removed from office by the Union at any time. An Employer Trustee may be removed from office by the unanimous vote of the other three (3) Employer Trustees.

Removal of a Trustee shall be evidenced by an instrument in writing signed by an accredited representative of the Union or by the Employer Trustees, whichever initiated such action, and said instrument shall be delivered to all the Trustees.

This Second Amendment is approved and adopted this 19th day of December 2007.

UNION TRUSTEES:                                    EMPLOYER TRUSTEES:

**Amendment No. 3 to the Restated Agreement and
Declaration of Trust of the
Teamsters Local Union No. 727 Legal and Educational Assistance Fund**

Whereas, the Board of Trustees has the authority to amend the Restated Agreement and Declaration of Trust of the Teamsters Local Union No. 727 Legal and Educational Assistance Fund, and

Whereas, the Board of Trustees desires to clarify the potential sources of contributions to the Trust,

Now, therefore, it is hereby resolved that effective November 1, 2011, that Article Six, Section 6.01(a) is amended, to replace the existing text with the following:

ARTICLE SIX

CONTRIBUTIONS

6.01. (a) The Contributions of the Employers shall be made to the Fund, in accordance with the various Collective Bargaining Agreements with the Union and with the rules and regulations adopted by the Trustees, provided that such Contributions shall be subject to acceptance by the Trustees. Each Employer agrees that there shall be an absolute obligation to the Trust Fund, and such obligation shall not be subject to a set-off or counterclaim which the Employer may have for any liability of the Union. The Trustees shall give consideration to the contribution rate in determining the benefits of any Plan maintained or adopted. Non-payment by an Employer of any Contributions as required by its Collective Bargaining Agreement shall not relieve any other Employer of its own obligation to make Contributions. Employees may not contribute to the Trust Fund in order to obtain or maintain eligibility under the Legal and Educational Assistance Plan.

This Third Amendment is approved and adopted this 1st day of November 2011.

UNION TRUSTEES:                                    EMPLOYER TRUSTEES:

**Fourth Amendment to the Restated Agreement and
Declaration of Trust of the
Teamsters Local Union No. 727
Legal and Educational Assistance Fund**

Whereas, the Board of Trustees has the authority to amend the Restated Agreement and Declaration of Trust of the Teamsters Local Union No. 727 Legal and Educational Assistance Fund, and

Whereas, the Board of Trustees deems it prudent to change the appointing authority of the Employer Trustees to be the Funeral Directors Services Association of Greater Chicago as set forth in the original trust document and subsequent restatement as well as the Apartment Building Owners and Managers Association,

Now, therefore, it is hereby resolved effective March 1, 2023, that Sections 4.01 through 4.05, and Section 4.08 of Article Four are amended and replaced in their entirety to provide as follows:

## ARTICLE FOUR

## APPOINTMENT, REMOVAL, VOTING, AND RESIGNATION OF TRUSTEES

4.01. The Trust Fund shall be administered by a Board of Trustees consisting of eight (8) Trustees. Four (4) of whom shall be designated as Employer Trustees, two (2) of whom shall be appointed by the Funeral Directors Services Association of Greater Chicago ("FDSA"), and two (2) of whom shall be appointed by the Apartment Building Owners and Managers Association ("ABOMA"). Four (4) of whom shall be designated as Union Trustees and shall be appointed by the Union.

The number of Trustees may be increased or decreased by unanimous action of the Trustees so long as there is always an equal number of Employer and Union Trustees.

1

In the event the FDSA is unable or unwilling to appoint an Employer Trustee, ABOMA shall assume the FDSA's appointment authority. In the event that ABOMA is unable or unwilling to appoint an Employer Trustee, the FDSA shall assume ABOMA's appointment authority.

4.02. (a) Each Trustee shall serve until his death, incapacity, resignation, or replacement, as provided herein.

(b) A Trustee may resign at any time by giving at least ten (10) days' notice in writing to the remaining Trustees. The notice shall state the date the resignation shall take effect and the resignation shall be effective on that date unless a successor Trustee has been appointed, in which event the resignation shall take effect as of the date the successor files the written acceptance provided for under this Article.

4.03. In the event of the death, incapacity to act, resignation or removal of a Trustee, his successor Trustee shall be appointed by the party having responsibility for the appointment and designation of such Trustee. Any successor Trustee, by whomsoever designated, shall file his written acceptance with the Board of Trustees and he shall thereupon become vested with all the duties, powers, rights, responsibilities, and properties of a Trustee hereunder. No vacancy or vacancies in the office of Trustee shall impair the power of the remaining Trustees to act in the manner herein provided to administer the affairs of the Trust pending the filling of any vacancy or vacancies.

4.04. The Union, at any time, may remove a Union Trustee and appoint a successor Trustee to fill any vacancy. The FDSA, at any time, may remove an Employer Trustee appointed by it and appoint a successor Trustee to fill any vacancy. ABOMA, at any time, may remove an Employer Trustee appointed by it and appoint a successor

2

Trustee to fill any vacancy. Removal of a Trustee shall be evidenced by an instrument in writing signed by an accredited representative of the Union, the FDSA or ABOMA, whichever initiated such action, and said instrument shall be delivered to all the Trustees.

4.05. Any successor Trustee, by whomsoever designated, shall file his written acceptance with the Board of Trustees and he shall thereupon become vested with all the duties, powers, rights, responsibilities, and properties of a Trustee. Any Trustee who has resigned or who has been removed from office shall execute all necessary instruments. A Trustee upon signing this Trust Agreement, or upon written acceptance filed with the Board in the case of any successor Trustee, shall be deemed to accept the Trust created and established by this Trust Agreement, to consent to act as Trustee, and to agree to administer the Trust Fund as provided herein.

4.08. The Trustees shall serve without compensation for their services hereunder as Trustees, but they may be reimbursed for expenses properly and actually incurred for Trust business; provided, however, that to the extent permitted by law, Trustees who are not receiving full-time pay from an Employer, the FDSA, ABOMA, or the Union because of work performed on a particular day may be paid reasonable compensation, including fringe benefits and reasonable expenses, for services rendered as a Trustee on said day. The amount of compensation to be paid shall be established by the Trustees from time to time.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Signature page follows*

3

IN WITNESS WHEREOF, the Trustees have caused this Fourth Amendment to be approved and adopted this 24th day of February 2023.

UNION TRUSTEES:                                    EMPLOYER TRUSTEES:

Carl Tominberg / RTL

4

# Exhibit C

## AGREEMENT AND DECLARATION OF TRUST OF THE PARKING INDUSTRY LABOR MANAGEMENT COMMITTEE

THIS AGREEMENT AND DECLARATION OF TRUST is made and entered into as of this 1st day of January 2002, by and among the Trustees, John Coli, Michael Coli, Michael Prussian and Steven Warshauer, who, with their successors designated in the manner herein provided, are hereinafter called the "Trustees" or "Board of Trustees."

WHEREAS, the Union and Employers have agreed to establish a joint committee, known as the Parking Industry Labor Management Committee ("Committee"), to promote the parking industry's important contributions to the Chicago metropolitan area, to improve communication between representatives of labor and management, to enhance economic development in the industry, and to involve employees in decisions affecting their jobs, including improving communication with respect to subjects of mutual interest and concern; and

WHEREAS, the Union and Employers are parties to Collective Bargaining Agreements requiring periodic payments by Employers to the Committee; and

WHEREAS, the Union and Employers have agreed through collective bargaining to create a Trust Fund to accomplish the aforesaid purposes; and

WHEREAS, officers of the principal Employers have offered to serve as Employer Trustees, and have so advised the Employers,

NOW THEREFORE, the Trustees hereby accept and adopt all of the provisions of

1

NOW THEREFORE, the Trustees hereby accept and adopt all of the provisions of this Agreement. The Trustees declare that they will receive and hold the Contributions, and any other money or property which may come into their hands as Trustees, with the powers and duties and for the uses and purposes as hereinafter set forth:

## ARTICLE ONE

## NAME

This Trust shall be designated and known as the Parking Industry Labor Management Committee Trust.

## ARTICLE TWO

## PURPOSES

2.01. The Trust is established for the purposes of carrying out the activities of the Parking Industry Labor Management Committee, a Labor-Management Cooperation Committee under the authority of Section 6(b) of the Labor-Management Cooperation Act of 1978, 29 U.S.C. Section 175a, and Section 302(c)(9) of the National Labor Relations Act, 29 U.S.C. Section 186 (c)(9), and for collecting, administering and disbursing funds as necessary to carry out the purposes of the Committee. The Committee is established to improve the business conditions in the parking industry in the Chicago metropolitan area and for such other permissible purposes established by the above federal statutes, including:

(a)     Enhancing communication and engendering cooperative and harmonious relations between labor and management within the jurisdiction of the Union;

2

(b)     Providing employees and employers with opportunities to study and explore new and innovative joint approaches to achieving organizational effectiveness;

(c)     Assisting employees and management in solving problems of mutual concern not susceptible to resolution within the collective bargaining process;

(d)     Studying and exploring ways of eliminating potential problems which reduce the competitiveness and inhibit the economic development of the Employers and/or the parking industry;

(e)     Enhancing the involvement of employees in making decisions that affect their working lives;

(f)     Expanding and improving working relationships between employees and managers by undertaking activities to foster communication between supervisory personnel and employees;

(h)     Fostering improvements in occupational safety and health and other working conditions within the jurisdiction of the Union;

(i)     Providing employees and employers with opportunities to study and explore new and innovative approaches to enhancing job security;

(j)     Engaging in any other lawful activities incidental or related to the accomplishment of these purposes, including, but not limited to the following:

> 1) Conducting seminars for supervisory personnel and employees on improving working conditions;
>
> 2) Providing safety training for both management and employees;

3) Undertaking surveys of members of management and of employees to determine issues of concern;

4) Providing supervisory personnel with training on issues of effective management of the workforce, including, but not limited to, education on the grievance process;

5) Commissioning professional evaluations of workplace safety standards;

6) Studying the management of insurance risks in the industry;

7) Distribution of publications of interest to both employees and employers;

8) Dissemination of information regarding the contributions of the industry to the Chicago metropolitan community.

2.02. No part of the net earnings of this Trust shall inure or be payable to or for the benefit of any individual and no substantial part of the activities of this Trust shall be for the carrying on of propaganda or otherwise attempting to influence legislation. No part of the activities of this Trust shall be for the participation in, or intervention in (including the publishing or distributing of statements), any political campaign on behalf of or in opposition to any candidate for public office. The Committee is not organized for profit or to engage in activities ordinarily carried on for profit, and is intended to be operated as a tax-exempt organization pursuant to Section 501(c)(6) of the Internal Revenue Code. To the extent that any of the provisions of this Agreement are found to be inconsistent with the requirements thereunder, those provisions are superseded.

2.03. The Trust's Fiscal Year shall be from January 1 through December 31.

4

2.04. This Agreement and Declaration of Trust shall be in full force and effect as of January 1, 2002.

## ARTICLE THREE

## DEFINITION OF TERMS

Unless the context clearly indicates otherwise, the following terms shall be construed as hereinafter defined:

3.01. The term "Collective Bargaining Agreement" shall mean any collective bargaining agreement in force and effect from time to time between the Union and any Employer which provides for Contributions to the Committee. Such term shall also be deemed to include other written agreements by which any person or an Employer is obligated to make Contributions to the Committee.

3.02. The term "Committee" shall mean the Parking Industry Labor Management Committee.

3.03. The term "Contributions" shall mean the payments required to be made by Employers to the Committee pursuant to Collective Bargaining Agreements.

3.04. The term "Custodian" shall mean the bank or trust company, if any, selected by the Board of Trustees to hold the assets comprising the Trust Fund.

5

3.05. The term "Employee" shall mean any individual who is represented for collective bargaining purposes by the Union, and employed by an Employer, and for whom that Employer is obligated to make a Contribution to the Committee.

3.06. The term "Employer" shall mean all employers who are obligated to make Contributions to the Committee pursuant to the terms of any Collective Bargaining Agreement.

3.07. The terms "Fund" or "Trust Fund" shall mean the funds held in trust for the purposes of this Trust Agreement, and shall consist of all monies due the Committee as Employer Contributions, and any other property or income received and held by the Trustees for the uses and purposes set forth in this Trust Agreement.

3.08. The term "Trust" shall mean the Parking Industry Labor Management Committee Trust as created by and pursuant to the terms of this Agreement.

3.09. The terms "Trustees" or "Board" shall mean the Trustees designated in this Trust Agreement together with their successors designated and appointed in accordance with the terms and procedures of this Trust Agreement.

3.10. The term "Trust Agreement" shall mean this Agreement and Declaration of Trust, including any amendments, modifications, revisions or extensions hereof.

3.11. The term "Union" shall mean Auto Livery Chauffeurs, Embalmers, Funeral Directors, Apprentices, Ambulance Drivers and Helpers, Taxi Cab Drivers, Miscellaneous Garage Employees, Car Washers, Greasers, Polishers and Wash Rack Attendants Union, Local No. 727, an affiliate of the International Brotherhood of Teamsters ("I.B.T.").

6

## ARTICLE FOUR

## APPOINTMENT, REMOVAL, VOTING, AND RESIGNATION OF TRUSTEES

4.01. The Trust shall be administered by a Board of Trustees consisting of four Trustees, two of whom shall be designated as Employer Trustees and shall be appointed by the Employers and two of whom shall be designated Union Trustees and shall be appointed by the Union. Michael Prussian and Steven Warshauer have been appointed as the Employer Trustees. John T. Coli and Michael Coli have been appointed as the Union Trustees.

The number of Trustees may be increased or decreased by unanimous action of the Trustees so long as there is always an equal number of Employer and Union Trustees.

4.02. (a) Each Trustee shall serve until his death, incapacity, resignation, removal, or replacement as herein provided.

(b) A Trustee may resign at any time by giving at least ten (10) days notice in writing to the remaining Trustees. The notice shall state the date the resignation shall take effect and the resignation shall be effective on that date unless a successor Trustee has been appointed, in which event the resignation shall take effect as of the date the successor files the written acceptance provided for under Section 4.05 of this Article.

4.03. Any Union Trustee may be removed as a Trustee by the Union at any time. An Employer Trustee may be removed as a Trustee at any time by a weighted vote of the Employers who have made Contributions to the Committee during the three months

7

preceding the voting. Each such Employer shall have a number of votes equal to the amount of Contributions (other than delinquent Contributions) paid by that Employer during said three-month period. Such vote shall be conducted whenever a request is supported by Employers who have contributed twenty-five percent (25%) of the Contributions (other than delinquent Contributions) received by the Committee during the three (3) months preceding the request. The Committee, with the affected Employer Trustee abstaining, may establish the rules necessary to conduct the vote and may utilize the services of an impartial agency to conduct the vote. Removal of a Trustee shall be evidenced by an instrument in writing signed by an accredited representative of the Union or the Employers, whichever initiated such action, and said instrument shall be delivered to all the Trustees.

4.04. (a) In the event of the death, removal, incapacity to act, or resignation of an Employer Trustee, a successor Trustee shall be appointed by the remaining Employer Trustee, if any. If no Employer Trustee is serving, nominations shall be solicited and an election conducted in accordance with the procedures set forth in Section 4.03. In the event of the death, removal, incapacity to act, or resignation of a Union Trustee, a successor Union Trustee shall be appointed by the Union in accordance with its By-laws.

(b) Any successor Trustee, by whomsoever designated, shall file his written acceptance with the Board of Trustees and he shall thereupon become vested with all the duties, powers, rights, responsibilities and properties of a Trustee. No vacancy or vacancies in the office of Trustee shall impair the power of the remaining Trustees to administer the affairs of the Trust pending the filling of any vacancy or vacancies.

8

4.05. A Trustee upon signing this Trust Agreement, or upon written acceptance filed with the Board in the case of any successor Trustee, shall be deemed to accept the Trust created and established by this Agreement, to consent to act as Trustee, and to agree to administer the Trust Fund as provided herein.

4.06. The Trustees shall select from among the Trustees a Chairman and a Secretary, one of whom shall be an Employer Trustee and the other a Union Trustee. The term of office for such officers shall be for two (2) years or until his or their successors have been elected. The positions shall be rotated between Employer and Union Trustees.

4.07. No successor Trustee shall be liable or responsible for any acts or defaults of any other Trustee or predecessor Trustee, or for any losses or expenses resulting from or occasioned by anything done or neglected to be done in the administration of the Trust Fund prior to his becoming a Trustee. A successor Trustee shall not be required to inquire into or take any notice of the prior administration of the Trust Fund.

4.08. The Trustees shall serve without compensation for their services hereunder as Trustees, but they may be reimbursed in accordance with guidelines to be adopted by the Trustees for expenses properly and actually incurred for Trust business.

4.09. (a) Regular meetings of the Trustees may be held at such time or times as may be established by the Trustees but not less than annually. Meetings may also be held at any time without notice if all of the Trustees consent. Special meetings may be called at any time by the Chairman or the Secretary of the Board, upon giving five (5) days' written notice to all other Trustees. Notice may be waived by agreement of all Trustees. Minutes

9

of all meetings shall be kept, but not necessarily verbatim and copies thereof shall be furnished to the Trustees.

(b) Any action by the Trustees may be taken at a meeting, by a telephone poll, in a conference call, or in writing without a meeting. Concurrence of all the Trustees, evidenced by their written signatures, shall be required for action taken without a meeting, or in a conference call.

(c) Two Trustees shall constitute a quorum at any regular or special meeting of the Trustees, provided that one Union Trustee and one Employer Trustee are present.

(d) Unless otherwise specified herein, the concurring vote of a majority of the Trustees present and voting shall be required to carry any motion or resolution. Each Union Trustee and each Employer Trustee shall be entitled to cast one (1) vote on each motion or resolution; provided, however, that the vote of any absent Trustee shall be allocated among the group of Trustees of which he is a member so that both groups will have an equal number of votes.

(e) A deadlock of the Trustees shall be deemed to exist if a quorum is not present at two successive properly scheduled meetings, or if the vote of the Trustees is equal on any proposal. Whenever a deadlock exists, the Trustees shall first seek mediation in an endeavor to break such deadlock, and if that proves unavailing (or if the Trustees agree to waive mediation), either group of Trustees may advise the other group of Trustees that they wish to submit the deadlocked issue for arbitration to an impartial person to be selected by the Trustees. Should they fail to agree on the impartial person

10

within ten (10) days, any Trustee may petition the American Arbitration Association for a list of five (5) impartial arbitrators experienced in such disputes. The Trustee groups shall alternately and expeditiously strike names from said list and the remaining name shall be the impartial arbitrator. The order of striking shall be determined by chance. The arbitrator's decision shall be final and binding on the Trustees and his fees and expenses, as well as the joint expenses incidental to his activities and the arbitration, shall be paid from the Trust Fund.

4.10. (a) The Board of Trustees shall be bound by the signatures of the Chairman and Secretary. In addition, any instrument may be executed on behalf of the Board by one or more Trustees designated for that purpose by the Board, or by the signature of any other person or persons designated for that purpose by the Board.

(b) Upon the signing of any instrument by an authorized person, all persons, partnerships, corporations or associations may rely thereon that such instrument has been duly authorized by action of the Board of Trustees.


## ARTICLE FIVE

## POWERS, DUTIES AND OBLIGATIONS OF THE TRUSTEES

5.01. The Trustees shall supervise the operation of the Trust and shall conduct the business and activities of the Trust. The Trustees shall collect the income and Contributions made to the Committee and shall hold, manage, care for, and protect the Trust Fund.

11

5.02.  The Trustees are hereby empowered to do all acts, whether or not expressly authorized herein, which the Trustees may deem necessary to accomplish the general objective of improving labor-management cooperation or for any other purpose allowed under Section 6(b) of the Labor-Management Cooperation Act of 1978, 29 U.S.C. 175a(b), and consistent with the Committee's tax-exempt status.

5.03.  The Trustees are authorized, empowered and directed to invest and reinvest the Trust Fund in any property or undivided interest therein in accordance with investment guidelines to be adopted by the Trustees. The primary purpose of said guidelines shall be the preservation of principal.    The Trustees may sell or otherwise dispose of such securities or property at any time.  The Trustees shall have power (in addition to, and not in limitation of, common law and statutory authority) to exercise in respect to any stocks, bonds, or other property, real or personal, all such rights, powers, and privileges as might be lawfully exercised by any person owning similar stocks, bonds, or other property in his own right.

All or any part of the Trust assets may be invested in any collective investment trust fund qualified for tax exemption under Section 501(a) of the Internal Revenue Code, or amendments thereof, which is then maintained by any bank or trust company whether or not acting as a trustee, co-trustee, or agent for the Trustees hereunder.  The document governing each such collective investment trust, as amended from time to time, shall govern any investment therein, and is hereby made a part of this Trust Agreement.

12

The Trustees shall have the power to borrow from any bank, savings and loan association, insurance company, or any other money lending firm or institution, such sums, and on such terms and conditions, which the Trustees may from time to time determine. The Trustees may hypothecate, mortgage, pledge or otherwise collateralize or secure any indebtedness so created with assets of this Trust; provided, however, that any resolution presented to the Trustees pursuant to the powers contained in this paragraph must be adopted by the affirmative vote of not less than three-fourths of the Trustees, regardless of the number of Trustees present at any meeting.

Such investment actions shall be taken with the care, skill, prudence and diligence, under the circumstances then prevailing, that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. Such actions shall include the diversification of the Trust's investments so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so.

If one or more Investment Managers have been appointed in accordance with the terms of this Agreement, no Trustee shall be liable for the acts or omissions of any such Investment Manager(s) or under any obligation to invest or otherwise manage any Fund asset of which is subject to the management of any such Investment Manager.

5.04. The Trustees are hereby empowered to allocate fiduciary responsibilities among the Trustees and to designate persons other than Trustees to carry out fiduciary responsibilities as provided in this Agreement. The power to allocate fiduciary

13

responsibility shall not apply to the application of the responsibility to manage the assets of the Trust Fund other than the power to appoint an Investment Manager or Managers.

The Trustees shall have exclusive authority and discretion to manage and control the assets of the Trust Fund except to the extent that such authority to manage, acquire, or dispose of the assets of the Trust Fund is delegated to one or more Investment Managers in accordance with the following paragraph.

The Trustees are empowered to appoint an Investment Manager(s) to manage, acquire, or dispose of any assets of the Trust Fund. An "Investment Manager" is any fiduciary who has been designated by the Trustees to manage, acquire or dispose of any assets of the Fund, who is: (i) registered as an investment adviser under the Investment Advisers Act of 1940; (ii) is a bank, as defined in that Act; or (iii) is an insurance company qualified to perform such services under the laws of more than one state, and who has acknowledged in writing that it is a fiduciary with respect to the Fund.

5.05. The Board and each Trustee, to the extent permitted by applicable law, shall be fully protected in acting upon any instrument, certificate or paper believed by them to be genuine and to be signed or presented by the proper person or persons and shall be under no duty to make any investigation of, or inquiry as to, any statement contained in such record, but may accept the same as conclusive evidence of the truth of the statements therein contained.

No Trustee shall be liable for any acts or defaults of any prior Trustee, any other Trustee, any other fiduciary, any party in interest or any other person except to the extent

14

required by applicable law; it being the intent and purpose of the parties hereto that, to the extent permitted by law, each Trustee shall be liable only for his own acts or omissions occurring during his term of service as Trustee.

5.06. The Trust will indemnify the Trustees against any and all losses, liabilities or expenses incurred by any of them arising out of or in connection with the acceptance or administration of their duties under this Trust, including the costs and expenses of enforcing the provisions of this Section 5.06 of the Trust, and defending themselves against any claim or liability in connection with the exercise or performance of any of their duties hereunder, except as may be prohibited by law and/or to the extent any such loss, liability or expense may be attributable to the gross negligence or bad faith of the applicable Trustee(s).

5.07. No individual or person may act as agent for the Trust unless specifically authorized by this Agreement or in writing by the Trustees. Neither an Employer nor the Union, or any representative of an Employer or the Union, in such capacity, is authorized to interpret the Trust Agreement, nor can any such person act as agent of the Trustees. Only the Board of Trustees is authorized to interpret the Trust Agreement.

5.08. The Trustees shall keep true and accurate books of account and a record of all their transactions, meetings and the actions taken at such meetings or by informal action of the Trustees.

5.09. The books and records of the Trust Fund shall be kept according to generally accepted accounting principles. The Trustees shall procure an audit of the books of the

15

Trust by a Certified Public Accountant not less frequently than once for each fiscal year and a copy of each such audit shall be furnished, upon request, to each Trustee.

5.10. The Trustees are hereby authorized to formulate and promulgate any and all necessary rules and regulations which they deem necessary or desirable to facilitate the proper administration of the Trust. All rules and regulations adopted by majority action of the Trustees for the administration of the Trust shall be final and binding upon all parties hereto, and all parties dealing with the Trust. The Trustees shall have the exclusive authority and discretion to interpret and apply this Trust Agreement, and all such interpretations and applications shall be final and binding upon all parties.

5.11. The Trustees shall use and apply the Trust Fund for the following purposes:

(a) To pay or provide for the payment of all necessary expenses of collecting the Contributions and administering the affairs of this Trust, including the employment of such administrative, custodial, legal, accounting, expert, and clerical assistance as may be necessary, the purchase or the lease of such premises as may be necessary for the operation of the affairs of the Trust, and the purchase or lease of such materials, supplies and equipment as the Trustees in their discretion find necessary or appropriate to the performance of their duties;

(b) To operate a Labor-Management Cooperation Committee as defined under Section 6(b) of the Labor-Management Cooperation Act of 1978, 29 U.S.C. Section 175a, and Section 302(c)(9) of the National Labor Relations Act, 29 U.S.C. Section 186 (c)(9) with the general objective of improving labor-management cooperation or for any other

16

purpose allowed under the Act, and to use and apply the Trust Fund to establish and maintain programs in furtherance of this objective;

(c) To pay or provide for the payment of expenses incidental to the operation of an office; and

(d) To pay or provide for the payment of expenses of Trustees in connection with attendance at educational conferences and seminars.

5.12. The receipt of the Trustees for any money or property received by them shall discharge the person or persons paying or transferring the same.

5.13. All Trust funds not invested shall be deposited by the Trustees in such depository or depositories ("Custodian") as the Trustees shall from time to time select and any such deposit or deposits shall be made in the name of the Trust. Any Trustee authorized to deposit, transfer or withdraw funds held in a trust account(s) shall have the authority to transfer, by wire or phone, such funds to a checking account.

Except as provided otherwise by Resolution of the Trustees, all such funds may be disbursed by check or draft signed by at least one Employer Trustee and one Union Trustee. The Board may authorize the Chairman to make withdrawals by check for the payment of administrative expenses.

To the extent permitted by law, no Trustee shall be liable in any manner for any loss to the Fund occasioned by the fault or negligence of any Custodian selected by the Trustees in good faith and in the exercise of reasonable business judgment.

17

5.14. Notices to the Trustees, the Union, or any Employer hereunder shall, unless otherwise specified, be sufficient if in writing and delivered to or sent by pre-paid first class mail or by facsimile. Notices shall be sent in accordance with the attached Exhibit 1.

5.15. The Trustees are hereby empowered, in addition to such other powers as are set forth herein or conferred by law:

(a)     To enter into any and all contracts and agreements for carrying out the terms of this Agreement and for the administration of the Trust Fund and to do all acts as they, in their discretion, may deem necessary or advisable, and such contracts, agreements and acts shall be binding and conclusive on the parties.

(b)     To keep property and securities registered in the name of the Trustees or in the name of the Custodian or a nominee(s) or in unregistered or bearer form, without disclosure of any fiduciary relationship.

(c)     To establish and accumulate as part of the Trust Fund a reserve or reserves adequate, in the opinion of the Trustees, to carry out the purposes of the Trust.

(d)     To pay out of the Trust Fund all real and personal property taxes, income taxes and other taxes of any and all kind levied or assessed under existing or future laws upon or in respect to the Trust Fund or any money, property or securities forming a part thereof.

(e)     To compromise, arbitrate, settle, adjust or release any suit or legal proceeding, claim, debt, damage or understanding due or owing from or to the Committee

18

on such terms and conditions as the Trustees, in their sole discretion, may deem advisable.

(f)     To consult with legal counsel with respect to the meaning or construction of this Agreement, or their obligations and duties hereunder, or with respect to any action or proceeding, or any question of law, and shall be fully protected, to the extent permitted by law, with respect to any action taken or omitted by them in good faith pursuant to the advice of counsel.

(g)     To do all acts, whether or not expressly authorized herein, which the Trustees deem necessary or proper.

(h)     To enter into an arrangement with the trustees of employee benefit funds to which contributions are due from the Employers for the collection of delinquent contributions to this Trust.

5.16  The Trustees shall provide for fidelity bonds, in such form and amounts as may be required by statute, for their fiduciaries and every person who handles funds or other property of the Trust Fund. If no such statutory requirement shall exist, such bonds shall be in such form and amounts as the Trustees may determine, provided however, that the amount of such bonds, which shall be fixed at the beginning of the fiscal year, shall not be less than ten percent (10%) of the amount of funds handled, and in no case shall such bond be less than $5,000 or more than $500,000. In addition, the Trustees will purchase insurance to cover liabilities or losses occurring by reason of the act or omission of a fiduciary.

5.17. The Board may employ an administrator who may, but need not be, a Trustee, and delegate to such administrator the authority to act upon all matters in connection with the administration of the Trust, including the authorization to execute those documents which, in the sole discretion of the Trustees, are deemed necessary for the day-to-day administration of the Trust; the responsibility of accounting for the Contributions made to the Trust Fund and the collection of delinquent Contributions; and such other function as the Board may deem advisable. Any administrator so appointed may be employed part-time, may provide similar services for other funds and may engage in unrelated employment activities.

5.18. The Trustees shall have and maintain an office in the State of Illinois which shall be deemed the situs of the Trust Fund, and which may be in the office building of the Union.

## ARTICLE SIX

## CONTRIBUTIONS

6.01. (a) The Contributions of the Employers shall be made in accordance with the various Collective Bargaining Agreements with the Union and with the rules and regulations adopted by the Trustees, provided that such Contributions shall be subject to acceptance by the Trustees. Each Employer agrees that there shall be an absolute obligation to make Contributions, and such obligation shall not be subject to a set-off or counterclaim which the Employer may have for any liability of the Union. Non-payment by

20

an Employer of any Contributions as required by its Collective Bargaining Agreement shall not relieve any other Employer of its own obligation to make Contributions.

(b) The Trustees may compel and enforce the payment of Contributions in any manner which they may deem proper but without limitation upon any rights and privileges the Union may have in this connection. Expenses incurred in the collection of such Contributions shall be paid from the Trust Fund, even though such expenses are subject to reimbursement by the delinquent Employer.

6.02. The failure of an Employer to pay Contributions by the date established by the Collective Bargaining Agreements or, if no date is set by the Collective Bargaining Agreement, by the rules and regulations adopted by the Trustees shall constitute a violation of the applicable Collective Bargaining Agreement between such Employer and the Union, as well as a violation of the Employer's obligations hereunder.

The Trustees shall have the right to adopt rules and regulations relating to the collection of Employer Contributions, including provisions for time of payment, collection of interest, audit fees, attorneys' fees at the rate set by the Trustees in their sole discretion, costs, and liquidated damages as specified in this Section. An Employer in default as of the date established by the Collective Bargaining Agreement or the Trustees for payment of Contributions shall be liable for an additional amount of twenty percent (20%) of the delinquent payment or $50.00, whichever is greater, and interest at the rate set forth in the rules and regulations. In the absence of a rate set forth in the rules and regulations, the interest rate used each month shall be the prime rate plus one percent (1%), as reported in

21

the Wall Street Journal on the first business day of each month. Liquidated damages shall compensate the Fund for some or all of the damages arising from lost earnings, administrative costs, uncertainties causing difficulties in forecasting earnings and managing investments, the disruptive effects of unequal performance of obligations among Employers.

The Trustees may waive all or part of the liquidated damages and interest where Contributions are found by the Trustees to have been delinquent as a result of clerical errors or administrative problems beyond the control of an Employer and where there have been good faith efforts by the Employer to comply with the applicable rules and regulations for payment of Contributions.

6.03. Each Employer and its affiliated or related companies or businesses shall furnish to the Trustees on demand the names of all employees, their Social Security numbers, the time worked by each employee, the Contributions due or payable to the Committee, and such other information, including cash journals, wage and payroll records, income tax records, and other business records, as the Trustees or their agents may reasonably require in connection with the administration of the Trust. The Trustees, or their authorized representative, shall have the right to examine and audit the pertinent books and records (as determined by the Trustees) of each Employer and its affiliated or related companies whenever such examination is deemed necessary or advisable by the Trustees in connection with the proper administration of the Trust. The Trustees may, in

22

their discretion, accept a certified report of an Employer's accountant in lieu of an independent audit.

6.04. Nothing in this Agreement shall prevent a Contribution which is made by an Employer by a mistake of fact or law to be returned by the Trustees to such Employer, upon written request, within twelve months after the Trustees determine that the Contribution was made by such a mistake.

## ARTICLE SEVEN

## CONTROVERSIES AND DISPUTES

7.01. In any controversy, claim, demand, suit at law or other proceeding between any person or persons and the Trustees, the Trustees shall be entitled to rely upon any facts appearing in the records of the Trustees, any instruments on file with the Trustees, with the Union, or with any Employer, any facts certified to the Trustees by the Union or any Employer, any facts which are of public record, and any other evidence pertinent to the issue involved.

7.02. All questions or controversies arising in any manner between any parties or persons in connection with the Committee or the Trust or its operation, whether as to the construction of the language or meaning of the rules and regulations adopted by the Trustees or this instrument, or as to any writing, decision, instrument or accounts in connection with the operation of the Committee or the Trust shall be submitted to the

23

Board of Trustees for decision. The decision of a majority of the Board shall be binding upon all persons dealing with the Committee or the Trust.

## ARTICLE EIGHT

## TERMINATION AND MERGER OF TRUST

8.01. In the event the obligation of all Employers to make Contributions shall cease, or the Trust Fund, in the opinion of the Trustees, is inadequate to carry out the intent and purposes of the Trust, the Trustees shall expend the Trust Fund's assets for the payment of expenses and for the exempt purposes specified in Article Two, or for any other purpose consistent with this Agreement and with the requirements of the Internal Revenue Code governing exempt organizations. In no event, upon termination, shall any assets of the Trust Fund revert to any Employer, or be paid to the Union or directly to Employees. Upon the disbursement of the entire Trust Fund, the Trust shall terminate.

8.02. Upon termination, the Trustees shall notify the Union and each Employer contributing to the Fund, and any other person, partnership, corporation or association with whom they are dealing, and shall continue as Trustees for the purpose of dissolution.

8.03. In lieu of the distribution and liquidation upon termination as set forth in Section 8.01, the Trustees may, after all obligations of the Trust have been satisfied, turn over any surplus monies and property in the Fund to any future labor management cooperation committee that may be created by and between Employers and the Union

24

pursuant to collective bargaining agreements, provided that said committee is operated for the exempt purposes provided for in this Agreement or for any other purpose consistent with this Agreement and with the requirements of the Internal Revenue Code governing exempt organizations.

8.04. In addition to any other authority granted under this Trust Agreement, the Trustees shall have the authority to merge this Trust Fund with another trust fund established for the exempt purposes set forth in Article Two of this Agreement. The terms and conditions of such a merger shall be within the sole discretion of the Trustees, consistent with the provisions of this Article Eight.

## ARTICLE NINE

### MISCELLANEOUS

9.01. In no event shall the Employers, directly or indirectly, receive any refund of Contributions, except as provided in Section 6.04, or participate in the disposition of the Trust Fund. Upon payment to the Trustees, all responsibilities of the Employers for Contributions shall cease and the Employers shall have no responsibilities for the acts of the Trustees.

9.02. The Trustees shall be entitled, at any time, to have a judicial settlement of their accounts and judicial determination of any questions in connection with their duties and obligations under this Trust, or in connection with the administration thereof.

9.03. Where used in this Agreement, words in the masculine shall be read and construed as in the feminine and words in the singular shall be read and construed as though used in the plural, in all cases where such construction would so apply.

9.04. The Article titles are included solely for convenience and shall, in no event, be construed to affect or modify any part of the provisions of this Agreement or be construed as part thereof.

9.05. This Agreement shall in all respects be construed according to, and be governed by, the laws of the State of Illinois, except as may be otherwise provided by federal law.

9.06. Neither this Agreement nor any amendments thereto, nor any rules and regulations adopted for the administration of the same, nor any award of any arbitrator appointed hereunder shall modify the Collective Bargaining Agreements between the Union and any association or any Employer or add to or alter the obligations of the Employers or the Union thereunder. The provisions of this paragraph shall in no event be subject to amendment.

9.07. No Employer nor the Union shall at any time, and under any circumstances or conditions, have any financial obligations under this Trust other than the payment of any required Contributions and such other amounts as may be provided for under Article Six.

26

## ARTICLE TEN

## AMENDMENT OF AGREEMENT

This Agreement may be amended by majority vote of the Trustees at any time, provided that no amendment shall authorize the Trustees to conduct the affairs of the Committee in any manner or for any purpose which would jeopardize its tax-exempt status. Any amendment of the provisions of this Article Ten shall be valid only if and to the extent that such amendment further restricts the Trustees' amending power.

## ARTICLE ELEVEN

## SAVINGS CLAUSE

Should any provision of this Agreement be held to be unlawful, such fact shall not adversely affect the other provisions herein contained, or the application of said provisions, unless such illegality shall make impossible the functioning of the Trust. Except to the extent required by law, no Trustee shall be held liable for any act done or performed in pursuance of any provision hereof prior to the time such act or provisions shall be held unlawful by a court of competent jurisdiction.

27

IN WITNESS WHEREOF, the Trustees have caused this Agreement to be executed this 26th day of July, 2002.

UNION TRUSTEES:

_John T. Cali_

_Mich. Thel_

EMPLOYER TRUSTEES:

_George Warshaw_

_Jel_

28

# Exhibit D



**AGREEMENT**

between

**HEAT PARKING**

and

**TEAMSTERS LOCAL 727**

**July 1, 2023 – June 30, 2027**

# TABLE OF CONTENTS

ARTICLE 1 Recognition .................................................................................................... 1

ARTICLE 2 Union Security ............................................................................................... 1

ARTICLE 3 Uniforms ....................................................................................................... 2

ARTICLE 4 Seniority ........................................................................................................ 2

ARTICLE 5 Grievance Procedure ..................................................................................... 3

ARTICLE 6 Discipline and Discharge .............................................................................. 5

ARTICLE 7 Strikes and Lockouts ..................................................................................... 5

ARTICLE 8 Wages ............................................................................................................ 5

ARTICLE 9 Holidays ........................................................................................................ 6

ARTICLE 10 Military Service ........................................................................................... 7

ARTICLE 11 Jury Duty ..................................................................................................... 7

ARTICLE 12 Sick and Personal Leave ............................................................................. 8

ARTICLE 13 Funeral Leave .............................................................................................. 8

ARTICLE 14 Vacations ..................................................................................................... 9

ARTICLE 15 Leave of Absence ...................................................................................... 10

ARTICLE 16 Hours of Work ........................................................................................... 11

ARTICLE 17 Transfers .................................................................................................... 12

ARTICLE 18 Driver's License ........................................................................................ 12

ARTICLE 19 Health and Welfare and Legal and Educational Assistance ..................... 12

ARTICLE 20 Labor Management Committee .................................................................. 15

ARTICLE 21 Teamsters Local Union Number 727 Trade Show 401(k) Plan ............... 15

ARTICLE 22 Management Rights ................................................................................... 16

ARTICLE 23 Doctors' Examinations .............................................................................. 16

ARTICLE 24 Time Records ............................................................................................ 16

ARTICLE 25 Access to Facility ...................................................................................... 16

ARTICLE 26 Payday ....................................................................................................... 17

ARTICLE 27 Maintenance of Benefits ........................................................................... 17

ARTICLE 28 Individual Agreements .............................................................................. 17

ARTICLE 29 Non-Discrimination .................................................................................. 17

ARTICLE 30 Shortages ................................................................................................... 17

ARTICLE 31 Employee Liability .................................................................................... 18

ARTICLE 32 Change in Ownership or Management ....................................................... 18

## TABLE OF CONTENTS
(continued)

ARTICLE 33 Credit Union.................................................................................................... 19

ARTICLE 34 Drive Authorization and Deduction.................................................................. 19

ARTICLE 35 Open Full-Time Positions................................................................................. 20

ARTICLE 36 Location/Facility Classification........................................................................ 20

ARTICLE 37 Miscellaneous.................................................................................................... 20

LETTER OF UNDERSTANDING NO. 1.............................................................................. 23

LETTER OF UNDERSTANDING NO. 2.............................................................................. 24

LETTER OF UNDERSTANDING NO.3............................................................................... 25

LETTER OF UNDERSTANDING NO. 4.............................................................................. 26

## ARTICLES OF AGREEMENT

AGREEMENT made and entered into by and between HEAT PARKING, (hereinafter referred to as the "Employer"), and Auto Livery Chauffeurs, Embalmers, Funeral Directors, Apprentices, Ambulance Drivers and Helpers, Taxicab Drivers, Miscellaneous Garage Employees, Car Washers, Greasers, Polishers and Wash Rack Attendants, Motion Picture, Theatrical, Exposition, Convention and Trade Show Employees, Pharmacists, Bus Drivers, Parking Lot Attendants, and Hikers, Hotel Industry and Racetrack Industry Employees, Newspaper, Magazine, Periodical Salesmen, Drivers, Division Men, District Managers, Checkers, Vendors and Handlers, and Electronic Media Workers Chicago and Vicinity, Illinois LOCAL 727, an affiliate of the I. B. of T. (hereinafter referred to as the "Union").

## ARTICLE 1
### Recognition

1.1     Notwithstanding the title or the Charter of the Union, it is agreed that the Union, shall be the sole and exclusive bargaining agent for the following employees of the Employer only: All full-time and part-time employees who perform valet services at locations which have no parking facilities.

1.2     It is agreed that this Agreement applies only to valet service locations which have no parking facilities as defined in Article 36. All locations which have parking facilities will be covered under the commercial or residential contract with the Union (also referred to as the Parking Industry Agreement), which is hereby incorporated by reference.

1.3     Except as otherwise provided herein, all work covered by this Agreement shall be performed by bargaining unit employees. The Employer shall assign the work covered under this Agreement to employees covered by this Agreement as described in Article 1, Section 1.1 of this Agreement. Non-bargaining unit employees, including supervisors, shall not regularly perform bargaining unit work normally assigned to employees in job classifications covered by this Agreement; provided, however, that they may perform such work in emergencies or in the instruction and/or training of employees. Nothing in this Article shall be construed to limit the Employer's ability to subcontract out maintenance and construction projects.

## ARTICLE 2
### Union Security

2.1     It shall be a condition of employment that all employees of the Employer covered by this Agreement who are members of the Union in good standing on the date on which this Agreement is signed shall remain members in good standing, or pay fees in lieu thereof, and those who are not members on the date on which this Agreement is signed shall, on the thirty-first day following the date on which this Agreement is signed, become and remain members in good standing in the Union, or pay fees in lieu thereof. It shall also be a condition of employment that all employees covered by this Agreement and hired on or after the date on which the Agreement is signed shall, on the thirty-first day following the beginning of such employment, become and remain members in the Union, or pay fees in lieu thereof.

1

2.2     When specifically authorized in writing by each employee, the Employer will deduct, from the first paycheck of each month, dues, and/or fees owing the Union and forward them to the Secretary-Treasurer of the Union, not later than ten (10) days after each monthly deduction. Such authorization, once given, shall be irrevocable for a period of not less than one (1) year or the term of this Agreement, whichever occurs sooner.

2.3     Upon hiring an employee or upon the request of the Union, it shall be the responsibility of the Employer to obtain from the employee a completed Application and Authorization form provided by the Union and an Enrollment Card provided by the Teamsters Local Union No. 727 Benefit Funds. The Employer will forward the same to the Union by the employee's thirty-first day of employment or within thirty (30) days after a request by the Union is made.

2.4     The Union agrees to further the interests of the Employer to the best of its ability.

## ARTICLE 3
### Uniforms

3.1     Should an employee be required to wear a uniform, the Employer agrees to furnish said uniforms, free of charge, and replace worn-out or damaged uniforms, free of charge. The Employer shall supply such employees with uniforms that, in the opinion of the Employer, are reasonable for the season in light of the specific requirements at each location.

3.2     Employees shall not be required to pay for uniforms or replacement uniforms or for a deposit for such uniforms or replacement uniforms; provided the Employer may deduct the cost of such uniform from the employee's final paycheck if the employee fails to return the uniform upon termination.

3.3     Identification badges will be issued to employees free of charge; provided that the Employer may charge an employee $5.00 for replacement of a lost badge.

## ARTICLE 4
### Seniority

4.1     Seniority shall mean length of continuous service from an employee's first day of continuous employment in the industry as a member of the Union. Separate seniority lists shall be maintained for full-time and part-time employees. Employees changing from one seniority list to the other shall go to the bottom of that seniority list. The Employer shall keep and make copies available to a representative of the Union accurate and up-to-date separate seniority lists, showing their names and first date of employment.

Seniority is to prevail at all times, except that seniority shall not apply to foremen or to the selection of foremen.

2

All seniority shall be considered on a company-wide basis for purposes of lay-offs. In case of lay-offs, the last employee hired is to be the first laid off in respect to the separately maintained seniority lists. An employee laid off from one seniority list shall not use his seniority to replace an employee on the other seniority list except that a full-time employee may work part-time and retain his recall rights provided that there is no more senior part-time employee currently on layoff.

4.2 Seniority shall be broken for any one or more of the following reasons:

(a) Voluntary quit.

(b) Discharge for cause.

(c) Absence from work for three (3) consecutive working days without notifying the Employer unless prevented from doing so through no fault of the employee.

(d) Failure to return to work after expiration of a leave of absence unless due to circumstances beyond the control of the employee or unless excused by the Employer.

(e) Failure to return to work within seventy-two (72) hours following recall after layoff, which notice will be made by the Employer by certified letter to the employee's last known address according to the records of the Employer.

(f) Lay off for a continuous period of more than twelve (12) months.

(g) Engages in other employment while on an authorized leave of absence without the consent of the Employer.

4.3 The first one hundred twenty (120) days of employment shall constitute a probationary period during which time an employee may be discharged at the sole discretion of the Employer. After one hundred twenty (120) days, an employee's seniority date shall date from his or her first day of continuous employment in the industry as a member of the Union.

## ARTICLE 5
### Grievance Procedure

5.1 Any complaint, grievance, or dispute arising under or concerning the meaning, application, or compliance with the terms of this Agreement shall first be taken up for adjustment by a representative of the Employer and a representative of the Union. The Employer and the Union shall meet at a time and place mutually agreed upon after the request by either party for such a meeting.

3

5.2     The following Grievance Procedure shall be followed in resolving said disputes:

STEP ONE:  Grievant will meet with Union Representative and Facility Manager as outlined above,

STEP TWO:  In failing to have the dispute resolved in STEP ONE, grievant will meet with a representative of the Union and a representative of the Employer at a mutually convenient time and place to resolve the grievance.

If the parties cannot agree, the issue may then be referred by the Union to arbitration as provided for in this Section.  Any demand for arbitration must be made within forty-five (45) calendar days from the date of the Step TWO grievance meeting unless the parties mutually agree to extend said timeline.

5.3     Arbitration shall be by an arbitrator from the Federal Mediation and Conciliation Service ("FMCS"), and his or her decision shall be final and binding upon both parties and the employee(s).  For Grievances filed after ratification of this Agreement only the arbitration hearing must be scheduled and occur within eighteen months of the Step ONE meeting or the Employer's liability will be tolled until the hearing is conducted.  The tolling shall not apply if the employer cancels the hearing or agrees to a postponement of the hearing.  The Union shall request a panel of seven (7) arbitrators who are members of the National Academy of Arbitrators within the Chicago Geographical Region.  The parties will alternate striking arbitrator names until one is chosen.  The identity of the party which shall strike first shall be determined by a coin toss.  The Union and the Employer will each be responsible for one-half of the cost for such arbitration proceeding.  All other expenses of the arbitration shall be assumed by the party incurring them.  The arbitration hearing will not be transcribed except when the arbitrator may deem necessary.  After the conclusion of the hearing, the arbitrator will issue a decision with any award in writing.

In lieu of FMCS arbitration provided for above, the parties may agree to an expedited Grievance Panel.  Such Grievance Panel shall be selected within ten (10) business days from the receipt of the written statement of grievance, and shall consist of one (1) person selected by the Chicago Parking Association who is not a representative of the Employer against whom the grievance was filed, and one (1) person selected by the Union and shall endeavor to settle the matter.  The Grievance Panel shall meet within ten (10) business days after being selected and shall render their decision within ten (10) business days after the meeting.  Unanimous decisions by the Grievance Panel shall be final and binding on the parties, and there shall be no further recourse to Arbitration procedures or court litigation.  If said Grievance Panel fails to resolve the matter within thirty (30) business days after it is referred to the Grievance Panel, the matter may be submitted by the Union to arbitration as outlined above in Section 5.3.  The fees and expenses of the Grievance Panel shall be divided equally between the Union and the Employer.

5.4     The Employer must be notified of a monetary grievance within thirty (30) days after knowledge of the alleged violation or it shall be waived.

5.5     A non-monetary (policy) grievance must be filed in writing within ten (10) days after knowledge of the alleged violation or it shall be waived.

4

5.6     Notwithstanding any past practices, the Arbitrator shall have no authority to alter, delete, amend, or modify the terms of this Agreement.

## ARTICLE 6
### Discipline and Discharge

6.1     No employee who has completed his or her probationary period will be discharged or disciplined except for just cause.

6.2     The Union shall have the right to investigate the reasons for any discharge or discipline and to protest the same through the grievance and arbitration procedure.

6.3     An employee must be notified as soon as possible of any disciplinary action.

## ARTICLE 7
### Strikes and Lockouts

7.1     The Union agrees that there shall be no strike, slow-down, or cessation of work. There shall be no picketing, hand billing or boycott of the Employer's customers. The Employer agrees there shall be no lockout during the term of this Agreement.

The provisions of this section shall not apply to employers which have failed for six consecutive months to pay the contributions due to the Benefit Plans which are not in dispute or to submit dues.

7.2     Should there be an unauthorized strike, slow-down, walk-out, or other unauthorized cessation of work, the Union shall not be liable for damages resulting from such unauthorized acts from its members, and the Union shall undertake every reasonable means to induce the employees to immediately return to their jobs.  In the event of an unauthorized strike, slow-down, walk-out, or any unauthorized cessation of work, the Employer shall have the sole and exclusive right to discipline or discharge the employees who participate in such an event.

7.3     No employee covered by this Agreement shall be required to go through a picket line when the picket line is approved by Teamsters' Joint Council No. 25.

## ARTICLE 8
### Wages

8.1     Effective July 1, 2023, all employees covered by this Agreement are guaranteed to receive the following wages rates: $13.70 or $0.25 over the Cook County Minimum Wage, whichever is greater each July 1st.

Employees employed in the City of Chicago covered by this Agreement are guaranteed to receive the following wage rates:$15.80 or $0.25 over the City of Chicago Minimum Wage, whichever is greater each July 1st.

8.2(a)  Current Employees shall receive contract anniversary wage increases over and above their hourly wage rate. Specifically, the Employer agrees to increase the total package for the compensation to be paid for (i) all hours worked or paid in the form of additional hourly wages, and (ii) additional hourly 401(k) plan contributions for eligible employees as follows:

| | |
|---|---|
| Effective July 1, 2023 | $1.65 (inclusive of minimum wage increase and at least $0.50 employer contribution to eligible employees' 401(k) account); |
| Effective July 1, 2024 | Greater of $0.75 or annual increase in applicable minimum wage whichever is greater; |
| Effective July 1, 2025 | Greater of $0.75 or annual increase in applicable minimum wage whichever is greater; and |
| Effective July 1, 2026 | Greater of $0.75 or annual increase in applicable minimum wage whichever is greater. |

8.2(b)  The allocation of the annual increase required in Section 8.2(a) shall be determined by the Union as between wages and employer 401(k) plan contributions, except that for the increase effective July 1, 2023, at least $0.50 is to be allocated for the Employer's 401(k) plan contributions to eligible employees. Eligible employees are those who have been employed for at least one year. For eligible employees, Employer contributions shall begin once their 401(k) plan accounts are opened.  The Union shall notify the Employer of its determination of the allocation between wages and additional contributions to the 401(k) plan by April 1st of each contract year.

8.3.      Employees shall not receive two increases on July 1 of any calendar year. For the avoidance of doubt, no Employee shall receive an increase required by 8.1 plus an additional wage increase pursuant to 8.2.

8.4.      Employees hired after the effective date of this Agreement shall receive the guaranteed wage rate as set forth above (8.1) and thereafter shall receive the wage rate increases provided above in 8.2 on July 1, 2024, July 1, 2025, and July 1, 2026.

## ARTICLE 9
### Holidays

Regular full-time employees shall receive additional compensation for the seven (7) holidays listed below equal to their normal workday hours but not less than eight (8) hours pay at their regular daily straight-time rate of pay. Beginning January 1, 2027, New Year's Day will be recognized as an eighth (8th) contractual holiday. Those employees who are scheduled and do work on any of these holidays will receive their regular daily straight-time rate of pay in addition to time and one-half (1 ½) per hour for all hours actually worked on said holidays. To be entitled to holiday

6

pay under this clause, the employee must work for the Employer six (6) months and work his or her scheduled workday before and his or her scheduled workday after said holiday if the employee is scheduled to work. An employee who is scheduled to work on a holiday but fails to report to work shall forfeit his or her right to holiday pay unless his or her absence is due to extenuating circumstances. For the purpose of holidays and overtime pay on holidays, the below listed holidays will be celebrated on the days they fall on unless otherwise specified by law:

> Martin Luther King, Jr. Day
> Memorial Day
> Fourth of July
> Labor Day
> Thanksgiving Day
> Christmas Day
> Employee's Birthday
> New Year's Day – Beginning in 1/1/2027

A holiday for which an employee is paid and during which he or she did not work shall be considered as time actually worked by him or her under the terms of this Agreement. No employee shall receive holiday pay unless he or she has attained six (6) months' seniority with the Employer on or before the date of the holiday. Part-time employees, when working on said holidays, shall be entitled to time and one-half (1 ½) per hour for hours worked. All work performed on the sixth (6th) day of a holiday week shall be paid at the overtime rate.

The additional compensation for each holiday (holiday pay) for part-time employees shall be based upon the average weekly hours scheduled and paid during the two (2) calendar months preceding the Holiday as follows:

| Weekly Hours Scheduled | Holiday Pay |
| --- | --- |
| Up to 19 hours | 2 hours |
| 20 to 29 hours | 4 hours |
| 30 to 39 hours | 6 hours |

### ARTICLE 10
### Military Service

10.1    Employees who become members of the U.S. Armed Services shall have such rights of reemployment as may be prescribed by the Uniformed Services Employment and Reemployment Rights Act.

### ARTICLE 11
### Jury Duty

11.1    Employees on the payroll with ninety (90) days or more of service will be reimbursed for any loss of income incurred during the time spent on jury service with a maximum of ten (10) days annually.

7

## ARTICLE 12
### Sick and Personal Leave

12.1    A full-time employee who has worked for the Employer for six (6) months or longer shall be entitled to nine (9) combined sick and/or personal days per year at the employee's normal rate of pay for their normal workday hours but not less than eight (8) hours per day.

12.2    A part-time employee who has worked for the Employer for six (6) months or longer shall be entitled to nine (9) combined sick and/or personal days per year based upon the average weekly hours scheduled and paid during the two (2) calendar months preceding the sick or personal day as follows:

| Weekly Hours Scheduled | Personal/Sick Leave Pay |
|---|---|
| Up to 19 hours | 2 hours |
| 20 to 29 hours | 4 hours |
| 30 to 39 hours | 6 hours |

12.3    The employee shall give one week's notice to the Employer for days used for personal leave. The employee shall phone a designated phone number and if no answer, a designated back-up phone number at least two (2) hours before his or her regularly scheduled starting time for days used for sick leave. Combined sick and/or personal days shall be noncumulative.

12.4    The provisions of this Article 12 shall be in lieu of the rights and benefits provided under the City of Chicago and the Cook County Sick Leave Ordnances (or the ordinances of any other jurisdiction) and the parties agree that the Union and the employees waive any and all rights under those Ordinances.

## ARTICLE 13
### Funeral Leave

13.1    A regular full-time or regular part-time employee who may lose time from his or her employment due to a death in his or her immediate family shall be entitled to receive his or her regular pay during said absence for four (4) days. Immediate family members are defined to be father, mother, brother, sister, spouse, child, father-in-law, mother-in-law, or grandparents.

13.2    In order to qualify for funeral pay, the employee must have worked for the Employer for six (6) months or longer.

13.3    Employees must, upon request from the Employer, furnish satisfactory proof of death and relationship.

13.4    Funeral leave shall only be granted for the purpose of attending the funeral of the deceased, grieving, and settling the affairs of the deceased.

## ARTICLE 14
### Vacations

14.1    Employees shall receive vacation in accordance with the following schedule:

After one (1) year of continuous employment, one (1) week vacation;
After three (3) years of continuous employment, two (2) weeks vacation;
After ten (10) years of continuous employment, three (3) weeks vacation;
After twenty-five (25) years of continuous employment, four (4) weeks vacation.

14.2    An employee's vacation time may be split upon mutual agreement between employee and Employer.  At least one (1) continuous week must be taken each year.  Vacations shall be scheduled between January 1 and December 31 of each year.

14.3    (a)    A vacation bank shall be established for each employee, into which employees shall begin to accrue vacation pay on a monthly basis in accordance with paragraph 14.3 (b), below.

(b)    Vacation pay and time shall be earned on a monthly basis in accordance with the following schedule:

After one (1) year of employment: .417 vacation days per month (equivalent to, one (1) week vacation):

Beginning with the first month of employment and continuing through the month prior to the month in which the employee completes two (2) years of employment (1st month through 36th month of employment), employees accrue .417 vacation days with pay per month in which the employee actually performs work or takes paid time off.

After three (3) years of employment, .834 vacation days per month (equivalent to two (2) weeks vacation):

Beginning with the month in which the employee completes three (3) years of employment and continuing through the month prior to the month in which the employee completes ten (10) years of employment (37th month through 120th month of employment), employees accrue .834 vacation days with pay per month in which the employee actually performs work or takes paid time off.

After ten (10) years of employment, 1.25 vacation days per month (equivalent to three (3) weeks vacation);

Beginning with the month in which the employee completes ten (10) years of employment and continuing through the month prior to the month in which the employee completes twenty-five years of employment (121st month through 300th month of employment), employee accrues 1.25

9

vacation days with pay per month (equivalent to three (3) weeks' vacation) in which the employee actually performs work or takes paid time off.

After twenty-five (25) years of employment, 1.67 vacation days per month (equivalent to four (4) weeks vacation);

Beginning with the month in which the employee completes twenty-five (25) years of employment (301st month of employment), employee accrues 1.67 vacation days with pay per month (equivalent to four (4) weeks' vacation) in which the employee actually performs work or takes paid time off.

(c)     The month in which employment begins and the month in which employment ends shall be considered a full month for purposes of this Section.

(d)     Employees shall be entitled to use vacation time with pay, immediately after accruing it.

(e)     Every December 31st, each employee shall be given the option of a payout or carry over of unused vacation days in his or her vacation bank; provided, however, that the carry over will be limited to accruals in the prior twelve (12) months. Should the employee receive a payout, such employee shall receive the payout on the next scheduled pay period.

(f) Employees shall receive an accounting of all their accrued vacation, no less frequently than monthly.

14.4    Vacation pay for part-time employees shall be prorated in accordance with the above schedule.

14.5    Employees shall be paid their accrued vacation pay prior to the time they leave on vacation.

14.6    Preference by seniority shall be given to an employee's choice of vacation period.

14.7    Employees shall receive vacation pay on the basis of average hours worked in the previous year. All hours worked or paid for (combined sick and/or personal days, holidays, sick leave, bereavement pay) shall be considered as hours worked in determining compensation.

14.8    Vacation checks shall be issued separately.

## ARTICLE 15
### Leave of Absence

15.1    The Employer may, at its sole discretion, grant a personal leave of absence to an employee with seniority provided:

10

(a)     The employee requests the leave, in writing, at least one (1) week in advance of such a leave, unless there was no possibility that the employee had such prior knowledge of the necessity of the leave. Approved leaves shall be in writing with a copy to the Union; and

(b)     The leave is for a specified time not to exceed thirty (30) calendar days in duration which may be extended for an additional specified time not to exceed an additional thirty (30) calendar days in duration at the sole discretion of the Employer.

(c)     Upon the expiration of an employee's authorized personal leave of absence, said employee shall be reinstated with full seniority to the same or substantially equivalent employment.

15.2     The Employer may implement the Family Medical Leave Act (FMLA) consistent with applicable law, and the provisions of this section. The Employer shall grant family and medical leaves to employees entitled by law to such leaves.

15.3     The Employer shall continue to contribute to the Health and Welfare Fund during FMLA leaves, to the extent required by law or alternatively, the Employee shall remain covered by the Employer's health insurance plan during FMLA leaves as though the employee were actively at work.

15.4     In all cases of medical leave, regardless of whether they are FMLA leaves, the Employer may require employees to submit to medical examinations by a physician chosen by the Employer at the Employer's expense, during the leave and before the employee returns to work.

15.5     Upon expiration of an authorized medical or family leave an employee shall be reinstated with full seniority to the same or substantially equivalent employment (unless the employee would have been laid off or terminated had the employee not taken a leave). It is understood that employees returning to work from a leave (or any illness or injury) must be able to acceptably perform all essential job functions and may not constitute a threat to safety.

## ARTICLE 16
## Hours of Work

16.1     Full-time employees covered by this Agreement who are called to work shall receive not less than six (6) hours work or its equivalent per day.

16.2     All regular full-time employees covered by this Agreement, shall be guaranteed a workweek consisting of forty (40) hours inclusive of a mandatory 20-minute meal period.

16.3     Any regular employee shall forfeit his or her weekly guarantee in that week in which he or she takes off a regularly scheduled workday or any portion thereof on his or her own initiative or when an employee is discharged for cause. However, an employee, before leaving the Employer's premises, shall be required to punch out.

11

16.4    Overtime [time and one-half (1 ½)] shall be paid for all hours worked over forty (40) hours in any one week. If an Employer has any employees covered by the Fair Labor Standards Act, overtime shall be paid in accordance with said Act.

16.5    When feasible, the Employer shall post the employee's schedule at least seven (7) days in advance.

16.6    When feasible the Employer shall post the employee's schedule at least seven (7) days in advance. The provisions of this Article 16 are in lieu of the rights and benefits provided by the City of Chicago Fair Workweek Ordinance and the Evanston Fair Workweek Ordinance or any other scheduling ordinance or law. The parties expressly agree that all rights, requirements and benefits under the City of Chicago Fair Workweek Ordinance and the Evanston Fair Workweek Ordinance or any other ordinance or law are hereby expressly waived.

## ARTICLE 17
### Transfers

17.1    The Employer may assign duties to any employee as dictated by business conditions.

## ARTICLE 18
### Driver's License

18.1    All employees shall continuously have and shall exhibit to the Employer upon request a valid Driver's License issued by any State within the United States. Any employee found not to have a valid Driver's License in his or her possession will be suspended without pay for up to ninety (90) days until a valid license is presented. After that time, the employee may be subject to termination. An Employee whose license is suspended or revoked must report the loss or suspension of his/her license. An employee who makes a timely report will be suspended without pay for up to ninety (90) days until a valid Driver's License is presented. After ninety (90) days the employee will be placed on a preferential rehire list for up to six (6) months. An employee who fails to make a timely report as to the loss or suspension of his/her License and who is involved in an accident or who is ticketed by a traffic control officer while on duty will be terminated.

## ARTICLE 19
### Health and Welfare and Legal and Educational Assistance

19.1    Health and Welfare

    (a)    During those period(s) that the Affordable Care Act as amended from time to time is not in effect, as least to the extent an Employer is not obligated to provide health insurance coverage under it, the Employer shall contribute to Teamsters Local Union No. 727 Health and Welfare Fund on account of each employee covered by this Agreement $80.00 per month. This amount shall be increased each March 1 by $5.00 per month as follows:

12

| July 1, 2023 | $105.00 per month |
| March 1, 2024 | $110.00 per month |
| March 1, 2025 | $115.00 per month |
| March 1, 2026 | $120.00 per month |
| March 1, 2027 | $125.00 per month |

Commencing the first of the month in which the Affordable Care Act as amended from time to time obligates the Employer to provide any current or future fulltime employee of the Employer healthcare coverage under the eligibility criteria providing the latest possible date or hours of work the Employer shall cease to have any obligation to make contributions under this Paragraph 19.1 (a) on behalf of its fulltime employees. Its obligation to make payments on behalf of part time employees shall continue, however.

(b)     During those periods the Affordable Care Act as amended from time to time obligates the Employer to provide healthcare coverage to any one of its current or future eligible fulltime employees (or would obligate the Employer to do so absent the minimum employee requirements), the Employer shall contribute $535.17 per month to the Teamsters Local 727 Health & Welfare Fund on account of each such eligible fulltime employee covered by this Agreement who actually performs work during the calendar month. The obligation to make contributions shall be determined on an individual by individual employee basis. Payments under this paragraph and paragraph 19.1(a) above shall not be duplicated. The amount of the monthly premium may be increased by the Trustees of the Teamsters Local 727 Plan by an additional 6.5% each March 1 thereafter.

The determination period for determining whether an employee is a fulltime employee for purpose of the Affordable Care Act shall be the calendar year. Similarly, the stability period for an employee receiving healthcare coverage shall be the calendar year. The determination period for employees hired during any calendar year after the Affordable Care Act becomes effective shall be the longest possible period permitted by the Affordable Care Act

(c)     Contributions due under Paragraph 19.b above to the Health and Welfare Fund for all fulltime Employees shall commence at the latest possible date or hours of work but not to exceed six (6) months.

Any fulltime employee otherwise eligible to receive health care coverage under Article 19(b) may opt out of coverage and shall receive a stipend of three hundred and fifty dollars (350.00) per month in lieu thereof, which shall increase by an additional 6.5% each July 1 thereafter. The Employer

13

shall have no obligation to make any contribution to any Teamsters Local 727 Health and Welfare Plan on behalf of opt-out employees. The opt-out will be by signature on a form prepared by the Employer, and the opt-out will be effective until the employee notifies the Employer in writing that he/she has experienced a loss of coverage due to a life altering event and wishes to begin receiving health care coverage.

(d)    In the event the health care coverage provided through the Teamsters Local 727 Plan does not meet the standards imposed by the Affordable Care Act or its implementing regulations, the Union agrees to indemnify the Employer for any penalties or other monetary consequences which result. If the Union does not compensate the Employer for its losses or the Teamsters Local 727 Plan is not made compliant, the Employer may withdraw from continued participation in the Plan, provided it provides Plan Participants with uninterrupted coverage under the Employer's health plan.

19.2    Legal and Educational Assistance

(a)    If the Employer is not a Contributing Employer as defined in Section 19.2(b), the Employer shall contribute to the Teamsters Local Union No. 727 Legal and Educational Assistance Fund on account of each employee covered by this Agreement the following:

Commencing July 1, 2018    $112.00 per month which shall be adjusted each March 1 to the amount of the contribution required by the Parking Industry Agreement.

(b)    A Contributing Employer means an Employer who is obligated to make contributions to the Legal and Educational Assistance Fund pursuant to the terms of the Collective Bargaining Agreement between the Union and the Employer covering residential and commercial locations (referred to as the Parking Industry Agreement).

19.3    Contributions due hereunder to the Health and Welfare and Legal and Educational Assistance Funds for all employees for which contributions are due shall commence with the month of their employment.

19.4    No contributions to the Health and Welfare Fund or Legal and Educational Assistance Fund shall be required on behalf of any employee who is on a leave of absence, except to the extent required by law.

19.5    By the execution of this Agreement, the Employer authorizes the Trustees to enter into appropriate trust agreements necessary for the administration of such Funds, and hereby waiving all notice thereof and ratifying all actions already taken or to be taken by such Trustees within the scope of their authority.

14

19.6    It is also agreed that in the event the Employer is delinquent at the end of a month in the payment of its contributions to the Health and Welfare Fund or Legal and Educational Assistance Fund, in accordance with the rules and regulations of the Trustees of such Fund, the employees or their representatives shall have the right to take such action as they deem necessary until such delinquent payments are made, and it is further agreed that in the event such action is taken, the Employer shall be responsible to the employee for losses resulting therefrom.

19.7    Should the Trustees of the Health and Welfare Fund or Legal and Educational Assistance Funds audit the records of the Employer, such audit shall not exceed: two (2) years from the date the notice of the audit in the case of an Employer which is signatory to the Parking Industry Agreement or seven (7) years in all other cases.

## ARTICLE 20
## Labor Management Committee

20.1    The Employer agrees to contribute five dollars ($5.00) per month to the Parking Industry Labor Management Committee (PILMC) for each employee covered by this Agreement.

## ARTICLE 21
## Teamsters Local Union Number 727 Trade Show 401(k) Plan

21.1    The parties hereby agree that the Employer shall cease to participate in the Teamsters National 401(k) Plan and, instead, the Employer hereby agrees to participate in the Teamsters Local Union Number 727 Trade Show 401(k) Plan on behalf of all employees represented for purposes of collective bargaining under this Agreement. Per Section 8.2 of this Agreement, for eligible employees, the Employer shall contribute fifty cents ($0.50) for every hour actually worked (including regular, overtime, and holiday hours worked). Eligible employees shall be those who have been employed by the Employer for at least one year. Other existing bargaining unit employees hired within the last year will become eligible to receive the Employer 401(k) contribution after their one-year employment anniversary date. Employees hired after the effective date of this Agreement shall have a 12-month waiting period before becoming eligible for Employer 401(k) contributions. The Employer will also make or cause to be made payroll deductions from participating employees' wages, in accordance with each employee's salary deferral election subject to compliance with ERISA and the relevant tax code provisions. Beginning July 1, 2024, the Employer shall make contributions for eligible employees as allocated by the Union pursuant to Section 8.2(a) and (b) of this Agreement. The Employer's 401(k) Plan contributions for eligible employees shall continue to be only for hours actually worked (including regular, overtime, and holiday hours worked).

21.2    Employer's initial contributions to eligible employees' 401(k) Plan accounts shall commence following a reasonable waiting period to allow for the establishment and opening of eligible employees' 401(k) Plan accounts.

21.3    Employer's 401(k) Plan contributions shall vest immediately in the eligible employee's 401(k) account.

15

21.4    The Employer shall not be obligated to pay any fees or costs to the 401(k) Plan beyond the required contributions to the accounts of eligible employees, plus any penalties or interests resulting from Employer delinquencies in making mandatory contributions to eligible employees.

21.5    Any employees with an existing account in the Teamsters National 401(k) Plan shall have the option to rollover their account balance to the Local 727 Plan.

21.6    Plan contribution audits shall be limited in scope to a two-year review period with Audit procedures to be agreed upon.

## ARTICLE 22
## Management Rights

22.1    All rights, powers, and authority customarily exercised by the Employer are retained and reserved by the Employer except as otherwise specifically modified by express provisions of this Agreement. No employee covered by this Agreement shall receive less than the terms and conditions therein specified.

## ARTICLE 23
## Doctors' Examinations

23.1    All doctors' examinations requested by the Employer will be paid for by the Employer. In the event the employment of the employee is terminated on the basis of the report of the Employer's doctor, or in the event of questionable status of employee's health upon being rehired due to a layoff, the Union may, at its own cost, have such report checked by a doctor of its election.

## ARTICLE 24
## Time Records

24.1    The Employer shall keep accurate time records and make them available for inspection by the Union upon request so that there will be no misunderstanding about the employee's time.

## ARTICLE 25
## Access to Facility

25.1    Authorized agents of the Union shall have access to the Employer's establishment during working hours for the purpose of adjusting disputes and investigating working conditions; provided, however, that there is no interruption of the Employer's business operations.

16

## ARTICLE 26
### Payday

26.1    Payday shall be at least as often as semi-monthly (twice monthly). Employees must receive a paper or electronic paycheck; an employer is prohibited from paying an employee in cash.

## ARTICLE 27
### Maintenance of Benefits

27.1    Employees covered by this Agreement receiving wages or conditions (excluding overtime) over and above those listed in this Agreement shall suffer no economic loss as the result of signing this Agreement. No employee covered by this Agreement shall receive less than the terms and conditions therein specified. Employees returning to the valet bargaining unit from a supervisor role shall not retain any premium pay or other benefit of their prior position but shall return to at least the pay and benefits provided to them prior to becoming a supervisor. For any non-supervisors transferring from outside the bargaining unit (for example, a transfer from a bargaining unit position under the Commercial Agreement), their pay and benefits will be reviewed by the Company and Union on a case-by-case basis.

## ARTICLE 28
### Individual Agreements

28.1    There shall be no side deals or agreements, whether orally or in writing, between any Employer and employee or between Employers. No employee or Employer, either orally or in writing, shall enter into any agreement, contract, or arrangement covering any employment to which this Agreement applies which is contrary to or conflicting with the terms and conditions of this Agreement.

## ARTICLE 29
### Non-Discrimination

29.1    It is the policy of both the Employer and the Union to comply with all Federal and State Equal Employment Opportunity Laws and not to discriminate against any employee because of race, sex, color, religion, national origin, age, or membership or non-membership in the Union, or other protected characteristic.

## ARTICLE 30
### Shortages

30.1    Employees shall be accountable for all receipts collected by them and responsible for their errors in the collection of parking tickets. Employers shall have the right to summarily dismiss an employee for stealing, misrepresentation of the receipts, or for failure to explain to the satisfaction of the Employer repeated errors in parking tickets, reports, and collections, except as set forth below.

30.2    Employees shall be informed of their shortages, if any, within thirty (30) days after discovery of the shortage, but in no event later than sixty (60) days after the shortage occurred. Shortages, if any, shall be recovered within two (2) pay periods after the employee is notified of the shortage, or longer if required by law.

30.3    In the event of shortages of $5.00 or more, the Employer will follow the progression of discipline set forth below when appropriate, subject to such facts as may be present in each case, and subject to the just cause requirement of the collective bargaining agreement:

GUIDELINES

| CASHIER SHORTAGE OCCURRING IN A SINGLE YEAR | ACTION TO BE TAKEN GENERALLY APPLIED |
|---|---|
| 1st | Oral Warning |
| 2nd | Written Warning |
| 3rd | 3-Day Suspension without pay |
| 4th | Discharge |

30.4    It is understood that the foregoing constitute agreed-upon disciplinary guidelines. However, if unusual situations or extenuating circumstances are present, the situation may warrant consideration of deviation from the guidelines based upon all the facts available for review. Accordingly, these guidelines are intended to be used as a guide for the considered judgment of supervisory personnel who must in each case view all of the facts of an employee shortage in their proper context.

30.5    If the employee disagrees with the shortage charge, the matter may be processed through the grievance procedure.

**ARTICLE 31**
**Employee Liability**

31.1    Except as provided for in Article 30, no employee shall be held financially responsible for damages incurred in the performance of his or her daily duties.

31.2    No employee shall be charged for any insurance premiums or for any deductibles or costs related to any insurance claim or any other claim of damage to person or property.

**ARTICLE 32**
**Change in Ownership or Management**

32.1    In the event an Employer acquires, loses, closes, or anticipates losing a location which falls within the scope of this Agreement, the Employer will give the Union fifteen (15) days written notice prior to the effective date thereof, or immediate written notice if the acquisition or loss is to take place in less than fifteen (15) days, and said Employer will meet at the Union's request before the acquisition or loss to discuss all matters pertinent to said acquisition or loss.

18

32.2     Subject to the provisions herein, any employee who has continuously worked at a location for one hundred and eighty (180) days or more will be retained by the acquiring Employer when an Employer acquires a new location. The Employer losing the location will be obligated to retain all other employees. Provided, however, that regardless of length of service at the location, the Employer losing the location upon notice by the acquiring Employer (said notice must be made within thirty (30) days of hire) shall retain any employee who was previously terminated by the acquiring Employer, if such termination was upheld through the Grievance and Arbitration Procedure, or the Union decided not to pursue such termination through the Grievance and Arbitration Procedure. Employees who do not respond to a second new hire notice by the acquiring Employer (sent ten work days apart) within the time limits under Article 4 (Seniority) above shall be terminated and shall lose all rights under this Agreement. If an Employer losing a location makes a promise of employment in writing to any employee currently working at the location, the Employer shall be obligated to retain that employee. Full time Employees of the Employer losing the location who work less than 20 hours per week on average at the location being transitioned shall be retained by the Employer losing the location. Full time Employees of the Employer losing the location who work 20 hours or more per week on average at the location being transitioned shall be retained by the acquiring Employer and shall be provided with a full time schedule which can be created by laying off a part time employee employed elsewhere.

32.3     Within fifteen (15) days of the loss of a location, the Employer who lost the location shall pay to employees who are retained by the acquiring Employer the pro-rate value of all vacation, combined sick and/or personal days, and compensation earned under this Agreement but not taken and/or paid unless the location is a pass-through account.

In addition, the Employer who lost the location shall pay the respective benefit funds any amounts owed up to the last day actually worked. The acquiring Employer shall provide said employees with corresponding time-off without pay; unless the location is a pass-through account, in which case the time off shall be with pay. Upon commencing employment with the acquiring Employer, employees shall be credited with all seniority, as described in Article 4, Section 4.1, as though there had not been an Employer change.

## ARTICLE 33
### Credit Union

33.1     The Employer agrees to deduct from the employee's regular paycheck and forward to the credit union designated by the Union such sums as the employee may voluntarily decide to deposit. The employee will notify the Employer by written authorization of his or her desire. Such deduction will be on a semi-monthly basis and forwarded to the credit union.

## ARTICLE 34
### Drive Authorization and Deduction

34.1     The Employer agrees to deduct from the paycheck of all employees covered by this Agreement voluntary contributions to DRIVE. DRIVE shall notify the Employer of the amounts designated by each contributing employee that are to be deducted from his or her regular paycheck

19

on a semi-monthly basis. The Employer shall transmit to DRIVE National Headquarters on a monthly basis, in one check the total amount deducted along with the name of each employee on whose behalf a deduction is made, the employee's Social Security number and the amount deducted from the employee's paycheck,

## ARTICLE 35
### Open Full-Time Positions

35.1    Any full-time positions that become open must be offered to part-time employees at that location by seniority.

## ARTICLE 36
### Location/Facility Classification

36.1    The parties recognize that it is necessary to classify locations/facilities for purposes of this Agreement and the Agreement applicable to commercial and residential locations (also referred to as the Parking Industry Agreement). All locations/facilities that are covered under these Agreements as of November 1, 2001 will retain their current classification. Any location or facility not covered by these Agreements as of November 1, 2001 will be classified by mutual agreement between the Employer and the Union using the following guidelines:

(a)    Commercial: All locations in which fifty percent (50%) or more of the vehicles parked at the location belong to the general public are commercial locations. Commercial locations include locations with valet parking services where there is any parking space in the building where the location exists.

(b)    Residential: All locations of employer members of Apartment Building Owners and Managers Association of Illinois and all other locations in which more than 50% of the vehicles parked at the location belong to residents of the property are residential locations.

(c)    Valet: All locations that strictly provide valet parking services without any physical parking facility are valet locations and are covered by the Agreement covering valet service locations.

36.2    The Employer and the Union agree that employees employed as bellmen or doormen will be covered under the classification for the location where they are employed.

## ARTICLE 37
### Miscellaneous

37.1    No employee shall be required to take a polygraph or behavioral analysis test without his or her consent as a condition of employment.

20

37.2     Employees may not be required to perform janitorial services; however, in accordance with past practices, employees may be directed to clean immediate areas visible to customers.

37.3     An employee may not be discharged or disciplined because his or her earnings have been subjected to two (2) or less wage garnishment deduction orders within one (1) year.

37.4     Drug and alcohol testing will only be permitted for (1) probationary employees, and (2) reasonable suspicion under the terms and conditions of the Drug and Alcohol Policy and Testing Program agreed to by the Employer and the Union. An Employer acquiring a location pursuant to Article 32 (Change in Ownership) shall have the right to perform one (1) Drug and Alcohol or Background test pursuant to the existing policy and practices within the acquiring employer's first thirty (30) days of employing acquired employee. Under these circumstances, an acquired employee's refusal to submit to the Drug and Alcohol or background test shall result in termination of employment. Positive test results from the Drug and Alcohol or Background test shall result in termination of employment. Positive test results from the Drug and Alcohol test under these circumstances shall be handled in accordance with the terms of the existing policy and practices.

37.5     The Union agrees that in the event any agreement is executed by the Union with any other Parking Industry Employer which provides for a lower wage rate, reduced benefits, or changed working conditions than those provided in this Agreement, then the Employer may have such lower wage rates, or reduced benefits, or changed working conditions substituted in this Agreement. The Union shall provide advance, written notice to the Chicago Parking Association in the event it requests any exceptions to this provision for any newly organized Employer, or for any Employer who has not previously been signatory to an agreement with the Union. Upon receipt of such notice, the Chicago Parking Association agrees to designate representatives to meet and confer with the Union regarding this request. If the Chicago Parking Association does not respond, within seven (7) working days, to such a request by the Union, then the Union may enter into any such agreement without agreement from the Employer.

37.6     Subject to Articles 4 (Seniority) and 12 (Sick and Personal Leave), in the event that a client or governmental entity imposes a qualification or certification standard (e.g., vaccination, licensure, the completion of training, or other requirement at a location), employees who fail or refuse to meet that requirement will be laid off and placed on the recall list, unless at the time of layoff a vacancy exists for which the employee is qualified

THIS AGREEMENT shall be binding upon and inure to the benefit of the parties hereto and their respective administrators, executors, successors and assigns.

THIS AGREEMENT shall go into effect July 1, 2023, and shall continue in full force and effect until and including June 30, 2027, and shall continue thereafter on an annual basis from year to year unless written notice of desire to amend the Agreement is given by either party sixty (60) days prior to June 30, 2027 or sixty (60) days prior to June 30 of any subsequent year.

EXECUTED at Chicago, Illinois this _____ day of _____, 20___

FOR THE EMPLOYER

FOR THE UNION

22

## LETTER OF UNDERSTANDING NO. 1

This Letter of Understanding is entered into between [ \ tecd Party ] and Teamsters Local 727, and is hereby attached to the parties' collective bargaining agreement that is in effect from July 1, 2023 through June 30, 2027.

The parties acknowledge that the national healthcare legislation that has been enacted may impact the Health and Welfare provisions of their existing collective bargaining agreement. To that end, the parties agree that following the issuance of any meaningful substantive changes to the current regulations but before the effective date of the "employer penalties" they will meet and confer to discuss the impact, if any, that such legislation or change in regulation(s) has on their respective obligations under the terms of their agreement.

Nothing within this Letter of Understanding shall be construed to alter or amend the terms of the parties' collective bargaining agreement, including, but not limited to, Article 7. All provisions of the parties' collective bargaining agreement shall remain in full force and effect through its expiration date of June 30, 2027.

EXECUTED at Chicago, Illinois, this ___ day of _____, 20__

FOR THE EMPLOYER

_Juell Bra_

FOR THE UNION

23

## LETTER OF UNDERSTANDING NO. 2

This Letter of Understanding is entered into between [Heat Parky] and Teamsters Local 727, and is hereby attached to the parties' collective bargaining agreement that is in effect from July 1, 2023 through June 30, 2027.

The parties agree that, notwithstanding any provision to the contrary in their collective bargaining agreement, during the first three (3) months (January, February, and March) of each calendar year, the Employer may require of any bargaining unit employee one or the other, but not both, of the following:

1. To be involuntarily furloughed for up to three (3) weeks (one (1) day per week for up to fifteen (15) weeks) of an employee's equivalent annual vacation entitlement during this three (3) month period. Any bargaining unit employee selected for this involuntary furlough may elect to use any earned vacation for any of these furloughed hours, in lieu of an absence without pay. If an employee so elects to use their earned vacation pay, they may still request unpaid time off during the remaining nine (9) months of any calendar year.

2. To have a full-time schedule reduced to 32 hours.

EXECUTED at Chicago, Illinois, this ____ day of _____, 20__

FOR THE EMPLOYER

_Juell Bra_

FOR THE UNION

_[signature]_

24

## LETTER OF UNDERSTANDING NO.3

This Letter of Understanding is entered into between [ Hextary ] and Teamsters Local 727, and is hereby attached to the parties' collective bargaining agreement that is in effect from July 1, 2023 through June 30, 2027, commonly referred to as the "Valet Agreement".

The parties acknowledge that the obligation that dependent health care coverage be provided due to the enactment of the national healthcare legislation known as the Affordable Care Act is now in effect and agree that it has in fact had an impact on the cost of the healthcare coverage available from the Teamsters Local 727 Plan described in the Health and Welfare provisions of the Valet Agreement. In lieu of the Employer withdrawing from the Teamsters Local 727 Plan, the parties agree that so long as the Employer mandate remains in effect:

The Employer will withhold from the paychecks of bargaining unit members the monthly amount determined by the Trustees of the Teamsters Local 727 Plan as sufficient to provide ACA compliant dependent (children only) coverage for employees who enroll in the Teamsters Local 727 Plan which shall not be less than $380.00

For the duration of the Valet Agreement, the Employer shall make a monthly payment of $275.00 on behalf of each employee who participates in the Local 727 Plan and who selects dependent coverage applicable to a 6% annual increase.

The monthly amount the employee is obligated to contribute to the Local 727 Plan will be withheld in equal amounts from each anticipated paycheck based on the number of pay periods in a calendar month.

In the event an employee does not have sufficient earnings in a particular paycheck or does not receive a paycheck the Employer will not be under an obligation to withhold from that particular pay period. In that event, the employee will be obligated to make arrangements with the Fund Office to make the appropriate contribution to the Local 727 Plan.

Employees may continue to exercise the right to opt out of coverage.

Nothing within this Letter of Understanding shall be construed to alter or amend the terms of the parties' collective bargaining agreement, including, but not limited to, Article 7. All provisions of the parties' collective bargaining agreement shall remain in full force and effect through its expiration date of June 30, 2027.

EXECUTED at Chicago, Illinois, this ___ day of _____, 2023

FOR THE EMPLOYER

_Juell Bra_

FOR THE UNION

25

## LETTER OF UNDERSTANDING NO. 4

This Letter of Understanding ("LOU") is entered into between _Heat Parkay_ (the "Employer") and Teamsters Local 727 (the "Union") (collectively, the "Parties"), and is hereby attached to the Parties' valet collective bargaining agreement that is in effect from July 1, 2023-June 30, 2027 (the "Valet Agreement").

The Parties agree that, notwithstanding any provision to the contrary, Article 37.5 (the Most Favored Nations Clause) of the Valet Agreement shall not apply to any restaurant-only or retail-only location which: 1) as of July 1, 2023, is not currently covered by or operated under the Valet Agreement or the Commercial Parking Agreement; 2) does not provide any onsite physical parking lot or facility; and 3) does not provide for overnight stays or parking. Any other restaurant-only and/or retail-only location that is currently covered by or operated under the Valet or Commercial Agreements, as of July 1, 2023, shall retain its existing classification as either a Valet, Commercial, or Residential location and continue operating under the respective Valet or Commercial Parking Agreement. In order to monitor compliance with this LOU, the Parties further agree to the following:

(1)     The Union shall provide written notification (email is fine) to the Chicago Parking Association ("CPA") within seven calendar days of ratifying a restaurant-only or retail-only labor agreement under this exception to the Parties' "Most Favored Nations Clause" in Article 37.5 of the Valet Agreement, including providing CPA with a copy of such agreement.

(2)     The Employer shall have the option to sign on to the same terms and conditions of employment of any such restaurant-only or retail-only labor agreement provided that such shall apply only at locations that meet all of the same criteria enumerated above for a restaurant-only or retail-only agreement.

(3)     To qualify as a restaurant-only or retail-only location the valet parking operation may not be connected to any other operation or building that provides parking services under the Valet or Commercial Parking Agreement, or a location that would qualify as a Valet, Commercial, or Residential location under those Agreements. For example, a hotel restaurant would not qualify as a restaurant-only location. Further, for the avoidance of doubt, it is understood that valet service at special event venues, such as valet service at a banquet, wedding, or The Art Institute of Chicago, may be covered by such a retail-only or restaurant-only agreement provided the location meets the above requirements to be eligible.

(4)     Further, to qualify as a restaurant-only or retail-only location, the valet parking must directly serve the restaurant or retail establishment with which it is affiliated, including operating only during hours that coincide with the business being directly served. For example, a restaurant-only valet may not open its valet operations before the restaurant is open, or remain open after the restaurant is closed, and may not offer overnight parking. Accordingly, a location that advertises /markets for all-day or early bird parkers, which parking is not incidental to business with the associated restaurant or retail establishment, may not be classified as a restaurant-only or retail-only location under this LOU.

26

(5)     Temporary labor valets may provide supplemental staffing at a location for call-offs, vacation coverage, and/or special projects (e.g., a special event or construction project), such that there is no anticipated permanent position. Temporary labor valets shall receive the wages and benefits based on the classification of the location at which the temporary valet works, whether that be a restaurant-only or retail-only location, or a location covered by either the Valet Agreement or Commercial Parking Agreement; *provided, however*, that temporary valets may not displace an existing employee, nor may temporary labor valets replace the operator's need to fill a future permanent position.

(6)     Any location that falls within the definition of a Valet, Commercial, or Residential location under the Valet Agreement or another labor agreement with the Union shall not be operated under the more favorable terms of a restaurant-only or retail-only agreement but must be operated in full compliance with the terms set forth in those other Agreements.

(7)     No signatory employer to a restaurant-only or retail-only labor agreement with the Union shall be permitted to use lower cost labor from such a location to service or work at another location that falls within the definition of a Valet, Commercial, or Residential location under those other Agreements.

(8)     In order to monitor compliance with this LOU, any restaurant-only or retail-only labor agreement shall grant the Union and the affiliated Funds the right to audit the parking tickets and or any other records (whether hard or electronic) regarding the length of time a vehicle was continuously parked at a designated restaurant-only or retail-only location as well as any agreement with the establishment or establishments for which those services are offered.

(9)     If a signatory employer to a restaurant-only or retail-only agreement violates one or more of the conditions set forth above in paragraphs (3), (4), (5), (6), (7), or (8), then the offending employer's location(s) shall be operated in accordance with the terms of the Valet Agreement or Commercial Parking Agreement (as applicable).

(10)    As a condition of entering any restaurant-only or retail-only agreement covered by this LOU, the Union shall require that such signatory employer agree that, in the event it violates this LOU the Employer (in addition to the Union) may seek to recover monetary damages as well as any other relief to which the Employer may be entitled to recover from such violating, signatory employer.

FOR THE EMPLOYER

_Juel Bra_

FOR THE UNION

27

## EXTENSION AGREEMENT

This Extension Agreement is entered into between TEAMSTERS LOCAL 727 (the "Union") and _____Heat Parking_____(the "Employer").

Whereas, the Union and Employer are parties to collective bargaining agreements known as the Valet Agreement which is effective from July 1, 2018, to June 30, 2021, and therefore are scheduled to expire on June 30, 2021, (the "Agreement");

Whereas, the Employer previously agreed to extend the Agreement to June 30, 2022; and

Whereas, the Union and the Employer in recognition of the continuing impact COVID-19 has had on the Parking, Valet, and Hospitality Industries in the Chicago area have negotiated another one year extension of the Agreement and;

Now, therefore, in consideration of the mutual undertakings herein set forth, the Parties' agree as follows:

1. The Agreement in its entirety shall be extended one year from June 30, 2022, and shall continue in full force and effect until June 30, 2023, except as modified herein.

2. The Parties agree that Article 8.1 shall be amended to read as follows;

"8.1    Effective July 1, 2018 all employees covered by this Agreement are guaranteed to receive the following wage rates effective as indicated.

| July 1, 2018 | $11.00 | |
|---|---|---|
| July 1, 2019 | $12.00 | |
| July 1, 2020 | $13.00 | |
| July 1, 2021 | $13.40 | (Or the Inflation-adjusted minimum wage calculated by the Cook County Commission and announced on its website by June 1 of each year whichever is higher ) |
| July 1, 2022 | $13.80 | (Or the Inflation-adjusted minimum wage calculated by the Cook County Commission and announced on its website by June 1 of each year whichever is higher ) |

Employees employed in the City of Chicago covered by this Agreement are guaranteed to receive the following wage rates effective as indicated.

July 1, 2018    $12.00

-1-

## EXTENSION AGREEMENT

| | | |
|---|---|---|
| July 1, 2019 | $13.00 | |
| July 1, 2020 | $13.20 | (or an amount equal to the CPI for the prior 12 months-- not to exceed 2.5% -- whichever of the two amounts is larger) |
| July 1, 2021 | $15.00 | |
| July 1, 2022 | $15.40 | (or an amount equal to the CPI for the prior 12 months—not to exceed 2.5%-- whichever of the two amounts is larger) |

Employees who make above the guaranteed wage rate set forth above on July 1 of the respective calendar year shall receive an increase in their wage rate as follows:

| | |
|---|---|
| July 1, 2018 | $.40 |
| July 1, 2019 | $.40 |
| July 1, 2020 | $.40 |
| July 1, 2021 | $.40 |
| July 1, 2022 | $.40 |

Employees shall not receive two increases on July 1 of any calendar year.

Employees hired after the effective date of this Agreement shall receive the guaranteed wage rate as set forth above and thereafter shall receive the wage rate increases provided herein."

3. The Parties' Letter Agreement dated February 4, 2020 regarding "Implementing Changes in the City of Chicago Minimum Wage" shall remain in full force and effect and will apply to the July 1, 2023, wage increase.

4. Each Employer in its sole discretion and without regard to the most favored nations' clause in Section 37.5 of the Parties' Agreement may adopt and implement a hazardous pay program for such locations as it shall designate on such terms and amounts for such period as it desires. The Employer retains the discretion to discontinue or change any such hazardous pay program at any time. Any decision by an Employer regarding the adoption, implementation, alteration, or termination of any such hazardous pay program are not subject to the grievance and arbitration procedure and may not be the cause of a work stoppage or other disruption in service. Provided, however, that the Employer may not discriminate among bargaining unit employees working at a location

-2-

## EXTENSION AGREEMENT

in its implementation, adoption, modification, alteration, or termination of any such hazard pay program. Instead, any hazard pay program, alteration or termination thereof must apply equally to all bargaining unit employees working at the location to which the hazard pay program applies.

5. The Union, the CPA, and the Employers hereby withdraw any notices of termination of the Agreement and it shall be of no force or effect.

**AGREED:**

Signed on behalf of the Union

By: _____

Signed on behalf of the Employer

By: _____

-3-

# Exhibit E

DRAFT – October 6, 2025

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into between the Teamsters Local Union No. 727 Health and Welfare Fund, the Teamsters Local Union No. 727 Legal and Educational Assistance Fund, and the Parking Industry Labor Management Committee (collectively, the "Funds") and Heat Valet Parking Service Inc. ("Heat Parking" or the "Employer" or "Maker") and Employer's owner, Jermell L. Brown ("Brown" or "Owner"). The Funds and the Employer and Brown agree as follows:

WHEREAS, the Employer is signatory to one or more Collective Bargaining Agreements ("CBA") obligating Employer to pay principal fringe benefit contributions to the Funds for its covered employees pursuant to such agreements. Employer acknowledges that it is delinquent in the payment of these principal contributions and it is therefore liable to the Funds for such delinquent contributions, interest and liquidated damages, audit fees, as well as attorneys' fees and costs incurred in the collection thereof;

WHEREAS the Funds' auditor conducted an audit of Heat Parking's payroll for the period October 1, 2022 through August 31, 2023 ("Audit");

WHEREAS, the Audit demonstrated that Heat Parking owes **$36,215.93** to the Funds ("Audit Balance") for delinquent contributions, plus interest, liquidated damages and audit fees;

WHEREAS, Heat Parking does not dispute the Audit Balance, but Heat Parking has claimed that it cannot afford to pay the Audit Balance;

WHEREAS, Heat Parking in an effort to avoid the costs associated with litigation, agrees to pay to the Funds collectively the total amount of $30,000.00 ("Agreed Amount") with two (2) initial payments of $6,000 and, thereafter, monthly payments of $1,000.00;

WHEREAS, Jermell L. Brown is the owner of the Employer, and he is desirous of maintaining an ongoing relationship between the Funds and Employer. As an inducement to the Funds to continue their relationship with the Employer, to enter into this Payment Agreement, and the Funds' agreement to suspend collection efforts for the Audit Balance identified herein pursuant to the terms of this Agreement, Brown has agreed to guarantee the payments the Employer is obligated to make under this Payment Agreement in the event of the Employer's default as set forth in this Payment Agreement;

WHEREAS, the Funds, having given due consideration to this matter, have determined that it is prudent and in the best interests of the Funds' participants and beneficiaries to resolve this matter without litigation; and,

WHEREAS, based upon the Payment Agreement between the parties recited herein, the Funds, the Employer, and Brown are desirous of resolving the above identified delinquencies owed to the Fund and the parties are desirous of resolving all issues between them.

Draft – October 6, 2025

DRAFT – October 6, 2025

NOW, THEREFORE, for good and valuable consideration, the sufficiency of which is hereby acknowledged, the above-referenced parties hereby agree, as follows:

1. **Terms of Agreement**

   A. Heat Parking shall pay to the Funds as follows:

   i. An initial payment of $6,000.00 shall be submitted to the Funds concurrent with Heat Parking's execution of this Agreement ("Initial Payment").

   ii. A second payment of $6,000.00 shall be submitted to the Funds by November 30, 2025.

   iii. Thereafter, Employer shall make eighteen (18) monthly payments of $1,000.00 until the aforesaid Agreed Amount has been timely paid in full. Each of these eighteen (18) monthly payments of $1,000.00 must be received by the Funds' office no later than the twentieth (20th) of the month with the first of the monthly payments due on November 20, 2025. Payment dates falling on a Saturday, Sunday or holiday shall be due on the first business day thereafter.

   iv. Payments shall be by check made payable to the Teamsters Local 727 Benefits Funds and forwarded to the Teamsters Local 727 Benefits Funds Office at 1300 W. Higgins Rd., Suite 303, Park Ridge, IL 60068.

   B. Heat Parking shall continue to update the Funds so that each of its covered employees is set up in the Funds' contribution system.

   C. The parties agree that the monthly payments identified in this Payment Agreement shall not be made at the expense of the "then current" contributions due from the Employer not being paid, as well as the "then current" monthly reporting forms not being submitted. The "then current" monthly payments/reporting forms must be made as required by the Employer's CBA(s). Therefore, Employer further agrees that effective with the contributions owed for the month of October 2025 and thereafter, it will keep current on its then "current" monthly reports and contributions payments.

   D. This Agreement does not address or satisfy any other deficiency in contributions Heat Parking may have currently, for other audit periods or monthly contributions, or any future deficiency that may be claimed by the Funds. This Settlement Agreement covers only the October 1, 2022 through August 31, 2023 Audit.

Draft – October 6, 2025

### Fund's Agreement Conditional upon Concurrent Tender of Initial Payment

This Agreement shall not be effective or binding until Heat Parking tenders the Initial Payment concurrent with its signature hereto. In the event the Initial Payment is not cleared by the bank or in any way fails to reach the Funds' office, this Agreement shall be deemed null and void and Heat Parking shall owe the full amount of delinquent contributions, interest, liquidated damages, and audit fees set forth in the audit report.

### 2. Release of Claims Regarding Audit Balance:

In consideration of the covenants contained herein, the parties, including their respective agents, attorneys, successors, and assigns, hereby fully, forever, irrevocably and unconditionally release one another from any claims or demands in dispute of the amount of the Audit Balance. As a matter of compromise, the parties hereby acknowledge and agree that $30,000.00 is due form Heat Parking to the Funds. In accordance therewith, the Teamsters Local Union No. 727 Health and Welfare Fund, the Teamsters Local Union No. 727 Legal and Education Assistance Fund and the Parking Industry Labor Management Committee, individually and collectively, waive any rights each may have to further audit the Employer's contributions due to the Funds for the period of time beginning October 1, 2022 through August 31, 2023. The Employer waives any right it may have to challenge the Audit Balance, through litigation or otherwise. Nothing herein shall be construed to be a waiver of the Teamsters Local Union No. 727 Health and Welfare Fund, the Teamsters Local Union No. 727 Legal and Education Assistance Fund and the Parking Industry Labor Management Committee's right to attempt to collect any ongoing contribution obligations from the Employer that may be due and owing after September 1, 2023.

### 3. Events of Default

The occurrence of any one or more of the following matters constitutes a Default by Employer under this Agreement:

(a) Failure by Employer to timely pay any amounts due as provided in this Agreement;

(b) Failure by Employer to stay current on any other financial contribution obligations to the Funds, including without limitation failure to stay current with ongoing monthly contributions during the repayment period described in Section 1(A)(ii) above;

(c) Employer becomes insolvent or bankrupt or admits in writing its inability to pay any amounts it owes (to the Funds or otherwise), or applies for or consents to the appointment of a trustee or receiver for Employer or for a major part of Employer's property or business.

### 4. Funds' Right to Entry of Judgment

Upon the occurrence of any "Event of Default" as defined above, the Funds may serve Employer and copy Brown with a ten-calendar day notice of default specifying the Event of default. Employer shall have the right to cure the default by paying the full amount due within this ten-calendar (10) day period. Upon Employer's failure to cure said default within the ten-calendar

DRAFT – October 6, 2025

(10) day period, the Funds shall be entitled to bring suit or motion in Federal Court and shall be immediately entitled to judgment of the full Audit Balance ($36,215.93) less payments made and any other amounts due hereunder, plus any additional amounts due the Funds including, without limitation, interest, liquidated damages, the Funds' attorney fees and court costs, and further audit expenses.

## 5. Brown's Obligations on Employer's Default

In the event Employer defaults in the payment of any monies due pursuant to paragraph 3 above, and such default is not cured within the ten-calendar (10) days following written notice to Employer, Brown agrees to make all remaining payments due on the Agreed Amount pursuant to this Payment Agreement and as scheduled pursuant to paragraph 1, unless otherwise agreed by the Funds.

The Employer's default in any payment under this Payment Agreement shall not void, rescind or modify Brown's obligations to make the payments on the Agreed Amount set forth herein. Brown agrees to make any and all remaining payments due under this Payment Agreement and as scheduled pursuant to paragraph 1, and, upon default by the Employer, the Funds may proceed with collection efforts against Brown for the unpaid balance on the Agreed Amount, and the Funds may also recover all reasonable attorneys' fees and costs incurred in collecting said balance.

### Release:

Upon full payment of the monies owed to the Funds, and subject to the Funds' right to execute on the Audit Balance as provided in Section 4 above should a default occur, the Funds and any person claiming through them agree to release and forever discharge Heat Parking, Brown, and each of its past, present and future owners, directors, officers, agents, employees and the predecessors, successors and assigns of each of them, from any and all further liability under the Audit covering the period October 1, 2022 through August 31, 2023. Neither the Funds, nor this Agreement, releases Heat Parking from the payment of any contributions, interest and liquidated damages that may be owed outside of the audit period or that may be owed in the future.

## 5. Waiver of Jury Trial:

To the extent permissible by law, the parties hereby waive any right they may have to demand a jury in the Suit or any other action taken to enforce this agreement.

## 6. Enforcement:

Any suit to enforce this Agreement shall be brought within the District Court for the Northern District of Illinois, Eastern Division. If subject matter jurisdiction in the federal courts is found to be lacking, the parties agree to litigate any claim to enforce this Agreement in the Circuit Court of Cook County, Illinois.

## 7. Confession of Judgment

If Employer fails to cure any Event of Default within the 10 calendar day cure period, as herein provided, Employer hereby irrevocably appoints any attorney of any Court of Record in this State, attorney for Employer and in Employer's name, from time to time, to enter the appearance

Draft – October 6, 2025

DRAFT – October 6, 2025

of Employer, to waive the issuance of process and service thereof, to waive trial by jury, and to confess judgment in favor of the Funds and against Employer for the amounts which are then due hereunder, together with costs of suit and the Funds' attorney's fees in the entry of such judgment, and to waive and release all errors and right of appeal from any such judgment, and to consent to an immediate execution thereon. Employer agrees that a true, accurate, and clearly legible photocopy or scanned version of this instrument shall be sufficient for purposes of entering and confirming the confessed judgment; the original signed version shall not be required.

The remedy provided for by this paragraph shall be in addition to any and all other remedies available to the Funds, and shall not modify or prejudice any of the Funds' rights to recovery under any other provision of this Agreement.

8. **Notices**

   a. **Form of Notice**: All notices, requests, claims, demands and other communications between the parties shall be in writing.
   b. **Method of Notice**: All notices shall be given by (i) first class, registered or certified mail, postage prepaid or (ii) by facsimile or (iii) email to the address of the party specified in this Agreement or such other address as either party may specify in writing.
   c. **Address of Notice for the Funds**: All notices to the Funds shall be sent to 1300 W. Higgins Rd. Suite 303, Park Ridge, IL 60068 and addressed to Bobby Laino, Funds Administrator.
   d. **Address of Notice for the Employer and Brown**: All notices to the Employer shall be sent to Heat Parking c/o Jermell Brown, 5726 W. Washington, Apt. 206, Chicago, Il 60644. Copies of all notices to the Employer shall be sent to Brown at the same address.
   e. **Notification of Change of Address**: The parties have an obligation to notify one another of any charge in address or notifications for service purposes.

9. **Miscellaneous:**

   a. **Other Agreements**: This Agreement in no way modifies, amends, otherwise alters, terminates or voids any other agreements between the Funds and the Employer.
   b. **Attorney Review:** The parties agree that they have had the opportunity to consult with their counsel of choice prior to signing this agreement and have either done so or knowingly waive their right to do so.

   c. **Amendment and Non-waiver**: This agreement may only be amended by written agreement executed by the parties or their successors and, if necessary, adopted by the Court. Failure to enforce any portion of this Agreement by any party for any length of time shall in no case be deemed a waiver or novation of this Agreement.

   d. **Execution:** This Agreement shall not be binding upon the parties until it is fully executed and the Initial Payment is deposited into the Funds' account(s). This

Draft – October 6, 2025

DRAFT – October 6, 2025

Agreement may be signed in parts. Facsimile and electronic signatures shall be deemed equivalent to original signatures.

e.  **Governing Law:**  Unless otherwise governed by ERISA, this Agreement shall be governed by Illinois law.

f.  **Severability:**  In the event that one or more of the provisions of this Agreement shall be held to be illegal or unenforceable, the remaining portions of the Agreement shall continue to be enforceable.  Notwithstanding the foregoing, Heat Parking, **Brown** and the Funds agree that paragraphs 1.A., 1.B., 1.C. are essential to this Agreement, and if any one of them is deemed unenforceable, the remaining portions of this Agreement shall be null and void.

g.  **No Admission:**  The Parties agree that neither this Agreement nor the furnishing of the consideration for this Agreement shall be deemed or construed at any time for any purpose as an admission by any of the Parties, or evidence of any liability or unlawful conduct of any kind.  Nothing in the preceding sentence shall preclude introduction of this Agreement by any of the Parties to establish a breach of this Agreement.

h.  **Entire Agreement:**  The Agreement constitutes and contains the entire agreement and understanding concerning the Funds' Claims against Heat Parking, **Brown**'s obligations, as well as any other subject matters addressed herein between the Funds, Heat Parking, and **Brown** and supersedes and replaces all prior negotiations and all prior agreements proposed or otherwise, whether written or oral, concerning the subject matter hereof.  Any amendment or modification to this Agreement must be made in writing and signed by an authorized agent of the Funds and an authorized agent of Heat Parking and **Brown personally.** The drafting of this Agreement shall be deemed a mutual endeavor by all Parties, and shall not be construed against any single party as the drafter.

i.  **Captions:**  Any captions to the paragraphs of this Agreement are solely for the convenience of the Parties; neither those captions nor the title to this Agreement are to be construed in any way as modifying the provisions of themselves.

WHEREFORE:  by affixing their signatures thereto, each Party acknowledges that they have read and understand this Settlement Agreement; that they have had the opportunity to consult with and receive the benefit of legal counsel; that the terms and conditions set forth herein constitute the entire agreement and understanding between the Parties; that they agree to and accept the terms and conditions set forth herein; that they executed this Settlement Agreement voluntarily; and that they acknowledge and intend to be fully and legally bound by it.

## WARRANT OF ATTORNEY

Draft – October 6, 2025

DRAFT – October 6, 2025

IF THE MAKER DEFAULTS ON THIS NOTE, THE MAKER HEREBY IRREVOCABLY AUTHORIZES AND EMPOWERS THE CLERK OF COURT FOR THE U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION, OR ANY DESIGNATED ATTORNEY, AS DESCRIBED BELOW, TO APPEAR FOR AND CONFESS JUDGMENT AGAINST THE MAKER, UPON THE OCCURRENCE OF A DEFAULT, AS DESCRIBED IN THE AGREEMENT, FOR SUCH SUMS AS ARE OR MAY BECOME DUE UNDER THIS AGREEMENT, WITH TEN (10) DAYS PRIOR NOTICE BY THE HOLDERS OF THE EXERCISE OF THIS CONFESSION OF JUDGMENT, WITH COSTS OF SUIT, WITHOUT STAY OF EXECUTION AND WITH AN AMOUNT, FOR LIEN PRIORITY PURPOSES, INCLUDING ALL REASONABLE ATTORNEYS' FEES AND COSTS AS PROVIDED UNDER SECTION 505(g)(2) OF ERISA, 29 U.S.C. § 1132(g)(2).

FOR SO DOING, THIS NOTE OR A COPY HEREOF VERIFIED BY AFFIDAVIT SHALL BE A SUFFICIENT WARRANT. TO THE EXTENT PERMITTED BY LAW, THE MAKER RELEASES ALL ERRORS IN SUCH PROCEEDINGS. IF A COPY OF THIS AGREEMENT, VERIFIED BY AFFIDAVIT BY OR ON BEHALF OF THE HOLDERS OF THIS AGREEMENT, SHALL HAVE BEEN FILED IN SUCH ACTION, IT SHALL NOT BE NECESSARY TO FILE THE ORIGINAL AGREEMENT AS A WARRANT OF ATTORNEY. THE AUTHORITY AND POWER TO APPEAR FOR AND CONFESS JUDGMENT AGAINST MAKER SHALL NOT BE EXHAUSTED BY THE INITIAL EXERCISE OF SUCH CONFESSION OF JUDGMENT AND MAY BE EXERCISED AS OFTEN AS THE HOLDERS SHALL FIND IT NECESSARY AND DESIRABLE, AND THIS AGREEMENT SHALL BE A SUFFICIENT WARRANT FOR ANY SUBSEQUENT CONFESSION OF JUDGMENT.

THE HOLDERS MAY CONFESS ONE OR MORE JUDGMENTS IN THE SAME OR DIFFERENT JURISDICTIONS FOR ALL OR ANY PART OF THE AMOUNT OWING UNDER THIS AGREEMENT, WITHOUT REGARD TO WHETHER JUDGMENT HAS PREVIOUSLY BEEN CONFESSED FOR THE SAME AMOUNT, PROVIDED THAT THE JUDGMENT FOR THAT AMOUNT HAS NOT BEEN SATISFIED.

IF ANY JUDGMENT CONFESSED AGAINST MAKER UNDER THIS NOTE IS STRICKEN OR OPENED UPON APPLICATION BY OR ON BEHALF OF MAKER FOR ANY REASON, THE HOLDERS ARE HEREBY AUTHORIZED AND EMPOWERED AGAIN TO APPEAR FOR AND CONFESS JUDGMENT AGAINST MAKER FOR ANY PART OR ALL OF THE AMOUNTS OWING UNDER THIS AGREEMENT, IF DOING SO WILL CURE ANY ERRORS OR DEFECTS IN THE PRIOR CONFESSION.

ACCEPTED AND AGREED on this _____ day of October, 2025.


HEAT VALET PARKING SERVICE INC.

_____        Dated:_____

By: _____

Its: _____


Draft – October 6, 2025

DRAFT – October 6, 2025

**JERMELL L. BROWN, INDIVIDUALLY**

_(signature)_

Dated:___11/7/2025___

**TEAMSTERS LOCAL 727 BENEFIT FUNDS**

_(signature)_

Dated:_____

By: _JOHN COLI JR._

Its: _TRUSTEE_

# Exhibit F

STATEMENT OF COLLECTION PROCEDURES
TEAMSTERS LOCAL UNION NO. 727 BENEFIT FUNDS
April 22, 2024

**OBJECTIVE**

It is the intent of the Trustees that the following procedure be implemented so that the Trustees may fulfill their statutory and fiduciary obligations. The Trustees also intend to ensure that each employer is following the requirements of its Collective Bargaining Agreement and the Restated Agreement and Declaration of Trust.

**COLLECTION PROCEDURE**

1.  Due Date

    **Contributions and signed remittance reports are due by the 10th day of the month following the month in which the work was performed.** If **a pay period ends in a month, other than the month in which work is performed, the employer may remit its payment for such work in the next month.**

    **References in this statement to receipt by a particular date shall mean by the close of business on that day, or by the close of business on the last business day prior to that day in the case of a Saturday, Sunday or holiday.**

2.  Delinquent Payments

    A.  The Fund Office will provide the Collection and Field Representative responsible for the employer with a monthly report showing delinquencies by the 15th of the month. The Collection and Field Representative will immediately begin collection efforts. If **the payment has not been received by the last business day of the month, interest at a rate of 0.75% per month of the delinquent contribution will be assessed. Interest will be compounded monthly with a minimum charge of $25.00 per month per Fund.** In no event will the amount of interest charged for a particular month exceed the amount of the contributions due for that month for that Fund.

    B.  If the employer does not pay the entire amount due by the 15th day of the month following the month in which it was due, the Fund Office will notify the Collection and Field Representative responsible for the employer. **If the payment has not been received by the 20th of the month, liquidated damages in the amount of 5% of the contribution owed**

**will be added to the delinquency. In addition, interest at the rate of 0.75% per month of the delinquent contribution will continue to accrue with a minimum charge of $25.00 per month per Fund.** In no event will the amount of interest charged for a particular month exceed the amount of the contributions due for that month for that Fund. The Fund Office will also advise the employer of the imposition of these additional charges for a continued delinquency.

C.  If the employer does not pay the entire amount due by the 15th day of the second month following the month in which it was due, the Fund Office will notify the Fund Manager. If **the employer does not make its payment by the 20th of the month, liquidated damages in the amount of 10% of the contribution owed will be added to the delinquency (5% for each month delinquent). In addition, interest at the rate of 0.75% per month of the delinquent contribution will continue to accrue with a minimum charge of $25.00 per month per Fund.** In no event will the amount of interest charged for a particular month exceed the amount of the contributions due for that month for that Fund. The Fund Manager will also advise the employer of the impositions of these additional charges for a continued delinquency. If the Employer has not paid the entire amount after the above procedure, the Fund Manager will refer the matter to the Trustees for further action.

D.  If after following the above procedure, the employer still has not paid the delinquency, the Trustees may refer the matter to Fund Counsel, or take any other action available to collect the delinquency. If so referred to Fund Counsel, Fund Counsel may pursue collection efforts without litigation, recommend that a lawsuit be filed or recommend that other appropriate action be taken. Fund Counsel, if so instructed, will be responsible for pursuing collection efforts against the employer until the delinquency has been paid and contributions are current, or the Trustees determine that delinquency is not collectable. **All payments by the employer on account of the delinquency shall also include all attorney's fees and costs associated with the collection of the delinquency, including losses to the employees as a result of the delinquency and a result of any action taken to collect the delinquency.**

E.  If, upon the recommendation of Fund Counsel, the Trustees decide to file a lawsuit to compel payment, the Fund Office will order a full audit of the employer's payroll records. **All payments by the employer on account of the delinquency shall also include all attorney's fees and costs associated with the collection of the delinquency, including the cost of the audit of the employer's payroll records and losses to the employees as a result of the delinquency and a result of any action taken to collect the delinquency.**

3.    Reports by Fund Counsel

Fund Counsel shall report to the Trustees monthly as to the status of matters Fund Counsel is handling.

4.    Separate Delinquency

If the employer owes contributions to more than one Fund, the payment due to each Fund will be considered a separate delinquency.  In addition, the contribution report of an employer, for each month, will be considered a separate delinquency subject to the interest charges and liquidated damages as set forth above.  Whenever an employer's account is turned over to Fund Counsel, all past and future reports may be combined for collection purposes and amounts then owed by the employer will include attorney's fees and all other costs associated with collecting the delinquency.

5.    Waivers of Interest and Liquidated Damages

The Trustees reserve the right to waive interest, liquidated damages and other delinquent amounts, provided such a waiver is in the best interest of the Funds and is consistent with the Trustees fiduciary duties.

6.    The Trustees will review the rate of interest assessed against delinquent contributions in January of each year to ensure that it meets the Trustees' intent.

7.    The Trustees are not bound to follow the procedures as set forth herein, when the Trustees or their designee determine that normal procedures are inappropriate to any particular matter, and that the matter may be handled in such manner as is determined appropriate by the Trustees or their designee, aside from the normal collection procedures.

# Exhibit G

TEAMSTERS LOCAL UNION NO. 727 BENEFIT FUNDS
STATEMENT OF AUDIT PROCEDURES
April 22, 2024

OBJECTIVE

This document sets forth the procedures under which audits of employers will be conducted. This document sets forth the rights and responsibilities of employers under the Plan. Audits are performed to determine what moneys, if any are owed to the Funds. Audits will not determine if the employer has made any excessive contributions. Any potential excessive employer contributions will be handled pursuant to the "Teamsters Local Union. No. 727 Benefit Funds' policy for Erroneous Payments Made by an Employer." It is the intent of the Trustees that audit procedures be implemented so as to fulfill the statutory and fiduciary obligations of the Trustees and to maximize the receipts due the Funds pursuant to the collective bargaining agreements. The Trustees are confident that a substantial majority of contributing employers are making timely contributions to the Funds in accordance with the labor agreements and the Trust Agreements. It is hoped that active implementation of the following procedures will encourage all contributing employers to comply on a timely basis.

AUDIT PROCEDURES

I.      Employers will be selected for Audit on a routine basis or for cause. It is the goal of the Board of Trustees to conduct an audit of each contributing employer no less frequently than once every three (3) years, except as provided in D, below

A.      FOR CAUSE: The Fund Office will direct the Contribution Compliance Department to perform audits on employers for cause. The Collection and Field Representatives will communicate the information that led to the audit.

B.      ROUTINE: Each employer will be audited once approximately each three years. The Fund Office will promptly advise the Auditor by letter when such selection has been made.

C.      NEW EMPLOYERS: The Fund Office will direct the Contribution Compliance Department to perform an audit on all new employers after they have contributed to the Benefit Funds for at least six (6) months.

D.      An Employer performs work under a collective bargaining agreement for a short period of time (e.g., on a project basis), or who has not performed a substantial amount of work, will not be audited unless the

Audit and Collection Committee has reason to believe the required contributions have not been made.

II.     PRE-AUDIT

A.      AUDIT FILE: Once an employer has been selected for audit by one of these processes, the Contribution Compliance Department will promptly open an audit file to compile information and to monitor the status of the audit.

B.      TOLLING AGREEMENTS: The Collection and Field Representative(s) will obtain tolling agreements for all audits with a risk of loss of claims due to the defense of the Statute of Limitations. The Fund Office will notify the Collection and Field Representative(s) at least one (1) month prior to the date the tolling agreement is needed, or as soon as is thereafter possible. If the Collection and Field Representative(s) is unable to obtain in a timely manner so as to eliminate the risk of loss, the matter will be referred to the Fund Manager, who will seek Trustees action.

C.      SCHEDULING OF AUDIT: Within seven (7) days after an employer has been selected for audit by either process above, the Contribution Compliance Department will send to the employer an initial contact letter to schedule an appointment for an audit.

1.      Within five (5) days after sending the letter, the Contribution Compliance Department will contact the employer by phone and/or email in order to schedule the audit.

2.      The Contribution Compliance Department will attempt to schedule an audit. If they are not able to do so within four (4) weeks, the auditor will request assistance from the Collection and Field Representative(s). The Collection and Field Representative(s), will then attempt to contact the employer to facilitate the scheduling of the audit. The Collection and Field Representative(s) will keep written records of all such attempts. If not successful within a two (2) week period, the Fund Office will send a letter to the Employer informing them that the matter will be referred to Fund Counsel and legal action will be initiated if the Employer fails to contact the auditor to schedule an audit within a

one (1) week period. A copy of that letter is attached as "Attachment A."

## III.     AUDIT

A.     Once an audit is started, it is expected that the audit will be completed in a reasonable time frame. A reasonable time frame will be determined by factors such as the number of employees who performed bargaining unit work for the employer, the availability of records and the time period being audited. The Contribution Compliance Department shall include an estimate of the time needed to complete the audit in their regular updates on the status of audits. It is the expectation of the Trustees that the audit will be completed within ninety (90) days from the date the audit is assigned.

B.     If the employer fails to provide all the necessary records to complete the audit, the Contribution Compliance Department will notify the Fund Management, at the earliest possible date. Fund Management and Collection and Field Representative(s), will then attempt to contact the employer to facilitate the completion of the audit. If not successful within a two (2) week period, the matter will be presented to the Trustees at the next meeting for further direction.

## IV.     DRAFT AUDIT REPORT

A.     The Contribution Compliance Department and the Collection and Field Representative assigned to the Employer will meet (if requested by employer) with the Employer to review the initial findings. The Collection and Field Representative will work with the employer to reach an agreement as to the  findings.  In doing this, they should use their knowledge of the Collective Bargaining Agreement and the industry and information obtained about the Employer in the course of their work as a Collection and Field Representative. They may also use internal files and/or consult with stewards and/or members and/or non-members.

B.     A draft audit report will be sent to the Collection and Field Representative(s) for review by Fund Management or their designee and appropriate Collection and Field Representative(s), the Collection and Field Representative will attempt to obtain a consensus on the findings within 30 days from the date the initial findings are provided to the employer.

1.     The Collection and Field Representative(s), under the direction of Fund Management, will review the report for any apparent errors or potential problems. This review will be completed within two (2) weeks of receipt of the draft copy.

2.     The results of the review by Fund Management will be communicated by email to the Contribution Compliance Department within four (4) weeks after the draft report is received by the Collection and Field Representative(s).

## V.    FINAL AUDIT REPORT

A.     After receipt of the email from Fund Management, the Contribution Compliance Department will prepare a final report with corrections, updated interest/liquidated damages as of date, ninety (90) days after transmitted. A copy of the Final Report will be emailed to the Collection and Field Representative(s).

B.     Within one (1) week of receipt of the final report from the Contribution Compliance Department, the Collection and Field Representative(s) will forward a copy to the employer along with a cover letter from Fund Management attached as "Attachment B."

C.     Within ten (10) days after the final report is forwarded to the employer, the Collection and Field Representative(s) will contact the employer to begin attempts to collect the delinquencies. Recognizing that each situation is unique, the following are guidelines on collection attempts:

1.     If attempts to contact the employer by phone are unsuccessful, the Collection and Field Representative(s) should visit the employer's office.

2.     The Collection and Field Representative(s) should offer his/her availability, including at a meeting, to discuss the report and any questions or issues the employer may have concerning the report.

3. If the employer disputes any of the findings, (the Collection and Field Representative(s) should investigate the employer's claims. This investigation must include requests for documentation from the employer, interviews of members and employees and research of internal Fund records. If the Collection and Field Representative(s) needs assistance in the investigation, he/she should consult with Fund Management for assistance.)

4. It is essential that the Collection and Field Representative(s) continually follow up throughout the process and keep accurate records of collection attempts for a report to be given to Fund Management. The Collection and Field Representative(s) must keep contemporaneous notes on all conversations. While the Trustees rely on the professional judgment of the Contribution Compliance Department, all matters in dispute are subject to Trustees' final approval. The Collection and Field Representative(s) and Fund Management will file a report with the Trustees at the conclusion of their collection attempts. The report will summarize the status of the matter and request further direction from the Trustees. Preferably, this report will be filed at a Trustees meeting. In no event, however, shall collection attempts exceed two (2) months unless directed otherwise by the Trustees.

5. Fund Management will send the Employer a letter by certified mail advising the employer that its payment has not been received. A copy of the letter is attached as "Attachment C." Fund Management will file a report with the Trustees at the conclusion of the collection attempts. The report will summarize the status of the matter and request further direction from the Trustees. Preferably, this report will be filed at a Trustees Meeting. In no event, however, shall collection attempts exceed two (2) months unless directed otherwise by the Trustees.

VI. RESOLUTION OF THE AUDIT

A. PAYMENT: If the employer has agreed to pay the delinquencies, the Fund Office will monitor the payment(s) including the distributions to the appropriate Funds. If the delinquency does not exceed $5,000, the Trustees will waive the audit fee as long as the delinquency is paid in full prior to referral to Fund Counsel. Once payment is made in full, the audit file will be closed.

B. SETTLEMENT: The Trustees authorize the Fund Manager to negotiate a settlement prior to a matter being turned over to Fund Counsel.

The Trustees further authorize the Fund Manager to waive liquidated damages if he believes it appropriate. If a settlement is reached, the Fund Office will monitor the payment(s) including the distributions to the appropriate Funds. Once payment is made in full, the audit file will be closed.

C.      REFERRAL TO THE ATTORNEY: The Trustees may direct the matter to be referred to Fund Counsel for litigation and/or settlement. Once a matter is turned over to Fund Counsel, the Fund Office will not actively attempt to settle the matter.

VIII.   COLLECTION AND FIELD REPRESENTATIVE RESPONSIBILITIES

A.      AVAILABILITY: The Collection and Field Representative(s) will be made available to the Contribution Compliance Department and to Fund's Counsel concerning the payroll audit or any collection issues, including as a potential witness in litigation.

B.      PROVISIONS: The Collection and Field Representative(s) should be aware of all governing provisions not only in the Audit Procedures but also in the Trust Agreements and Collective Bargaining Agreements.

MONITORING AUDIT PROCEDURES

Generally, the entire audit procedure will be monitored by Fund Management. To keep the Trustees advised of the process, reports will be given at each Trustees Meeting. The Contribution Compliance Department, Fund Counsel and Fund Management will provide reports to the Trustees. These reports will be combined into a master report of the status of all audits. The Collection and Field Representative should monitor his or her own payroll audits, including tolling agreements until the payroll audit is resolved. As such, he or she should monitor its status, even if referred to Fund Management, Board of Trustees or Fund Counsel. The Collection and Field Representative should work with the Fund Office to obtain updates on the status of payroll audits.

The Trustees reserve the right to amend these procedures when the Trustees or their designee determine that the normal procedures are inappropriate to any particular matter. Audits may be handled in such a manner as determined appropriate by the Trustees or their designee, aside from the normal collection procedures.

Table of Contents for Exhibits

The following documents are only examples of communications used by the Funds. The Funds may use different communication when it is deemed appropriate to a particular circumstance.


Attachment A:
Notification Letter, used to inform an employer that records are needed for a payroll audit

Attachment B:
Report Transmittal Letter, sent to employer with completed audit report

Attachment C:
Final Notice Letter, sent to employer when the Fund Office cannot collect amounts due

ATTACHMENT A

January 1, 2024

John Smith
ABC Corporation
123 N. La Salle Street
Chicago, IL 60601-1234

Dear Mr. Smith:

The Teamsters Local Union No. 727 Benefit Funds Contribution Compliance Department has sent you a letter and contacted you by phone and/or email to schedule an audit. In addition, I have contacted you to schedule an audit. However, you have not complied with their request. If you fail to contact the Contribution Compliance Department and schedule an audit within a one (l) week period, this matter may be referred to the Funds' Attorney for resolution.

Sincerely,


Ben Affetto
Collection and Field Representative

ATTACHMENT  B

January 1, 2024

John Smith
ABC Corporation
123 N. La Salle Street
Chicago, IL 60601-1234

Dear Mr. Smith:

Enclosed please find the audit report prepared by the Contribution Compliance Department of ABC Corporation reflecting amounts due the Health and Welfare, Pension and Legal and Educational Assistance Funds for the period January 1, 2004 through March 31, 2008.

After you review this report, contact our office to discuss payment of the delinquent contributions and the associated amounts for interest, liquidated damages and audit fees. We must hear from you by November 17, 2008 in order for you to avoid unnecessary expenses and litigation.

Our Collection and Field Representative, Ben Affetto, is  available to discuss any questions you may have regarding the audit report, as well as the payment of the delinquent contributions and associated fees.

Sincerely,


Robert Laino
Fund Manager


cc:      Ben Affetto, Collection and Field Representative


Enclosure

-9-

ATTACHMENT C

January 1, 2024

John Smith
ABC Corporation
123 N. La Salle Street
Chicago, IL 60601-1234

Dear Mr. Smith:

On November 3, 2008, our office forwarded a copy of the audit report for ABC Corporation prepared by the Contribution Compliance Department reflecting amounts due to the Teamsters Local Union No. 727 Benefit Funds for the period January 1, 2004 through March 31, 2008. We have made several attempts to collect the delinquent contributions and the associated amounts for interest, liquidated damages and audit fees. You have, however, failed to pay the amounts owed.

Please be advised that this is your final notice to settle the matter without proceeding to litigation. If we do not hear from you by January 26, 2009, I will recommend to the Trustees that the matter be referred to litigation and no further attempts at settlement will be considered.

Sincerely,

Robert Laino
Fund Manager

Cc:     Ben Affetto, Collection and Field Representative

-10-

# Exhibit H

HEAT PARKING
5726 W. WASHINGTON ST.
CHICAGO, IL  60644


OCTOBER 1, 2022 – AUGUST 31, 2023

<u>HEAT PARKING</u>

<u>CONTENTS</u>

| | |
|---|---|
| AUDIT REPORT LETTER | 1 |
| SUMMARY REPORT | 2 |
| DETAILED CONTRIBUTION EXCEPTION REPORTS | 3 - 7 |
| INTEREST SCHEDULE | 8 - 10 |

# TEAMSTERS LOCAL UNION NO. 727 BENEFIT FUNDS

*1300 West Higgins Road, Suite 103, Park Ridge, Illinois 60068, Telephone 773-685-0340*

September 21, 2023

Board of Trustees
Teamsters Local 727 I.B. of T. Health and Welfare
and Legal and Educational Assistance Funds
1300 West Higgins Road, Suite 303
Park Ridge, IL 60068

We have applied certain procedures, as discussed below, to the payroll records of Heat Parking, a contributing employer to the Teamsters Local 727 I.B. of T. Health and Welfare and Legal and Educational Assistance Funds, for the period October 1, 2022 to August 31, 2023. The purpose of our review was to assist you in determining whether contributions to the Trust Funds are being made in accordance with the collective bargaining agreement in effect and with the Trust Agreement of the Fund. The propriety of the contributions is the responsibility of the employer's management.

Our procedures generally include a review of the pertinent provisions of the collective bargaining agreements and comparing underlying employer payroll records to Fund contribution records. The employer records we review may include payroll journals, individual earnings records, payroll tax returns, contribution reports, job classifications, drivers logbooks, contracts and general disbursement records. The scope of this engagement is limited to records made available by the employer and would not necessarily disclose all exceptions in employer contributions to the Trust Funds. Any compensation paid to employees not disclosed to us or made part of the written record is not determinable by us and is not included in our review.

The exceptions to employer contributions are noted on the accompanying report.

Teamsters 727 Benefit Funds



# Teamsters Local Union No. 727 Benefit Funds
## Reconciliation of Differences Per Year

| Fiscal Year Ending | 2-28 2023 | 2-29 2024 | Total Due |
|---|---|---|---|
| **Part Time - Employees** | | | |
| Welfare | 950.00 | 1,260.00 | 2,210.00 |
| Legal & Educational Assistance | 1,559.70 | 2,183.64 | 3,743.34 |
| Totals | 2,509.70 | 3,443.64 | 5,953.34 |
| | | | |
| **Full Time - Employees** | | | |
| Welfare | 7,537.65 | 9,633.06 | 17,170.71 |
| Legal & Educational Assistance | 1,247.76 | 3,275.46 | 4,523.22 |
| Totals | 8,785.41 | 12,908.52 | 21,693.93 |
| | | | |
| **Total Dollar Amount Due** | | | |
| Welfare | 8,487.65 | 10,893.06 | 19,380.71 |
| Legal & Educational Assistance | 2,807.46 | 5,459.10 | 8,266.56 |
| PILMC | 90.00 | 150.00 | 240.00 |
| Totals | 11,385.11 | 16,502.16 | 27,887.27 |

| | Welfare | L&E Assistance | PILMC | Total Due |
|---|---|---|---|---|
| Total Deficiencies | 19,380.71 | 8,266.56 | 240.00 | 27,887.27 |
| Liquidated Damages | 3,876.14 | 1,653.31 | 48.00 | 5,577.45 |
| Interest | 1,524.54 | 608.66 | 18.01 | 2,151.21 |
| Payroll Audit Fee | 444.00 | 150.00 | 6.00 | 600.00 |
| Totals | 25,225.39 | 10,678.53 | 312.01 | 36,215.93 |

**Employer Name -** Heat Parking     **Person Contacted -** Jermell Brown

**Date of Audit -** N/A     **Telephone -** (312) 978-6810

**Audit Period -** October 1, 2022 - August 31, 2023     **Auditor -** Agata Jozwicki

2

# Teamsters Local Union No. 727 Benefit Funds

**Reconciliation Between Actual and Reported Part-Time Employees**

### Part-Time  Employees Without Contributions

| SS# | Name | Rate | 2022 | | | | | | | | | | 2023 | | Total Hours |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | |
| N/A | Heat Parking | | - | - | - | - | - | - | - | 2 | 2 | 2 | 2 | 2 | 10 |
| | Total | | - | - | - | - | - | - | - | 2 | 2 | 2 | 2 | 2 | 10 |

Note: The deficiency noted above for Heat Parking is the result of the employer not reporting sufficient hours to staff the Eurostar Hotel during the hours of operation.

| | Rate | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Health & Welfare | $95.00 | - | - | - | - | - | - | - | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | 950.00 |
| Legal & Educational Assistance | $155.97 | - | - | - | - | - | - | - | 311.94 | 311.94 | 311.94 | 311.94 | 311.94 | 1,559.70 |
| Total | | - | - | - | - | - | - | - | 501.94 | 190.00 | 190.00 | 190.00 | 190.00 | 2,509.70 |

## Totals for Year

| | Rate | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Health & Welfare | $95.00 | - | - | - | - | - | - | - | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | 950.00 |
| Legal & Educational Assistance | $155.97 | - | - | - | - | - | - | - | 311.94 | 311.94 | 311.94 | 311.94 | 311.94 | 1,559.70 |
| Total | | - | - | - | - | - | - | - | 501.94 | 501.94 | 501.94 | 501.94 | 501.94 | 2,509.70 |

# Teamsters Local Union No. 727 Benefit Funds

**Reconciliation Between Actual and Reported Full-Time Employees**

## Full-Time Employees Without Contributions

| SS# | Name | Rate | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Total Hours |
|-----|------|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-------------|
| | | | | | | 2022 | | | | | | | 2023 | | |
| N/A | Heat Parking | | - | - | - | - | - | - | - | 3 | 3 | 3 | 3 | 3 | 15 |
| | Total | | - | - | - | - | - | - | - | 3 | 3 | 3 | 3 | 3 | 15 |

Note: The deficiency noted above for Heat Parking is the result of the employer not reporting sufficient hours to staff the Eurostar Hotel during the hours of operation.

| | Rate | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Total Hours |
|---|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-------------|
| Health & Welfare | $502.51 | - | - | - | - | - | - | - | 1,507.53 | 1,507.53 | 1,507.53 | 1,507.53 | 1,507.53 | 7,537.65 |
| Legal & Educational Assistance | $155.97 | - | - | - | - | - | - | - | 467.91 | 467.91 | 467.91 | 467.91 | 467.91 | 2,339.55 |
| Less L&E contributions Paid | | - | - | - | - | - | - | - | 467.91 | 311.94 | 155.97 | 155.97 | - | 1,091.79 |
| **Total** | | - | - | - | - | - | - | - | 1,507.53 | 1,663.50 | 1,819.47 | 1,819.47 | 1,975.44 | 8,785.41 |

## Totals for Year

| | Rate | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Total Hours |
|---|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-------------|
| Health & Welfare | $502.51 | - | - | - | - | - | - | - | 1,507.53 | 1,507.53 | 1,507.53 | 1,507.53 | 1,507.53 | 7,537.65 |
| Legal & Educational Assistance | $155.97 | - | - | - | - | - | - | - | - | 155.97 | 311.94 | 311.94 | 467.91 | 1,247.76 |
| **Total** | | - | - | - | - | - | - | - | 1,507.53 | 1,663.50 | 1,819.47 | 1,819.47 | 1,975.44 | 8,785.41 |

4

# Teamsters Local Union No. 727 Benefit Funds

### Reconciliation Between Actual and Reported Part-Time Employees

**Part-Time Employees Without Contributions**

| SS# | Name | Rate | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Total Hours |
|-----|------|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-------------|
| | | | | | | 2023 | | | | | | | | 2024 | | Total |
| N/A | Heat Parking | | 2 | 2 | 2 | 2 | 2 | 2 | - | - | - | - | - | | 12 |
| | Total | | 2 | 2 | 2 | 2 | 2 | 2 | - | - | - | - | - | - | 12 |

Note: The deficiency noted above for Heat Parking is the result of the employer not reporting sufficient hours to staff the Eurostar Hotel during the hours of operation.

| | Rate | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Total Hours |
|---|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-------------|
| Health & Welfare | $105.00 | 210.00 | 210.00 | 210.00 | 210.00 | 210.00 | 210.00 | - | - | - | - | - | - | 1,260.00 |
| Legal & Educational Assistance | $181.97 | 363.94 | 363.94 | 363.94 | 363.94 | 363.94 | 363.94 | - | - | - | - | - | - | 2,183.64 |
| Total | | 573.94 | 573.94 | 573.94 | 573.94 | 573.94 | 573.94 | - | - | - | - | - | - | 3,443.64 |

## Totals for Year

| | Rate | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Total Hours |
|---|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-------------|
| Health & Welfare | $105.00 | 210.00 | 210.00 | 210.00 | 210.00 | 210.00 | 210.00 | - | - | - | - | - | - | 1,260.00 |
| Legal & Educational Assistance | $181.97 | 363.94 | 363.94 | 363.94 | 363.94 | 363.94 | 363.94 | - | - | - | - | - | - | 2,183.64 |
| Total | | 573.94 | 573.94 | 573.94 | 573.94 | 573.94 | 573.94 | - | - | - | - | - | - | 3,443.64 |

# Teamsters Local Union No. 727 Benefit Funds
**Reconciliation Between Actual and Reported Full-Time Employees**

### Full-Time  Employees Without Contributions

| SS# | Name | Rate | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Total Hours |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 2023 | | | | | | | 2024 | | |
| N/A | Heat Parking | | 3 | 3 | 3 | 3 | 3 | 3 | - | - | - | - | - | | 18 |
| | Total | | 3 | 3 | 3 | 3 | 3 | 3 | - | - | - | - | - | - | 18 |

Note: The deficiency noted above for Heat Parking is the result of the employer not reporting sufficient hours to staff the Eurostar Hotel during the hours of operation.

| | Rate | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Total Hours |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Health & Welfare | $535.17 | 1,605.51 | 1,605.51 | 1,605.51 | 1,605.51 | 1,605.51 | 1,605.51 | - | - | - | - | - | - | 9,633.06 |
| Legal & Educational Assistance | $181.97 | 545.91 | 545.91 | 545.91 | 545.91 | 545.91 | 545.91 | - | - | - | - | - | - | 3,275.46 |
| **Total** | | 2,151.42 | 2,151.42 | 2,151.42 | 2,151.42 | 2,151.42 | 2,151.42 | - | - | - | - | - | - | 12,908.52 |

## Totals for Year

| | Rate | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Total Hours |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Health & Welfare | $535.17 | 1,605.51 | 1,605.51 | 1,605.51 | 1,605.51 | 1,605.51 | 1,605.51 | - | - | - | - | - | - | 9,633.06 |
| Legal & Educational Assistance | $181.97 | 545.91 | 545.91 | 545.91 | 545.91 | 545.91 | 545.91 | - | - | - | - | - | - | 3,275.46 |
| **Total** | | 2,151.42 | 2,151.42 | 2,151.42 | 2,151.42 | 2,151.42 | 2,151.42 | - | - | - | - | - | - | 12,908.52 |

# Teamsters Local Union No. 727 Benefit Funds

**Reconciliation Between Actual and Reported Contributions - PILMC**

| | | | | | | | 2022 | | | | | | 2023 | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rate | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Employees |
| Total # of Employees Working | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 5 | 5 | 5 | 5 | 25 |
| Total # of Employees Contributed | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 2 | 1 | 1 | 0 | 7 |
| Total # of Employees Owed | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 3 | 4 | 4 | 5 | 18 |
| Contributions Due | $5.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $10.00 | $15.00 | $20.00 | $20.00 | $25.00 | $90.00 |

| | | | | | | | 2023 | | | | | | 2024 | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rate | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Employees |
| Total # of Employees Working | | 5 | 5 | 5 | 5 | 5 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 30 |
| Total # of Employees Contributed | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total # of Employees Owed | | 5 | 5 | 5 | 5 | 5 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 30 |
| Contributions Due | $5.00 | $25.00 | $25.00 | $25.00 | $25.00 | $25.00 | $25.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $150.00 |

8

SCHEDULE OF COMPOUND INTEREST
TEAMSTERS LOCAL UNION 727 - HEALTH & WELFARE FUND

EMPLOYER:     Heat Parking

| Y/E 2/28/2023 | Beginning Balance | Discrepancies | Rate | Interest | Ending Balance |
|---|---|---|---|---|---|
| Beginning Balance | | | | | 0.00 |
| Mar | 0.00 | 0.00 | 4.25% | 0.00 | 0.00 |
| Apr | 0.00 | 0.00 | 4.50% | 0.00 | 0.00 |
| May | 0.00 | 0.00 | 4.50% | 0.00 | 0.00 |
| Jun | 0.00 | 0.00 | 5.00% | 0.00 | 0.00 |
| Jul | 0.00 | 0.00 | 5.75% | 0.00 | 0.00 |
| Aug | 0.00 | 0.00 | 6.50% | 0.00 | 0.00 |
| Sep | 0.00 | 0.00 | 6.50% | 0.00 | 0.00 |
| Oct | 0.00 | 1697.53 | 7.25% | 10.26 | 1707.79 |
| Nov | 1707.79 | 1697.53 | 7.25% | 20.57 | 3425.89 |
| Dec | 3425.89 | 1697.53 | 8.00% | 34.16 | 5157.58 |
| Jan | 5157.58 | 1697.53 | 8.50% | 48.56 | 6903.66 |
| Feb | 6903.66 | 1697.53 | 8.75% | 62.72 | 8663.91 |
| Total | | 8487.65 | | 176.26 | |

| Y/E 2/29/2024 | Beginning Balance | Discrepancies | Rate | Interest | Ending Balance |
|---|---|---|---|---|---|
| Beginning Balance | | | | | 8663.91 |
| Mar | 8663.91 | 1815.51 | 8.75% | 76.41 | 10555.83 |
| Apr | 10555.83 | 1815.51 | 9.00% | 92.79 | 12464.13 |
| May | 12464.13 | 1815.51 | 9.00% | 107.10 | 14386.73 |
| Jun | 14386.73 | 1815.51 | 9.25% | 124.89 | 16327.14 |
| Jul | 16327.14 | 1815.51 | 9.25% | 139.85 | 18282.50 |
| Aug | 18282.50 | 1815.51 | 9.50% | 159.11 | 20257.12 |
| Sep | 20257.12 | 0.00 | 9.50% | 160.37 | 20417.48 |
| Oct | 20417.48 | 0.00 | 9.50% | 161.64 | 20579.12 |
| Nov | 20579.12 | 0.00 | 9.50% | 162.92 | 20742.04 |
| Dec | 20742.04 | 0.00 | 9.50% | 164.21 | 20906.25 |
| Jan | 20906.25 | 0.00 | 0.00% | 0.00 | 20906.25 |
| Feb | 20906.25 | 0.00 | 0.00% | 0.00 | 20906.25 |
| Total | | 10893.06 | | 1349.28 | |

| Totals | | 19380.71 | | 1525.54 | |

9

SCHEDULE OF COMPOUND INTEREST
TEAMSTERS LOCAL UNION 727 - LEGAL AND EDUCATIONAL ASSISTANCE FUND

EMPLOYER:      Heat Parking

| Y/E 2/28/2023 | Beginning Balance | Discrepancies | Rate | Interest | Ending Balance |
|---|---|---|---|---|---|
| Beginning Balance | | | | | 0.00 |
| Mar | 0.00 | 0.00 | 4.25% | 0.00 | 0.00 |
| Apr | 0.00 | 0.00 | 4.50% | 0.00 | 0.00 |
| May | 0.00 | 0.00 | 4.50% | 0.00 | 0.00 |
| Jun | 0.00 | 0.00 | 5.00% | 0.00 | 0.00 |
| Jul | 0.00 | 0.00 | 5.75% | 0.00 | 0.00 |
| Aug | 0.00 | 0.00 | 6.50% | 0.00 | 0.00 |
| Sep | 0.00 | 0.00 | 6.50% | 0.00 | 0.00 |
| Oct | 0.00 | 311.94 | 7.25% | 1.88 | 313.82 |
| Nov | 313.82 | 467.91 | 7.25% | 4.72 | 786.46 |
| Dec | 786.46 | 623.88 | 8.00% | 9.40 | 1419.74 |
| Jan | 1419.74 | 623.88 | 8.50% | 14.48 | 2058.10 |
| Feb | 2058.10 | 779.85 | 8.75% | 20.69 | 2858.64 |
| Total | | 2807.46 | | 51.18 | |

| Y/E 2/29/2024 | Beginning Balance | Discrepancies | Rate | Interest | Ending Balance |
|---|---|---|---|---|---|
| Beginning Balance | | | | | 2858.64 |
| Mar | 2858.64 | 909.85 | 8.75% | 27.48 | 3795.97 |
| Apr | 3795.97 | 909.85 | 9.00% | 35.29 | 4741.11 |
| May | 4741.11 | 909.85 | 9.00% | 42.38 | 5693.34 |
| Jun | 5693.34 | 909.85 | 9.25% | 50.90 | 6654.09 |
| Jul | 6654.09 | 909.85 | 9.25% | 58.31 | 7622.25 |
| Aug | 7622.25 | 909.85 | 9.50% | 67.55 | 8599.64 |
| Sep | 8599.64 | 0.00 | 9.50% | 68.08 | 8667.72 |
| Oct | 8667.72 | 0.00 | 9.50% | 68.62 | 8736.34 |
| Nov | 8736.34 | 0.00 | 9.50% | 69.16 | 8805.51 |
| Dec | 8805.51 | 0.00 | 9.50% | 69.71 | 8875.22 |
| Jan | 8875.22 | 0.00 | 0.00% | 0.00 | 8875.22 |
| Feb | 8875.22 | 0.00 | 0.00% | 0.00 | 8875.22 |
| Total | | 5459.10 | | 557.48 | |

| Totals | | 8266.56 | | 608.66 | |
|---|---|---|---|---|---|

SCHEDULE OF COMPOUND INTEREST
TEAMSTERS LOCAL UNION 727 - PILMC

EMPLOYER:     Heat Parking

| Y/E 2/28/2023 | Beginning Balance | Discrepancies | Rate | Interest | Ending Balance |
|---|---|---|---|---|---|
| Beginning Balance | | | | | 0.00 |
| Mar | 0.00 | 0.00 | 4.25% | 0.00 | 0.00 |
| Apr | 0.00 | 0.00 | 4.50% | 0.00 | 0.00 |
| May | 0.00 | 0.00 | 4.50% | 0.00 | 0.00 |
| Jun | 0.00 | 0.00 | 5.00% | 0.00 | 0.00 |
| Jul | 0.00 | 0.00 | 5.75% | 0.00 | 0.00 |
| Aug | 0.00 | 0.00 | 6.50% | 0.00 | 0.00 |
| Sep | 0.00 | 0.00 | 6.50% | 0.00 | 0.00 |
| Oct | 0.00 | 10.00 | 7.25% | 0.06 | 10.06 |
| Nov | 10.06 | 15.00 | 7.25% | 0.15 | 25.21 |
| Dec | 25.21 | 20.00 | 8.00% | 0.30 | 45.51 |
| Jan | 45.51 | 20.00 | 8.50% | 0.46 | 65.98 |
| Feb | 65.98 | 25.00 | 8.75% | 0.66 | 91.64 |
| Total | | 90.00 | | 1.64 | |

| Y/E 2/29/2024 | Beginning Balance | Discrepancies | Rate | Interest | Ending Balance |
|---|---|---|---|---|---|
| Beginning Balance | | | | | 91.64 |
| Mar | 91.64 | 25.00 | 8.75% | 0.85 | 117.49 |
| Apr | 117.49 | 25.00 | 9.00% | 1.07 | 143.56 |
| May | 143.56 | 25.00 | 9.00% | 1.26 | 169.82 |
| Jun | 169.82 | 25.00 | 9.25% | 1.50 | 196.33 |
| Jul | 196.33 | 25.00 | 9.25% | 1.71 | 223.03 |
| Aug | 223.03 | 25.00 | 9.50% | 1.96 | 250.00 |
| Sep | 250.00 | 0.00 | 9.50% | 1.98 | 251.97 |
| Oct | 251.97 | 0.00 | 9.50% | 1.99 | 253.97 |
| Nov | 253.97 | 0.00 | 9.50% | 2.01 | 255.98 |
| Dec | 255.98 | 0.00 | 9.50% | 2.03 | 258.01 |
| Jan | 258.01 | 0.00 | 0.00% | 0.00 | 258.01 |
| Feb | 258.01 | 0.00 | 0.00% | 0.00 | 258.01 |
| Total | | 150.00 | | 16.37 | |

| | | Discrepancies | | Interest | |
|---|---|---|---|---|---|
| Totals | | 240.00 | | 18.01 | |

# Exhibit I

US POSTAGE PITNEY BOWES
$ 004.440
ZIP 60602
02 7H
0006049701
JUL 29 2025
FIRST-CLASS

CTM LEGAL GROUP
ATTORNEYS AT LAW
77 W. Washington Street • Suite 2120
Chicago, IL 60602

Heat Parking
c/o Jernell Brown
5726 W. Washington, Apt. 206
Chicago, Il 60644



July 29, 2025

*Via Certified Mail and First Class mail*

Heat Parking
c/o Jermell Brown
5726 W. Washington, Apt. 206
Chicago, Il 60644

Heat Valet Parking Service Inc.
c/o Jermell L. Brown, Reg. Agent/Pres.
5726 W. Washington, Apt. 206
Chicago, Il 60644

**Re:** **Teamsters Local Union No. 727 Benefit Funds – Demand for Payment of Delinquent Contributions**

Dear Mr. Brown:

This firm is collection counsel to the Teamsters Local Union No. 727 Health and Welfare Fund, the Teamsters Local Union No. 727 Legal and Educational Assistance Fund, and the Parking Industry Labor Management Committee (collectively, the "Funds"). As you know, Heat Valet Parking Service Inc. ("Heat Parking" or the "Company") is obligated through its collective bargaining agreement ("CBA") with Teamsters Local 727 to make contributions to the Funds on behalf of certain individuals whose employment is covered by the CBA.

The Funds' auditor has conducted a payroll audit of Heat Parking's records for the period of October 1, 2022 through August 31, 2023 (the "Audit") to determine that the Company was compliant in its contribution obligations to the Funds. A copy of the Audit is enclosed.

As you can see from the enclosure, the Audit revealed that the Company was delinquent in its contributions for the aforementioned period. Additionally, pursuant to the Company's CBA, and the Funds' Trust Agreements, Collections Policy and Audit Policy, Heat Parking is required to pay interest and liquidated damages on the delinquent amounts plus audit fees. (Copies of the CBA, Collections Policy and Audit Policy are also enclosed.) Therefore, the Company owes the Funds for the delinquent contributions plus interest and damages on those contributions and audit fees.

The Audit established that the Company owes **$36,215.93** for contributions, interest, liquidated damages and audit fees.

The Funds' Board of Trustees is required, as a matter of law, to promptly collect all monies due and owing to the Funds. Administrative attempts by the Funds to secure an amicable resolution of the aforementioned delinquencies has proven unsuccessful.

**This letter serves as the Funds' formal and FINAL DEMAND for prompt payment of all amounts due from the Company for contributions, interest, liquidated damages and audit fees owed.** I am obligated to remind you that if the Fund office does receive full and timely payment of the contributions owed and any interest, liquidated damages, and audit fees related thereto, the Fund is obligated as a matter of law to take whatever legal action is necessary to obtain payment. **The Company's failure to comply with this demand within thirty (30) days from the date of this letter may result in the initiation of appropriate legal proceedings in federal court without further notice.** Should the Funds be forced to pursue litigation on these matters and prevail, the Fund will be entitled not only to the delinquent contributions, interest, liquidated damages, and audit fees but also to the attorneys' fees and costs incurred by the Fund to obtain full payment, *See Employee Retirement Income Security Act ("ERISA"), 29U.S.C. § 1132(g).*

The Funds would still prefer to resolve this matter amicably and without resorting to legal action. Therefore, your prompt attention to this demand is imperative. Should you have any questions, please do not hesitate to contact me.

Sincerely,

*/s/ Thomas E. Moss*
Attorney At Law

*Enclosures*

cc:     Bobby Laino, Fund Administrator (via electronic mail)

Zach Frankenbach, Assistant Fund Administrator (via electronic mail)

**Ben Affetto,** Lead Collection and Field Representative, (via electronic mail)

Jonathan Magna, Fund Counsel (via electronic mail)

James Beall, Fund Counsel (via electronic mail)

<u>HEAT PARKING</u>
<u>5726 W. WASHINGTON ST.</u>
<u>CHICAGO, IL  60644</u>

<u>OCTOBER 1, 2022 – AUGUST 31, 2023</u>

<u>HEAT PARKING</u>

<u>CONTENTS</u>

AUDIT REPORT LETTER                                          1

SUMMARY REPORT                                              2

DETAILED CONTRIBUTION EXCEPTION REPORTS                 3 - 7

INTEREST SCHEDULE                                       8 - 10

## TEAMSTERS LOCAL UNION NO. 727 BENEFIT FUNDS

*1300 West Higgins Road, Suite 103, Park Ridge, Illinois 60068, Telephone 773-685-0340*

September 21, 2023

Board of Trustees
Teamsters Local 727 I.B. of T. Health and Welfare
and Legal and Educational Assistance Funds
1300 West Higgins Road, Suite 303
Park Ridge, IL 60068

We have applied certain procedures, as discussed below, to the payroll records of Heat Parking, a contributing employer to the Teamsters Local 727 I.B. of T. Health and Welfare and Legal and Educational Assistance Funds, for the period October 1, 2022 to August 31, 2023. The purpose of our review was to assist you in determining whether contributions to the Trust Funds are being made in accordance with the collective bargaining agreement in effect and with the Trust Agreement of the Fund. The propriety of the contributions is the responsibility of the employer's management.

Our procedures generally include a review of the pertinent provisions of the collective bargaining agreements and comparing underlying employer payroll records to Fund contribution records. The employer records we review may include payroll journals, individual earnings records, payroll tax returns, contribution reports, job classifications, drivers logbooks, contracts and general disbursement records. The scope of this engagement is limited to records made available by the employer and would not necessarily disclose all exceptions in employer contributions to the Trust Funds. Any compensation paid to employees not disclosed to us or made part of the written record is not determinable by us and is not included in our review.

The exceptions to employer contributions are noted on the accompanying report.

Teamsters 727 Benefit Funds



# Teamsters Local Union No. 727 Benefit Funds
## **Reconciliation of Differences Per Year**

| Fiscal Year Ending | 2-28 2023 | 2-29 2024 | Total Due |
|---|---|---|---|
| **Part Time - Employees** | | | |
| Welfare | 950.00 | 1,260.00 | 2,210.00 |
| Legal & Educational Assistance | 1,559.70 | 2,183.64 | 3,743.34 |
| Totals | 2,509.70 | 3,443.64 | 5,953.34 |
| | | | |
| **Full Time - Employees** | | | |
| Welfare | 7,537.65 | 9,633.06 | 17,170.71 |
| Legal & Educational Assistance | 1,247.76 | 3,275.46 | 4,523.22 |
| Totals | 8,785.41 | 12,908.52 | 21,693.93 |
| | | | |
| **Total Dollar Amount Due** | | | |
| Welfare | 8,487.65 | 10,893.06 | 19,380.71 |
| Legal & Educational Assistance | 2,807.46 | 5,459.10 | 8,266.56 |
| PILMC | 90.00 | 150.00 | 240.00 |
| Totals | 11,385.11 | 16,502.16 | 27,887.27 |

| | Welfare | L&E Assistance | PILMC | Total Due |
|---|---|---|---|---|
| Total Deficiencies | 19,380.71 | 8,266.56 | 240.00 | 27,887.27 |
| Liquidated Damages | 3,876.14 | 1,653.31 | 48.00 | 5,577.45 |
| Interest | 1,524.54 | 608.66 | 18.01 | 2,151.21 |
| Payroll Audit Fee | 444.00 | 150.00 | 6.00 | 600.00 |
| Totals | 25,225.39 | 10,678.53 | 312.01 | 36,215.93 |

**Employer Name -** Heat Parking          **Person Contacted -** Jermell Brown

**Date of Audit -** N/A          **Telephone -** (312) 978-6810

**Audit Period -** October 1, 2022 - August 31, 2023          **Auditor -** Agata Jozwicki

2

# Teamsters Local Union No. 727 Benefit Funds

**Reconciliation Between Actual and Reported Part-Time Employees**

### Part-Time  Employees Without Contributions

| SS# | Name | Rate | 2022 | | | | | | | | | | 2023 | | Total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Hours |
| N/A | Heat Parking | | - | - | - | - | - | - | - | 2 | 2 | 2 | 2 | 2 | 10 |
| | Total | | - | - | - | - | - | - | - | 2 | 2 | 2 | 2 | 2 | 10 |

Note: The deficiency noted above for Heat Parking is the result of the employer not reporting sufficient hours to staff the Eurostar Hotel during the hours of operation.

| Health & Welfare | $95.00 | - | - | - | - | - | - | - | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | 950.00 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Legal & Educational Assistance | $155.97 | - | - | - | - | - | - | - | 311.94 | 311.94 | 311.94 | 311.94 | 311.94 | 1,559.70 |
| **Total** | | - | - | - | - | - | - | - | 501.94 | 190.00 | 190.00 | 190.00 | 190.00 | 2,509.70 |

## Totals for Year

| Health & Welfare | $95.00 | - | - | - | - | - | - | - | 190.00 | 190.00 | 190.00 | 190.00 | 190.00 | 950.00 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Legal & Educational Assistance | $155.97 | - | - | - | - | - | - | - | 311.94 | 311.94 | 311.94 | 311.94 | 311.94 | 1,559.70 |
| **Total** | | - | - | - | - | - | - | - | 501.94 | 501.94 | 501.94 | 501.94 | 501.94 | 2,509.70 |

# Teamsters Local Union No. 727 Benefit Funds
### Reconciliation Between Actual and Reported Full-Time Employees

**Full-Time Employees Without Contributions**

| SS# | Name | Rate | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Total Hours |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | 2022 | | | 2023 | |
| N/A | Heat Parking | | - | - | - | - | - | - | - | 3 | 3 | 3 | 3 | 3 | 15 |
| | Total | | - | - | - | - | - | - | - | 3 | 3 | 3 | 3 | 3 | 15 |

Note: The deficiency noted above for Heat Parking is the result of the employer not reporting sufficient hours to staff the Eurostar Hotel during the hours of operation.

| | Rate | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Health & Welfare | $502.51 | - | - | - | - | - | - | - | 1,507.53 | 1,507.53 | 1,507.53 | 1,507.53 | 1,507.53 | 7,537.65 |
| Legal & Educational Assistance | $155.97 | - | - | - | - | - | - | - | 467.91 | 467.91 | 467.91 | 467.91 | 467.91 | 2,339.55 |
| Less L&E contributions Paid | | - | - | - | - | - | - | - | 467.91 | 311.94 | 155.97 | 155.97 | - | 1,091.79 |
| **Total** | | - | - | - | - | - | - | - | 1,507.53 | 1,663.50 | 1,819.47 | 1,819.47 | 1,975.44 | 8,785.41 |

## Totals for Year

| | Rate | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Health & Welfare | $502.51 | - | - | - | - | - | - | - | 1,507.53 | 1,507.53 | 1,507.53 | 1,507.53 | 1,507.53 | 7,537.65 |
| Legal & Educational Assistance | $155.97 | - | - | - | - | - | - | - | - | 155.97 | 311.94 | 311.94 | 467.91 | 1,247.76 |
| **Total** | | - | - | - | - | - | - | - | 1,507.53 | 1,663.50 | 1,819.47 | 1,819.47 | 1,975.44 | 8,785.41 |

4

# Teamsters Local Union No. 727 Benefit Funds
**Reconciliation Between Actual and Reported Part-Time Employees**

### Part-Time Employees Without Contributions

| SS# | Name | Rate | 2023 | | | | | | | | | | 2024 | | Total Hours |
| | | | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | |
|-----|------|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| N/A | Heat Parking | | 2 | 2 | 2 | 2 | 2 | 2 | - | - | - | - | - | | 12 |
| | Total | | 2 | 2 | 2 | 2 | 2 | 2 | - | - | - | - | - | - | 12 |

Note: The deficiency noted above for Heat Parking is the result of the employer not reporting sufficient hours to staff the Eurostar Hotel during the hours of operation.

| | Rate | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Total |
|---|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-------|
| Health & Welfare | $105.00 | 210.00 | 210.00 | 210.00 | 210.00 | 210.00 | 210.00 | - | - | - | - | - | - | 1,260.00 |
| Legal & Educational Assistance | $181.97 | 363.94 | 363.94 | 363.94 | 363.94 | 363.94 | 363.94 | - | - | - | - | - | - | 2,183.64 |
| Total | | 573.94 | 573.94 | 573.94 | 573.94 | 573.94 | 573.94 | - | - | - | - | - | - | 3,443.64 |

## Totals for Year

| | Rate | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Total |
|---|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-------|
| Health & Welfare | $105.00 | 210.00 | 210.00 | 210.00 | 210.00 | 210.00 | 210.00 | - | - | - | - | - | - | 1,260.00 |
| Legal & Educational Assistance | $181.97 | 363.94 | 363.94 | 363.94 | 363.94 | 363.94 | 363.94 | - | - | - | - | - | - | 2,183.64 |
| Total | | 573.94 | 573.94 | 573.94 | 573.94 | 573.94 | 573.94 | - | - | - | - | - | - | 3,443.64 |

# Teamsters Local Union No. 727 Benefit Funds
### Reconciliation Between Actual and Reported Full-Time Employees

**Full-Time  Employees Without Contributions**

| SS# | Name | Rate | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Total Hours |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 2023 | | | | | | | 2024 | | |
| N/A | Heat Parking | | 3 | 3 | 3 | 3 | 3 | 3 | - | - | - | - | - | | 18 |
| | Total | | 3 | 3 | 3 | 3 | 3 | 3 | - | - | - | - | - | - | 18 |

Note: The deficiency noted above for Heat Parking is the result of the employer not reporting sufficient hours to staff the Eurostar Hotel during the hours of operation.

| | Rate | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Health & Welfare | $535.17 | 1,605.51 | 1,605.51 | 1,605.51 | 1,605.51 | 1,605.51 | 1,605.51 | - | - | - | - | - | - | 9,633.06 |
| Legal & Educational Assistance | $181.97 | 545.91 | 545.91 | 545.91 | 545.91 | 545.91 | 545.91 | - | - | - | - | - | - | 3,275.46 |
| **Total** | | 2,151.42 | 2,151.42 | 2,151.42 | 2,151.42 | 2,151.42 | 2,151.42 | - | - | - | - | - | - | 12,908.52 |

## Totals for Year

| | Rate | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Health & Welfare | $535.17 | 1,605.51 | 1,605.51 | 1,605.51 | 1,605.51 | 1,605.51 | 1,605.51 | - | - | - | - | - | - | 9,633.06 |
| Legal & Educational Assistance | $181.97 | 545.91 | 545.91 | 545.91 | 545.91 | 545.91 | 545.91 | - | - | - | - | - | - | 3,275.46 |
| **Total** | | 2,151.42 | 2,151.42 | 2,151.42 | 2,151.42 | 2,151.42 | 2,151.42 | - | - | - | - | - | - | 12,908.52 |

# Teamsters Local Union No. 727 Benefit Funds
### Reconciliation Between Actual and Reported Contributions - PILMC

| | Rate | 2022 Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | 2023 Jan | Feb | Total Employees |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total # of Employees Working | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 5 | 5 | 5 | 5 | 25 |
| Total # of Employees Contributed | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 2 | 1 | 1 | 0 | 7 |
| Total # of Employees Owed | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 3 | 4 | 4 | 5 | 18 |
| Contributions Due | $5.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $10.00 | $15.00 | $20.00 | $20.00 | $25.00 | $90.00 |

| | Rate | 2023 Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | 2024 Jan | Feb | Total Employees |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total # of Employees Working | | 5 | 5 | 5 | 5 | 5 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 30 |
| Total # of Employees Contributed | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total # of Employees Owed | | 5 | 5 | 5 | 5 | 5 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 30 |
| Contributions Due | $5.00 | $25.00 | $25.00 | $25.00 | $25.00 | $25.00 | $25.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $150.00 |

8

SCHEDULE OF COMPOUND INTEREST
TEAMSTERS LOCAL UNION 727 - HEALTH & WELFARE FUND

EMPLOYER:     Heat Parking

| Y/E 2/28/2023 | Beginning Balance | Discrepancies | Rate | Interest | Ending Balance |
|---|---|---|---|---|---|
| Beginning Balance | | | | | 0.00 |
| Mar | 0.00 | 0.00 | 4.25% | 0.00 | 0.00 |
| Apr | 0.00 | 0.00 | 4.50% | 0.00 | 0.00 |
| May | 0.00 | 0.00 | 4.50% | 0.00 | 0.00 |
| Jun | 0.00 | 0.00 | 5.00% | 0.00 | 0.00 |
| Jul | 0.00 | 0.00 | 5.75% | 0.00 | 0.00 |
| Aug | 0.00 | 0.00 | 6.50% | 0.00 | 0.00 |
| Sep | 0.00 | 0.00 | 6.50% | 0.00 | 0.00 |
| Oct | 0.00 | 1697.53 | 7.25% | 10.26 | 1707.79 |
| Nov | 1707.79 | 1697.53 | 7.25% | 20.57 | 3425.89 |
| Dec | 3425.89 | 1697.53 | 8.00% | 34.16 | 5157.58 |
| Jan | 5157.58 | 1697.53 | 8.50% | 48.56 | 6903.66 |
| Feb | 6903.66 | 1697.53 | 8.75% | 62.72 | 8663.91 |
| Total | | 8487.65 | | 176.26 | |

| Y/E 2/29/2024 | Beginning Balance | Discrepancies | Rate | Interest | Ending Balance |
|---|---|---|---|---|---|
| Beginning Balance | | | | | 8663.91 |
| Mar | 8663.91 | 1815.51 | 8.75% | 76.41 | 10555.83 |
| Apr | 10555.83 | 1815.51 | 9.00% | 92.79 | 12464.13 |
| May | 12464.13 | 1815.51 | 9.00% | 107.10 | 14386.73 |
| Jun | 14386.73 | 1815.51 | 9.25% | 124.89 | 16327.14 |
| Jul | 16327.14 | 1815.51 | 9.25% | 139.85 | 18282.50 |
| Aug | 18282.50 | 1815.51 | 9.50% | 159.11 | 20257.12 |
| Sep | 20257.12 | 0.00 | 9.50% | 160.37 | 20417.48 |
| Oct | 20417.48 | 0.00 | 9.50% | 161.64 | 20579.12 |
| Nov | 20579.12 | 0.00 | 9.50% | 162.92 | 20742.04 |
| Dec | 20742.04 | 0.00 | 9.50% | 164.21 | 20906.25 |
| Jan | 20906.25 | 0.00 | 0.00% | 0.00 | 20906.25 |
| Feb | 20906.25 | 0.00 | 0.00% | 0.00 | 20906.25 |
| Total | | 10893.06 | | 1349.28 | |

| Totals | | 19380.71 | | 1525.54 | |

9

SCHEDULE OF COMPOUND INTEREST
TEAMSTERS LOCAL UNION 727 - LEGAL AND EDUCATIONAL ASSISTANCE FUND

EMPLOYER:     Heat Parking

| Y/E 2/28/2023 | Beginning Balance | Discrepancies | Rate | Interest | Ending Balance |
|---|---|---|---|---|---|
| Beginning Balance | | | | | 0.00 |
| Mar | 0.00 | 0.00 | 4.25% | 0.00 | 0.00 |
| Apr | 0.00 | 0.00 | 4.50% | 0.00 | 0.00 |
| May | 0.00 | 0.00 | 4.50% | 0.00 | 0.00 |
| Jun | 0.00 | 0.00 | 5.00% | 0.00 | 0.00 |
| Jul | 0.00 | 0.00 | 5.75% | 0.00 | 0.00 |
| Aug | 0.00 | 0.00 | 6.50% | 0.00 | 0.00 |
| Sep | 0.00 | 0.00 | 6.50% | 0.00 | 0.00 |
| Oct | 0.00 | 311.94 | 7.25% | 1.88 | 313.82 |
| Nov | 313.82 | 467.91 | 7.25% | 4.72 | 786.46 |
| Dec | 786.46 | 623.88 | 8.00% | 9.40 | 1419.74 |
| Jan | 1419.74 | 623.88 | 8.50% | 14.48 | 2058.10 |
| Feb | 2058.10 | 779.85 | 8.75% | 20.69 | 2858.64 |
| Total | | 2807.46 | | 51.18 | |

| Y/E 2/29/2024 | Beginning Balance | Discrepancies | Rate | Interest | Ending Balance |
|---|---|---|---|---|---|
| Beginning Balance | | | | | 2858.64 |
| Mar | 2858.64 | 909.85 | 8.75% | 27.48 | 3795.97 |
| Apr | 3795.97 | 909.85 | 9.00% | 35.29 | 4741.11 |
| May | 4741.11 | 909.85 | 9.00% | 42.38 | 5693.34 |
| Jun | 5693.34 | 909.85 | 9.25% | 50.90 | 6654.09 |
| Jul | 6654.09 | 909.85 | 9.25% | 58.31 | 7622.25 |
| Aug | 7622.25 | 909.85 | 9.50% | 67.55 | 8599.64 |
| Sep | 8599.64 | 0.00 | 9.50% | 68.08 | 8667.72 |
| Oct | 8667.72 | 0.00 | 9.50% | 68.62 | 8736.34 |
| Nov | 8736.34 | 0.00 | 9.50% | 69.16 | 8805.51 |
| Dec | 8805.51 | 0.00 | 9.50% | 69.71 | 8875.22 |
| Jan | 8875.22 | 0.00 | 0.00% | 0.00 | 8875.22 |
| Feb | 8875.22 | 0.00 | 0.00% | 0.00 | 8875.22 |
| Total | | 5459.10 | | 557.48 | |

| Totals | | 8266.56 | | 608.66 | |

10

SCHEDULE OF COMPOUND INTEREST
TEAMSTERS LOCAL UNION 727 - PILMC

EMPLOYER:     Heat Parking

| Y/E 2/28/2023 | Beginning Balance | Discrepancies | Rate | Interest | Ending Balance |
|---|---|---|---|---|---|
| Beginning Balance | | | | | 0.00 |
| Mar | 0.00 | 0.00 | 4.25% | 0.00 | 0.00 |
| Apr | 0.00 | 0.00 | 4.50% | 0.00 | 0.00 |
| May | 0.00 | 0.00 | 4.50% | 0.00 | 0.00 |
| Jun | 0.00 | 0.00 | 5.00% | 0.00 | 0.00 |
| Jul | 0.00 | 0.00 | 5.75% | 0.00 | 0.00 |
| Aug | 0.00 | 0.00 | 6.50% | 0.00 | 0.00 |
| Sep | 0.00 | 0.00 | 6.50% | 0.00 | 0.00 |
| Oct | 0.00 | 10.00 | 7.25% | 0.06 | 10.06 |
| Nov | 10.06 | 15.00 | 7.25% | 0.15 | 25.21 |
| Dec | 25.21 | 20.00 | 8.00% | 0.30 | 45.51 |
| Jan | 45.51 | 20.00 | 8.50% | 0.46 | 65.98 |
| Feb | 65.98 | 25.00 | 8.75% | 0.66 | 91.64 |
| Total | | 90.00 | | 1.64 | |

| Y/E 2/29/2024 | Beginning Balance | Discrepancies | Rate | Interest | Ending Balance |
|---|---|---|---|---|---|
| Beginning Balance | | | | | 91.64 |
| Mar | 91.64 | 25.00 | 8.75% | 0.85 | 117.49 |
| Apr | 117.49 | 25.00 | 9.00% | 1.07 | 143.56 |
| May | 143.56 | 25.00 | 9.00% | 1.26 | 169.82 |
| Jun | 169.82 | 25.00 | 9.25% | 1.50 | 196.33 |
| Jul | 196.33 | 25.00 | 9.25% | 1.71 | 223.03 |
| Aug | 223.03 | 25.00 | 9.50% | 1.96 | 250.00 |
| Sep | 250.00 | 0.00 | 9.50% | 1.98 | 251.97 |
| Oct | 251.97 | 0.00 | 9.50% | 1.99 | 253.97 |
| Nov | 253.97 | 0.00 | 9.50% | 2.01 | 255.98 |
| Dec | 255.98 | 0.00 | 9.50% | 2.03 | 258.01 |
| Jan | 258.01 | 0.00 | 0.00% | 0.00 | 258.01 |
| Feb | 258.01 | 0.00 | 0.00% | 0.00 | 258.01 |
| Total | | 150.00 | | 16.37 | |

| Totals | | 240.00 | | 18.01 | |



**AGREEMENT**

between

**HEAT PARKING**

and

**TEAMSTERS LOCAL 727**

**July 1, 2023 – June 30, 2027**

## TABLE OF CONTENTS

ARTICLE 1 Recognition ................................................................................................ 1

ARTICLE 2 Union Security ........................................................................................... 1

ARTICLE 3 Uniforms ................................................................................................... 2

ARTICLE 4 Seniority ................................................................................................... 2

ARTICLE 5 Grievance Procedure ................................................................................ 3

ARTICLE 6 Discipline and Discharge ......................................................................... 5

ARTICLE 7 Strikes and Lockouts ............................................................................... 5

ARTICLE 8 Wages ....................................................................................................... 5

ARTICLE 9 Holidays ................................................................................................... 6

ARTICLE 10 Military Service ...................................................................................... 7

ARTICLE 11 Jury Duty ................................................................................................ 7

ARTICLE 12 Sick and Personal Leave ........................................................................ 8

ARTICLE 13 Funeral Leave ......................................................................................... 8

ARTICLE 14 Vacations ................................................................................................ 9

ARTICLE 15 Leave of Absence .................................................................................. 10

ARTICLE 16 Hours of Work ...................................................................................... 11

ARTICLE 17 Transfers ............................................................................................... 12

ARTICLE 18 Driver's License ................................................................................... 12

ARTICLE 19 Health and Welfare and Legal and Educational Assistance ............... 12

ARTICLE 20 Labor Management Committee ............................................................ 15

ARTICLE 21 Teamsters Local Union Number 727 Trade Show 401(k) Plan .......... 15

ARTICLE 22 Management Rights .............................................................................. 16

ARTICLE 23 Doctors' Examinations ......................................................................... 16

ARTICLE 24 Time Records ....................................................................................... 16

ARTICLE 25 Access to Facility ................................................................................ 16

ARTICLE 26 Payday .................................................................................................. 17

ARTICLE 27 Maintenance of Benefits ...................................................................... 17

ARTICLE 28 Individual Agreements ......................................................................... 17

ARTICLE 29 Non-Discrimination ............................................................................. 17

ARTICLE 30 Shortages .............................................................................................. 17

ARTICLE 31 Employee Liability .............................................................................. 18

ARTICLE 32 Change in Ownership or Management .................................................. 18

## TABLE OF CONTENTS
(continued)

ARTICLE 33 Credit Union............................................................................................ 19

ARTICLE 34 Drive Authorization and Deduction.................................................... 19

ARTICLE 35 Open Full-Time Positions..................................................................... 20

ARTICLE 36 Location/Facility Classification ........................................................... 20

ARTICLE 37 Miscellaneous........................................................................................ 20

LETTER OF UNDERSTANDING NO. 1.................................................................. 23

LETTER OF UNDERSTANDING NO. 2.................................................................. 24

LETTER OF UNDERSTANDING NO.3..................................................................... 25

LETTER OF UNDERSTANDING NO. 4.................................................................... 26

**ARTICLES OF AGREEMENT**

AGREEMENT made and entered into by and between HEAT PARKING, (hereinafter referred to as the "Employer"), and Auto Livery Chauffeurs, Embalmers, Funeral Directors, Apprentices, Ambulance Drivers and Helpers, Taxicab Drivers, Miscellaneous Garage Employees, Car Washers, Greasers, Polishers and Wash Rack Attendants, Motion Picture, Theatrical, Exposition, Convention and Trade Show Employees, Pharmacists, Bus Drivers, Parking Lot Attendants, and Hikers, Hotel Industry and Racetrack Industry Employees, Newspaper, Magazine, Periodical Salesmen, Drivers, Division Men, District Managers, Checkers, Vendors and Handlers, and Electronic Media Workers Chicago and Vicinity, Illinois LOCAL 727, an affiliate of the I. B. of T. (hereinafter referred to as the "Union").

## ARTICLE 1
### Recognition

1.1     Notwithstanding the title or the Charter of the Union, it is agreed that the Union, shall be the sole and exclusive bargaining agent for the following employees of the Employer only: All full-time and part-time employees who perform valet services at locations which have no parking facilities.

1.2     It is agreed that this Agreement applies only to valet service locations which have no parking facilities as defined in Article 36. All locations which have parking facilities will be covered under the commercial or residential contract with the Union (also referred to as the Parking Industry Agreement), which is hereby incorporated by reference.

1.3     Except as otherwise provided herein, all work covered by this Agreement shall be performed by bargaining unit employees. The Employer shall assign the work covered under this Agreement to employees covered by this Agreement as described in Article 1, Section 1.1 of this Agreement. Non-bargaining unit employees, including supervisors, shall not regularly perform bargaining unit work normally assigned to employees in job classifications covered by this Agreement; provided, however, that they may perform such work in emergencies or in the instruction and/or training of employees. Nothing in this Article shall be construed to limit the Employer's ability to subcontract out maintenance and construction projects.

## ARTICLE 2
### Union Security

2.1     It shall be a condition of employment that all employees of the Employer covered by this Agreement who are members of the Union in good standing on the date on which this Agreement is signed shall remain members in good standing, or pay fees in lieu thereof, and those who are not members on the date on which this Agreement is signed shall, on the thirty-first day following the date on which this Agreement is signed, become and remain members in good standing in the Union, or pay fees in lieu thereof. It shall also be a condition of employment that all employees covered by this Agreement and hired on or after the date on which the Agreement is signed shall, on the thirty-first day following the beginning of such employment, become and remain members in the Union, or pay fees in lieu thereof.

1

2.2     When specifically authorized in writing by each employee, the Employer will deduct, from the first paycheck of each month, dues, and/or fees owing the Union and forward them to the Secretary-Treasurer of the Union, not later than ten (10) days after each monthly deduction.  Such authorization, once given, shall be irrevocable for a period of not less than one (1) year or the term of this Agreement, whichever occurs sooner.

2.3     Upon hiring an employee or upon the request of the Union, it shall be the responsibility of the Employer to obtain from the employee a completed Application and Authorization form provided by the Union and an Enrollment Card provided by the Teamsters Local Union No. 727 Benefit Funds.  The Employer will forward the same to the Union by the employee's thirty-first day of employment or within thirty (30) days after a request by the Union is made.

2.4     The Union agrees to further the interests of the Employer to the best of its ability.

## ARTICLE 3
### Uniforms

3.1     Should an employee be required to wear a uniform, the Employer agrees to furnish said uniforms, free of charge, and replace worn-out or damaged uniforms, free of charge.  The Employer shall supply such employees with uniforms that, in the opinion of the Employer, are reasonable for the season in light of the specific requirements at each location.

3.2     Employees shall not be required to pay for uniforms or replacement uniforms or for a deposit for such uniforms or replacement uniforms; provided the Employer may deduct the cost of such uniform from the employee's final paycheck if the employee fails to return the uniform upon termination.

3.3     Identification badges will be issued to employees free of charge; provided that the Employer may charge an employee $5.00 for replacement of a lost badge.

## ARTICLE 4
### Seniority

4.1     Seniority shall mean length of continuous service from an employee's first day of continuous employment in the industry as a member of the Union.  Separate seniority lists shall be maintained for full-time and part-time employees.  Employees changing from one seniority list to the other shall go to the bottom of that seniority list.  The Employer shall keep and make copies available to a representative of the Union accurate and up-to-date separate seniority lists, showing their names and first date of employment.

Seniority is to prevail at all times, except that seniority shall not apply to foremen or to the selection of foremen.

2

All seniority shall be considered on a company-wide basis for purposes of lay-offs. In case of lay-offs, the last employee hired is to be the first laid off in respect to the separately maintained seniority lists. An employee laid off from one seniority list shall not use his seniority to replace an employee on the other seniority list except that a full-time employee may work part-time and retain his recall rights provided that there is no more senior part-time employee currently on layoff.

    4.2    Seniority shall be broken for any one or more of the following reasons:

    (a)    Voluntary quit.

    (b)    Discharge for cause.

    (c)    Absence from work for three (3) consecutive working days without notifying the Employer unless prevented from doing so through no fault of the employee.

    (d)    Failure to return to work after expiration of a leave of absence unless due to circumstances beyond the control of the employee or unless excused by the Employer.

    (e)    Failure to return to work within seventy-two (72) hours following recall after layoff, which notice will be made by the Employer by certified letter to the employee's last known address according to the records of the Employer.

    (f)    Lay off for a continuous period of more than twelve (12) months.

    (g)    Engages in other employment while on an authorized leave of absence without the consent of the Employer.

    4.3    The first one hundred twenty (120) days of employment shall constitute a probationary period during which time an employee may be discharged at the sole discretion of the Employer. After one hundred twenty (120) days, an employee's seniority date shall date from his or her first day of continuous employment in the industry as a member of the Union.

## ARTICLE 5
### Grievance Procedure

    5.1    Any complaint, grievance, or dispute arising under or concerning the meaning, application, or compliance with the terms of this Agreement shall first be taken up for adjustment by a representative of the Employer and a representative of the Union. The Employer and the Union shall meet at a time and place mutually agreed upon after the request by either party for such a meeting.

5.2     The following Grievance Procedure shall be followed in resolving said disputes:

STEP ONE:  Grievant will meet with Union Representative and Facility Manager as outlined above,

STEP TWO:  In failing to have the dispute resolved in STEP ONE, grievant will meet with a representative of the Union and a representative of the Employer at a mutually convenient time and place to resolve the grievance.

If the parties cannot agree, the issue may then be referred by the Union to arbitration as provided for in this Section.  Any demand for arbitration must be made within forty-five (45) calendar days from the date of the Step TWO grievance meeting unless the parties mutually agree to extend said timeline.

5.3     Arbitration shall be by an arbitrator from the Federal Mediation and Conciliation Service ("FMCS"), and his or her decision shall be final and binding upon both parties and the employee(s).  For Grievances filed after ratification of this Agreement only the arbitration hearing must be scheduled and occur within eighteen months of the Step ONE meeting or the Employer's liability will be tolled until the hearing is conducted.  The tolling shall not apply if the employer cancels the hearing or agrees to a postponement of the hearing.  The Union shall request a panel of seven (7) arbitrators who are members of the National Academy of Arbitrators within the Chicago Geographical Region.  The parties will alternate striking arbitrator names until one is chosen.  The identity of the party which shall strike first shall be determined by a coin toss.  The Union and the Employer will each be responsible for one-half of the cost for such arbitration proceeding.  All other expenses of the arbitration shall be assumed by the party incurring them.  The arbitration hearing will not be transcribed except when the arbitrator may deem necessary.  After the conclusion of the hearing, the arbitrator will issue a decision with any award in writing.

In lieu of FMCS arbitration provided for above, the parties may agree to an expedited Grievance Panel.  Such Grievance Panel shall be selected within ten (10) business days from the receipt of the written statement of grievance, and shall consist of one (1) person selected by the Chicago Parking Association who is not a representative of the Employer against whom the grievance was filed, and one (1) person selected by the Union and shall endeavor to settle the matter.  The Grievance Panel shall meet within ten (10) business days after being selected and shall render their decision within ten (10) business days after the meeting.  Unanimous decisions by the Grievance Panel shall be final and binding on the parties, and there shall be no further recourse to Arbitration procedures or court litigation.  If said Grievance Panel fails to resolve the matter within thirty (30) business days after it is referred to the Grievance Panel, the matter may be submitted by the Union to arbitration as outlined above in Section 5.3.  The fees and expenses of the Grievance Panel shall be divided equally between the Union and the Employer.

5.4     The Employer must be notified of a monetary grievance within thirty (30) days after knowledge of the alleged violation or it shall be waived.

5.5     A non-monetary (policy) grievance must be filed in writing within ten (10) days after knowledge of the alleged violation or it shall be waived.

4

5.6     Notwithstanding any past practices, the Arbitrator shall have no authority to alter, delete, amend, or modify the terms of this Agreement.

## ARTICLE 6
## Discipline and Discharge

6.1     No employee who has completed his or her probationary period will be discharged or disciplined except for just cause.

6.2     The Union shall have the right to investigate the reasons for any discharge or discipline and to protest the same through the grievance and arbitration procedure.

6.3     An employee must be notified as soon as possible of any disciplinary action.

## ARTICLE 7
## Strikes and Lockouts

7.1     The Union agrees that there shall be no strike, slow-down, or cessation of work. There shall be no picketing, hand billing or boycott of the Employer's customers. The Employer agrees there shall be no lockout during the term of this Agreement.

The provisions of this section shall not apply to employers which have failed for six consecutive months to pay the contributions due to the Benefit Plans which are not in dispute or to submit dues.

7.2     Should there be an unauthorized strike, slow-down, walk-out, or other unauthorized cessation of work, the Union shall not be liable for damages resulting from such unauthorized acts from its members, and the Union shall undertake every reasonable means to induce the employees to immediately return to their jobs.  In the event of an unauthorized strike, slow-down, walk-out, or any unauthorized cessation of work, the Employer shall have the sole and exclusive right to discipline or discharge the employees who participate in such an event.

7.3     No employee covered by this Agreement shall be required to go through a picket line when the picket line is approved by Teamsters' Joint Council No. 25.

## ARTICLE 8
## Wages

8.1     Effective July 1, 2023, all employees covered by this Agreement are guaranteed to receive the following wages rates: $13.70 or $0.25 over the Cook County Minimum Wage, whichever is greater each July 1st.

Employees employed in the City of Chicago covered by this Agreement are guaranteed to receive the following wage rates:$15.80 or $0.25 over the City of Chicago Minimum Wage, whichever is greater each July 1st.

5

8.2(a)  Current Employees shall receive contract anniversary wage increases over and above their hourly wage rate. Specifically, the Employer agrees to increase the total package for the compensation to be paid for (i) all hours worked or paid in the form of additional hourly wages, and (ii) additional hourly 401(k) plan contributions for eligible employees as follows:

| | |
|---|---|
| Effective July 1, 2023 | $1.65 (inclusive of minimum wage increase and at least $0.50 employer contribution to eligible employees' 401(k) account); |
| Effective July 1, 2024 | Greater of $0.75 or annual increase in applicable minimum wage whichever is greater; |
| Effective July 1, 2025 | Greater of $0.75 or annual increase in applicable minimum wage whichever is greater; and |
| Effective July 1, 2026 | Greater of $0.75 or annual increase in applicable minimum wage whichever is greater. |

8.2(b)  The allocation of the annual increase required in Section 8.2(a) shall be determined by the Union as between wages and employer 401(k) plan contributions, except that for the increase effective July 1, 2023, at least $0.50 is to be allocated for the Employer's 401(k) plan contributions to eligible employees. Eligible employees are those who have been employed for at least one year. For eligible employees, Employer contributions shall begin once their 401(k) plan accounts are opened. The Union shall notify the Employer of its determination of the allocation between wages and additional contributions to the 401(k) plan by April 1st of each contract year.

8.3.  Employees shall not receive two increases on July 1 of any calendar year. For the avoidance of doubt, no Employee shall receive an increase required by 8.1 plus an additional wage increase pursuant to 8.2.

8.4.  Employees hired after the effective date of this Agreement shall receive the guaranteed wage rate as set forth above (8.1) and thereafter shall receive the wage rate increases provided above in 8.2 on July 1, 2024, July 1, 2025, and July 1, 2026.

## ARTICLE 9
### Holidays

Regular full-time employees shall receive additional compensation for the seven (7) holidays listed below equal to their normal workday hours but not less than eight (8) hours pay at their regular daily straight-time rate of pay. Beginning January 1, 2027, New Year's Day will be recognized as an eighth (8th) contractual holiday. Those employees who are scheduled and do work on any of these holidays will receive their regular daily straight-time rate of pay in addition to time and one-half (1 ½) per hour for all hours actually worked on said holidays. To be entitled to holiday

6

pay under this clause, the employee must work for the Employer six (6) months and work his or her scheduled workday before and his or her scheduled workday after said holiday if the employee is scheduled to work. An employee who is scheduled to work on a holiday but fails to report to work shall forfeit his or her right to holiday pay unless his or her absence is due to extenuating circumstances. For the purpose of holidays and overtime pay on holidays, the below listed holidays will be celebrated on the days they fall on unless otherwise specified by law:

> Martin Luther King, Jr. Day
> Memorial Day
> Fourth of July
> Labor Day
> Thanksgiving Day
> Christmas Day
> Employee's Birthday
> New Year's Day – Beginning in 1/1/2027

A holiday for which an employee is paid and during which he or she did not work shall be considered as time actually worked by him or her under the terms of this Agreement. No employee shall receive holiday pay unless he or she has attained six (6) months' seniority with the Employer on or before the date of the holiday. Part-time employees, when working on said holidays, shall be entitled to time and one-half (1 ½) per hour for hours worked. All work performed on the sixth (6th) day of a holiday week shall be paid at the overtime rate.

The additional compensation for each holiday (holiday pay) for part-time employees shall be based upon the average weekly hours scheduled and paid during the two (2) calendar months preceding the Holiday as follows:

| Weekly Hours Scheduled | Holiday Pay |
|---|---|
| Up to 19 hours | 2 hours |
| 20 to 29 hours | 4 hours |
| 30 to 39 hours | 6 hours |

### ARTICLE 10
### Military Service

10.1 Employees who become members of the U.S. Armed Services shall have such rights of reemployment as may be prescribed by the Uniformed Services Employment and Reemployment Rights Act.

### ARTICLE 11
### Jury Duty

11.1 Employees on the payroll with ninety (90) days or more of service will be reimbursed for any loss of income incurred during the time spent on jury service with a maximum of ten (10) days annually.

7

## ARTICLE 12
### Sick and Personal Leave

12.1    A full-time employee who has worked for the Employer for six (6) months or longer shall be entitled to nine (9) combined sick and/or personal days per year at the employee's normal rate of pay for their normal workday hours but not less than eight (8) hours per day.

12.2    A part-time employee who has worked for the Employer for six (6) months or longer shall be entitled to nine (9) combined sick and/or personal days per year based upon the average weekly hours scheduled and paid during the two (2) calendar months preceding the sick or personal day as follows:

| Weekly Hours Scheduled | Personal/Sick Leave Pay |
| --- | --- |
| Up to 19 hours | 2 hours |
| 20 to 29 hours | 4 hours |
| 30 to 39 hours | 6 hours |

12.3    The employee shall give one week's notice to the Employer for days used for personal leave. The employee shall phone a designated phone number and if no answer, a designated back-up phone number at least two (2) hours before his or her regularly scheduled starting time for days used for sick leave. Combined sick and/or personal days shall be noncumulative.

12.4    The provisions of this Article 12 shall be in lieu of the rights and benefits provided under the City of Chicago and the Cook County Sick Leave Ordnances (or the ordinances of any other jurisdiction) and the parties agree that the Union and the employees waive any and all rights under those Ordinances.

## ARTICLE 13
### Funeral Leave

13.1    A regular full-time or regular part-time employee who may lose time from his or her employment due to a death in his or her immediate family shall be entitled to receive his or her regular pay during said absence for four (4) days. Immediate family members are defined to be father, mother, brother, sister, spouse, child, father-in-law, mother-in-law, or grandparents.

13.2    In order to qualify for funeral pay, the employee must have worked for the Employer for six (6) months or longer.

13.3    Employees must, upon request from the Employer, furnish satisfactory proof of death and relationship.

13.4    Funeral leave shall only be granted for the purpose of attending the funeral of the deceased, grieving, and settling the affairs of the deceased.

## ARTICLE 14
### Vacations

14.1    Employees shall receive vacation in accordance with the following schedule:

After one (1) year of continuous employment, one (1) week vacation;
After three (3) years of continuous employment, two (2) weeks vacation;
After ten (10) years of continuous employment, three (3) weeks vacation;
After twenty-five (25) years of continuous employment, four (4) weeks vacation.

14.2    An employee's vacation time may be split upon mutual agreement between employee and Employer.  At least one (1) continuous week must be taken each year.  Vacations shall be scheduled between January 1 and December 31 of each year.

14.3    (a)    A vacation bank shall be established for each employee, into which employees shall begin to accrue vacation pay on a monthly basis in accordance with paragraph 14.3 (b), below.

(b)    Vacation pay and time shall be earned on a monthly basis in accordance with the following schedule:

After one (1) year of employment: .417 vacation days per month (equivalent to, one (1) week vacation):

Beginning with the first month of employment and continuing through the month prior to the month in which the employee completes two (2) years of employment (1st month through 36th month of employment), employees accrue .417 vacation days with pay per month in which the employee actually performs work or takes paid time off.

After three (3) years of employment, .834 vacation days per month (equivalent to two (2) weeks vacation):

Beginning with the month in which the employee completes three (3) years of employment and continuing through the month prior to the month in which the employee completes ten (10) years of employment (37th month through 120th month of employment), employees accrue .834 vacation days with pay per month in which the employee actually performs work or takes paid time off.

After ten (10) years of employment, 1.25 vacation days per month (equivalent to three (3) weeks vacation);

Beginning with the month in which the employee completes ten (10) years of employment and continuing through the month prior to the month in which the employee completes twenty-five years of employment (121st month through 300th month of employment), employee accrues 1.25

9

vacation days with pay per month (equivalent to three (3) weeks' vacation) in which the employee actually performs work or takes paid time off.

After twenty-five (25) years of employment, 1.67 vacation days per month (equivalent to four (4) weeks vacation);

Beginning with the month in which the employee completes twenty-five (25) years of employment (301st month of employment), employee accrues 1.67 vacation days with pay per month (equivalent to four (4) weeks' vacation) in which the employee actually performs work or takes paid time off.

(c) The month in which employment begins and the month in which employment ends shall be considered a full month for purposes of this Section.

(d) Employees shall be entitled to use vacation time with pay, immediately after accruing it.

(e) Every December 31st, each employee shall be given the option of a payout or carry over of unused vacation days in his or her vacation bank; provided, however, that the carry over will be limited to accruals in the prior twelve (12) months. Should the employee receive a payout, such employee shall receive the payout on the next scheduled pay period.

(f) Employees shall receive an accounting of all their accrued vacation, no less frequently than monthly.

14.4 Vacation pay for part-time employees shall be prorated in accordance with the above schedule.

14.5 Employees shall be paid their accrued vacation pay prior to the time they leave on vacation.

14.6 Preference by seniority shall be given to an employee's choice of vacation period.

14.7 Employees shall receive vacation pay on the basis of average hours worked in the previous year. All hours worked or paid for (combined sick and/or personal days, holidays, sick leave, bereavement pay) shall be considered as hours worked in determining compensation.

14.8 Vacation checks shall be issued separately.

## ARTICLE 15
### Leave of Absence

15.1 The Employer may, at its sole discretion, grant a personal leave of absence to an employee with seniority provided:

10

(a)   The employee requests the leave, in writing, at least one (1) week in advance of such a leave, unless there was no possibility that the employee had such prior knowledge of the necessity of the leave. Approved leaves shall be in writing with a copy to the Union; and

(b)   The leave is for a specified time not to exceed thirty (30) calendar days in duration which may be extended for an additional specified time not to exceed an additional thirty (30) calendar days in duration at the sole discretion of the Employer.

(c)   Upon the expiration of an employee's authorized personal leave of absence, said employee shall be reinstated with full seniority to the same or substantially equivalent employment.

15.2   The Employer may implement the Family Medical Leave Act (FMLA) consistent with applicable law, and the provisions of this section. The Employer shall grant family and medical leaves to employees entitled by law to such leaves.

15.3   The Employer shall continue to contribute to the Health and Welfare Fund during FMLA leaves, to the extent required by law or alternatively, the Employee shall remain covered by the Employer's health insurance plan during FMLA leaves as though the employee were actively at work.

15.4   In all cases of medical leave, regardless of whether they are FMLA leaves, the Employer may require employees to submit to medical examinations by a physician chosen by the Employer at the Employer's expense, during the leave and before the employee returns to work.

15.5   Upon expiration of an authorized medical or family leave an employee shall be reinstated with full seniority to the same or substantially equivalent employment (unless the employee would have been laid off or terminated had the employee not taken a leave). It is understood that employees returning to work from a leave (or any illness or injury) must be able to acceptably perform all essential job functions and may not constitute a threat to safety.

## ARTICLE 16
### Hours of Work

16.1   Full-time employees covered by this Agreement who are called to work shall receive not less than six (6) hours work or its equivalent per day.

16.2   All regular full-time employees covered by this Agreement, shall be guaranteed a workweek consisting of forty (40) hours inclusive of a mandatory 20-minute meal period.

16.3   Any regular employee shall forfeit his or her weekly guarantee in that week in which he or she takes off a regularly scheduled workday or any portion thereof on his or her own initiative or when an employee is discharged for cause. However, an employee, before leaving the Employer's premises, shall be required to punch out.

11

16.4    Overtime [time and one-half (1 ½)] shall be paid for all hours worked over forty (40) hours in any one week. If an Employer has any employees covered by the Fair Labor Standards Act, overtime shall be paid in accordance with said Act.

16.5    When feasible, the Employer shall post the employee's schedule at least seven (7) days in advance.

16.6    When feasible the Employer shall post the employee's schedule at least seven (7) days in advance. The provisions of this Article 16 are in lieu of the rights and benefits provided by the City of Chicago Fair Workweek Ordinance and the Evanston Fair Workweek Ordinance or any other scheduling ordinance or law. The parties expressly agree that all rights, requirements and benefits under the City of Chicago Fair Workweek Ordinance and the Evanston Fair Workweek Ordinance or any other ordinance or law are hereby expressly waived.

## ARTICLE 17
### Transfers

17.1    The Employer may assign duties to any employee as dictated by business conditions.

## ARTICLE 18
### Driver's License

18.1    All employees shall continuously have and shall exhibit to the Employer upon request a valid Driver's License issued by any State within the United States. Any employee found not to have a valid Driver's License in his or her possession will be suspended without pay for up to ninety (90) days until a valid license is presented. After that time, the employee may be subject to termination. An Employee whose license is suspended or revoked must report the loss or suspension of his/her license. An employee who makes a timely report will be suspended without pay for up to ninety (90) days until a valid Driver's License is presented. After ninety (90) days the employee will be placed on a preferential rehire list for up to six (6) months. An employee who fails to make a timely report as to the loss or suspension of his/her License and who is involved in an accident or who is ticketed by a traffic control officer while on duty will be terminated.

## ARTICLE 19
### Health and Welfare and Legal and Educational Assistance

19.1    Health and Welfare

    (a)    During those period(s) that the Affordable Care Act as amended from time to time is not in effect, as least to the extent an Employer is not obligated to provide health insurance coverage under it, the Employer shall contribute to Teamsters Local Union No. 727 Health and Welfare Fund on account of each employee covered by this Agreement $80.00 per month. This amount shall be increased each March 1 by $5.00 per month as follows:

12

| July 1, 2023 | $105.00 per month |
| March 1, 2024 | $110.00 per month |
| March 1, 2025 | $115.00 per month |
| March 1, 2026 | $120.00 per month |
| March 1, 2027 | $125.00 per month |

Commencing the first of the month in which the Affordable Care Act as amended from time to time obligates the Employer to provide any current or future fulltime employee of the Employer healthcare coverage under the eligibility criteria providing the latest possible date or hours of work the Employer shall cease to have any obligation to make contributions under this Paragraph 19.1 (a) on behalf of its fulltime employees. Its obligation to make payments on behalf of part time employees shall continue, however.

(b) During those periods the Affordable Care Act as amended from time to time obligates the Employer to provide healthcare coverage to any one of its current or future eligible fulltime employees (or would obligate the Employer to do so absent the minimum employee requirements), the Employer shall contribute $535.17 per month to the Teamsters Local 727 Health & Welfare Fund on account of each such eligible fulltime employee covered by this Agreement who actually performs work during the calendar month. The obligation to make contributions shall be determined on an individual by individual employee basis. Payments under this paragraph and paragraph 19.1(a) above shall not be duplicated. The amount of the monthly premium may be increased by the Trustees of the Teamsters Local 727 Plan by an additional 6.5% each March 1 thereafter.

The determination period for determining whether an employee is a fulltime employee for purpose of the Affordable Care Act shall be the calendar year. Similarly, the stability period for an employee receiving healthcare coverage shall be the calendar year. The determination period for employees hired during any calendar year after the Affordable Care Act becomes effective shall be the longest possible period permitted by the Affordable Care Act

(c) Contributions due under Paragraph 19.b above to the Health and Welfare Fund for all fulltime Employees shall commence at the latest possible date or hours of work but not to exceed six (6) months.

Any fulltime employee otherwise eligible to receive health care coverage under Article 19(b) may opt out of coverage and shall receive a stipend of three hundred and fifty dollars (350.00) per month in lieu thereof, which shall increase by an additional 6.5% each July 1 thereafter. The Employer

13

shall have no obligation to make any contribution to any Teamsters Local 727 Health and Welfare Plan on behalf of opt-out employees. The opt-out will be by signature on a form prepared by the Employer, and the opt-out will be effective until the employee notifies the Employer in writing that he/she has experienced a loss of coverage due to a life altering event and wishes to begin receiving health care coverage.

(d)     In the event the health care coverage provided through the Teamsters Local 727 Plan does not meet the standards imposed by the Affordable Care Act or its implementing regulations, the Union agrees to indemnify the Employer for any penalties or other monetary consequences which result. If the Union does not compensate the Employer for its losses or the Teamsters Local 727 Plan is not made compliant, the Employer may withdraw from continued participation in the Plan, provided it provides Plan Participants with uninterrupted coverage under the Employer's health plan.

19.2    Legal and Educational Assistance

(a)     If the Employer is not a Contributing Employer as defined in Section 19.2(b), the Employer shall contribute to the Teamsters Local Union No. 727 Legal and Educational Assistance Fund on account of each employee covered by this Agreement the following:

Commencing July 1, 2018_____$112.00 per month which shall be adjusted each March 1 to the amount of the contribution required by the Parking Industry Agreement.

(b)     A Contributing Employer means an Employer who is obligated to make contributions to the Legal and Educational Assistance Fund pursuant to the terms of the Collective Bargaining Agreement between the Union and the Employer covering residential and commercial locations (referred to as the Parking Industry Agreement).

19.3    Contributions due hereunder to the Health and Welfare and Legal and Educational Assistance Funds for all employees for which contributions are due shall commence with the month of their employment.

19.4    No contributions to the Health and Welfare Fund or Legal and Educational Assistance Fund shall be required on behalf of any employee who is on a leave of absence, except to the extent required by law.

19.5    By the execution of this Agreement, the Employer authorizes the Trustees to enter into appropriate trust agreements necessary for the administration of such Funds, and hereby waiving all notice thereof and ratifying all actions already taken or to be taken by such Trustees within the scope of their authority.

14

19.6    It is also agreed that in the event the Employer is delinquent at the end of a month in the payment of its contributions to the Health and Welfare Fund or Legal and Educational Assistance Fund, in accordance with the rules and regulations of the Trustees of such Fund, the employees or their representatives shall have the right to take such action as they deem necessary until such delinquent payments are made, and it is further agreed that in the event such action is taken, the Employer shall be responsible to the employee for losses resulting therefrom.

19.7    Should the Trustees of the Health and Welfare Fund or Legal and Educational Assistance Funds audit the records of the Employer, such audit shall not exceed: two (2) years from the date the notice of the audit in the case of an Employer which is signatory to the Parking Industry Agreement or seven (7) years in all other cases.

## ARTICLE 20
## Labor Management Committee

20.1    The Employer agrees to contribute five dollars ($5.00) per month to the Parking Industry Labor Management Committee (PILMC) for each employee covered by this Agreement.

## ARTICLE 21
## Teamsters Local Union Number 727 Trade Show 401(k) Plan

21.1    The parties hereby agree that the Employer shall cease to participate in the Teamsters National 401(k) Plan and, instead, the Employer hereby agrees to participate in the Teamsters Local Union Number 727 Trade Show 401(k) Plan on behalf of all employees represented for purposes of collective bargaining under this Agreement. Per Section 8.2 of this Agreement, for eligible employees, the Employer shall contribute fifty cents ($0.50) for every hour actually worked (including regular, overtime, and holiday hours worked). Eligible employees shall be those who have been employed by the Employer for at least one year. Other existing bargaining unit employees hired within the last year will become eligible to receive the Employer 401(k) contribution after their one-year employment anniversary date. Employees hired after the effective date of this Agreement shall have a 12-month waiting period before becoming eligible for Employer 401(k) contributions. The Employer will also make or cause to be made payroll deductions from participating employees' wages, in accordance with each employee's salary deferral election subject to compliance with ERISA and the relevant tax code provisions. Beginning July 1, 2024, the Employer shall make contributions for eligible employees as allocated by the Union pursuant to Section 8.2(a) and (b) of this Agreement. The Employer's 401(k) Plan contributions for eligible employees shall continue to be only for hours actually worked (including regular, overtime, and holiday hours worked).

21.2    Employer's initial contributions to eligible employees' 401(k) Plan accounts shall commence following a reasonable waiting period to allow for the establishment and opening of eligible employees' 401(k) Plan accounts.

21.3    Employer's 401(k) Plan contributions shall vest immediately in the eligible employee's 401(k) account.

21.4    The Employer shall not be obligated to pay any fees or costs to the 401(k) Plan beyond the required contributions to the accounts of eligible employees, plus any penalties or interests resulting from Employer delinquencies in making mandatory contributions to eligible employees.

21.5    Any employees with an existing account in the Teamsters National 401(k) Plan shall have the option to rollover their account balance to the Local 727 Plan.

21.6    Plan contribution audits shall be limited in scope to a two-year review period with Audit procedures to be agreed upon.

## ARTICLE 22
## Management Rights

22.1    All rights, powers, and authority customarily exercised by the Employer are retained and reserved by the Employer except as otherwise specifically modified by express provisions of this Agreement. No employee covered by this Agreement shall receive less than the terms and conditions therein specified.

## ARTICLE 23
## Doctors' Examinations

23.1    All doctors' examinations requested by the Employer will be paid for by the Employer. In the event the employment of the employee is terminated on the basis of the report of the Employer's doctor, or in the event of questionable status of employee's health upon being rehired due to a layoff, the Union may, at its own cost, have such report checked by a doctor of its election.

## ARTICLE 24
## Time Records

24.1    The Employer shall keep accurate time records and make them available for inspection by the Union upon request so that there will be no misunderstanding about the employee's time.

## ARTICLE 25
## Access to Facility

25.1    Authorized agents of the Union shall have access to the Employer's establishment during working hours for the purpose of adjusting disputes and investigating working conditions; provided, however, that there is no interruption of the Employer's business operations.

16

## ARTICLE 26
### Payday

26.1　Payday shall be at least as often as semi-monthly (twice monthly). Employees must receive a paper or electronic paycheck; an employer is prohibited from paying an employee in cash.

## ARTICLE 27
### Maintenance of Benefits

27.1　Employees covered by this Agreement receiving wages or conditions (excluding overtime) over and above those listed in this Agreement shall suffer no economic loss as the result of signing this Agreement. No employee covered by this Agreement shall receive less than the terms and conditions therein specified. Employees returning to the valet bargaining unit from a supervisor role shall not retain any premium pay or other benefit of their prior position but shall return to at least the pay and benefits provided to them prior to becoming a supervisor. For any non-supervisors transferring from outside the bargaining unit (for example, a transfer from a bargaining unit position under the Commercial Agreement), their pay and benefits will be reviewed by the Company and Union on a case-by-case basis.

## ARTICLE 28
### Individual Agreements

28.1　There shall be no side deals or agreements, whether orally or in writing, between any Employer and employee or between Employers. No employee or Employer, either orally or in writing, shall enter into any agreement, contract, or arrangement covering any employment to which this Agreement applies which is contrary to or conflicting with the terms and conditions of this Agreement.

## ARTICLE 29
### Non-Discrimination

29.1　It is the policy of both the Employer and the Union to comply with all Federal and State Equal Employment Opportunity Laws and not to discriminate against any employee because of race, sex, color, religion, national origin, age, or membership or non-membership in the Union, or other protected characteristic.

## ARTICLE 30
### Shortages

30.1　Employees shall be accountable for all receipts collected by them and responsible for their errors in the collection of parking tickets. Employers shall have the right to summarily dismiss an employee for stealing, misrepresentation of the receipts, or for failure to explain to the satisfaction of the Employer repeated errors in parking tickets, reports, and collections, except as set forth below.

30.2    Employees shall be informed of their shortages, if any, within thirty (30) days after discovery of the shortage, but in no event later than sixty (60) days after the shortage occurred. Shortages, if any, shall be recovered within two (2) pay periods after the employee is notified of the shortage, or longer if required by law.

30.3    In the event of shortages of $5.00 or more, the Employer will follow the progression of discipline set forth below when appropriate, subject to such facts as may be present in each case, and subject to the just cause requirement of the collective bargaining agreement:

GUIDELINES

| CASHIER SHORTAGE OCCURRING IN A SINGLE YEAR | ACTION TO BE TAKEN GENERALLY APPLIED |
|---|---|
| 1st | Oral Warning |
| 2nd | Written Warning |
| 3rd | 3-Day Suspension without pay |
| 4th | Discharge |

30.4    It is understood that the foregoing constitute agreed-upon disciplinary guidelines. However, if unusual situations or extenuating circumstances are present, the situation may warrant consideration of deviation from the guidelines based upon all the facts available for review. Accordingly, these guidelines are intended to be used as a guide for the considered judgment of supervisory personnel who must in each case view all of the facts of an employee shortage in their proper context.

30.5    If the employee disagrees with the shortage charge, the matter may be processed through the grievance procedure.

**ARTICLE 31**
**Employee Liability**

31.1    Except as provided for in Article 30, no employee shall be held financially responsible for damages incurred in the performance of his or her daily duties.

31.2    No employee shall be charged for any insurance premiums or for any deductibles or costs related to any insurance claim or any other claim of damage to person or property.

**ARTICLE 32**
**Change in Ownership or Management**

32.1    In the event an Employer acquires, loses, closes, or anticipates losing a location which falls within the scope of this Agreement, the Employer will give the Union fifteen (15) days written notice prior to the effective date thereof, or immediate written notice if the acquisition or loss is to take place in less than fifteen (15) days, and said Employer will meet at the Union's request before the acquisition or loss to discuss all matters pertinent to said acquisition or loss.

18

32.2    Subject to the provisions herein, any employee who has continuously worked at a location for one hundred and eighty (180) days or more will be retained by the acquiring Employer when an Employer acquires a new location. The Employer losing the location will be obligated to retain all other employees. Provided, however, that regardless of length of service at the location, the Employer losing the location upon notice by the acquiring Employer (said notice must be made within thirty (30) days of hire) shall retain any employee who was previously terminated by the acquiring Employer, if such termination was upheld through the Grievance and Arbitration Procedure, or the Union decided not to pursue such termination through the Grievance and Arbitration Procedure. Employees who do not respond to a second new hire notice by the acquiring Employer (sent ten work days apart) within the time limits under Article 4 (Seniority) above shall be terminated and shall lose all rights under this Agreement. If an Employer losing a location makes a promise of employment in writing to any employee currently working at the location, the Employer shall be obligated to retain that employee. Full time Employees of the Employer losing the location who work less than 20 hours per week on average at the location being transitioned shall be retained by the Employer losing the location. Full time Employees of the Employer losing the location who work 20 hours or more per week on average at the location being transitioned shall be retained by the acquiring Employer and shall be provided with a full time schedule which can be created by laying off a part time employee employed elsewhere.

32.3    Within fifteen (15) days of the loss of a location, the Employer who lost the location shall pay to employees who are retained by the acquiring Employer the pro-rate value of all vacation, combined sick and/or personal days, and compensation earned under this Agreement but not taken and/or paid unless the location is a pass-through account.

In addition, the Employer who lost the location shall pay the respective benefit funds any amounts owed up to the last day actually worked. The acquiring Employer shall provide said employees with corresponding time-off without pay; unless the location is a pass-through account, in which case the time off shall be with pay. Upon commencing employment with the acquiring Employer, employees shall be credited with all seniority, as described in Article 4, Section 4.1, as though there had not been an Employer change.

### ARTICLE 33
### Credit Union

33.1    The Employer agrees to deduct from the employee's regular paycheck and forward to the credit union designated by the Union such sums as the employee may voluntarily decide to deposit. The employee will notify the Employer by written authorization of his or her desire. Such deduction will be on a semi-monthly basis and forwarded to the credit union.

### ARTICLE 34
### Drive Authorization and Deduction

34.1    The Employer agrees to deduct from the paycheck of all employees covered by this Agreement voluntary contributions to DRIVE. DRIVE shall notify the Employer of the amounts designated by each contributing employee that are to be deducted from his or her regular paycheck

19

on a semi-monthly basis. The Employer shall transmit to DRIVE National Headquarters on a monthly basis, in one check the total amount deducted along with the name of each employee on whose behalf a deduction is made, the employee's Social Security number and the amount deducted from the employee's paycheck,

## ARTICLE 35
### Open Full-Time Positions

35.1    Any full-time positions that become open must be offered to part-time employees at that location by seniority.

## ARTICLE 36
### Location/Facility Classification

36.1    The parties recognize that it is necessary to classify locations/facilities for purposes of this Agreement and the Agreement applicable to commercial and residential locations (also referred to as the Parking Industry Agreement). All locations/facilities that are covered under these Agreements as of November 1, 2001 will retain their current classification. Any location or facility not covered by these Agreements as of November 1, 2001 will be classified by mutual agreement between the Employer and the Union using the following guidelines:

        (a)    Commercial: All locations in which fifty percent (50%) or more of the vehicles parked at the location belong to the general public are commercial locations. Commercial locations include locations with valet parking services where there is any parking space in the building where the location exists.

        (b)    Residential: All locations of employer members of Apartment Building Owners and Managers Association of Illinois and all other locations in which more than 50% of the vehicles parked at the location belong to residents of the property are residential locations.

        (c)    Valet: All locations that strictly provide valet parking services without any physical parking facility are valet locations and are covered by the Agreement covering valet service locations.

36.2    The Employer and the Union agree that employees employed as bellmen or doormen will be covered under the classification for the location where they are employed.

## ARTICLE 37
### Miscellaneous

37.1    No employee shall be required to take a polygraph or behavioral analysis test without his or her consent as a condition of employment.

20

37.2    Employees may not be required to perform janitorial services; however, in accordance with past practices, employees may be directed to clean immediate areas visible to customers.

37.3    An employee may not be discharged or disciplined because his or her earnings have been subjected to two (2) or less wage garnishment deduction orders within one (1) year.

37.4    Drug and alcohol testing will only be permitted for (1) probationary employees, and (2) reasonable suspicion under the terms and conditions of the Drug and Alcohol Policy and Testing Program agreed to by the Employer and the Union. An Employer acquiring a location pursuant to Article 32 (Change in Ownership) shall have the right to perform one (1) Drug and Alcohol or Background test pursuant to the existing policy and practices within the acquiring employer's first thirty (30) days of employing acquired employee. Under these circumstances, an acquired employee's refusal to submit to the Drug and Alcohol or background test shall result in termination of employment. Positive test results from the Drug and Alcohol or Background test shall result in termination of employment. Positive test results from the Drug and Alcohol test under these circumstances shall be handled in accordance with the terms of the existing policy and practices.

37.5    The Union agrees that in the event any agreement is executed by the Union with any other Parking Industry Employer which provides for a lower wage rate, reduced benefits, or changed working conditions than those provided in this Agreement, then the Employer may have such lower wage rates, or reduced benefits, or changed working conditions substituted in this Agreement. The Union shall provide advance, written notice to the Chicago Parking Association in the event it requests any exceptions to this provision for any newly organized Employer, or for any Employer who has not previously been signatory to an agreement with the Union. Upon receipt of such notice, the Chicago Parking Association agrees to designate representatives to meet and confer with the Union regarding this request. If the Chicago Parking Association does not respond, within seven (7) working days, to such a request by the Union, then the Union may enter into any such agreement without agreement from the Employer.

37.6    Subject to Articles 4 (Seniority) and 12 (Sick and Personal Leave), in the event that a client or governmental entity imposes a qualification or certification standard (e.g., vaccination, licensure, the completion of training, or other requirement at a location), employees who fail or refuse to meet that requirement will be laid off and placed on the recall list, unless at the time of layoff a vacancy exists for which the employee is qualified

21

THIS AGREEMENT shall be binding upon and inure to the benefit of the parties hereto and their respective administrators, executors, successors and assigns.

THIS AGREEMENT shall go into effect July 1, 2023, and shall continue in full force and effect until and including June 30, 2027, and shall continue thereafter on an annual basis from year to year unless written notice of desire to amend the Agreement is given by either party sixty (60) days prior to June 30, 2027 or sixty (60) days prior to June 30 of any subsequent year.

EXECUTED at Chicago, Illinois this _____ day of _____, 20____

FOR THE EMPLOYER

FOR THE UNION

22

## LETTER OF UNDERSTANDING NO. 1

This Letter of Understanding is entered into between [ _____ ] and Teamsters Local 727, and is hereby attached to the parties' collective bargaining agreement that is in effect from July 1, 2023 through June 30, 2027.

The parties acknowledge that the national healthcare legislation that has been enacted may impact the Health and Welfare provisions of their existing collective bargaining agreement. To that end, the parties agree that following the issuance of any meaningful substantive changes to the current regulations but before the effective date of the "employer penalties" they will meet and confer to discuss the impact, if any, that such legislation or change in regulation(s) has on their respective obligations under the terms of their agreement.

Nothing within this Letter of Understanding shall be construed to alter or amend the terms of the parties' collective bargaining agreement, including, but not limited to, Article 7. All provisions of the parties' collective bargaining agreement shall remain in full force and effect through its expiration date of June 30, 2027.

EXECUTED at Chicago, Illinois, this ___ day of _____, 20__

FOR THE EMPLOYER

_____

FOR THE UNION

_____

23

## LETTER OF UNDERSTANDING NO. 2

This Letter of Understanding is entered into between [Heat Parky] and Teamsters Local 727, and is hereby attached to the parties' collective bargaining agreement that is in effect from July 1, 2023 through June 30, 2027.

The parties agree that, notwithstanding any provision to the contrary in their collective bargaining agreement, during the first three (3) months (January, February, and March) of each calendar year, the Employer may require of any bargaining unit employee one or the other, but not both, of the following:

1. To be involuntarily furloughed for up to three (3) weeks (one (1) day per week for up to fifteen (15) weeks) of an employee's equivalent annual vacation entitlement during this three (3) month period. Any bargaining unit employee selected for this involuntary furlough may elect to use any earned vacation for any of these furloughed hours, in lieu of an absence without pay. If an employee so elects to use their earned vacation pay, they may still request unpaid time off during the remaining nine (9) months of any calendar year.

2. To have a full-time schedule reduced to 32 hours.

EXECUTED at Chicago, Illinois, this ___ day of _____, 20__

FOR THE EMPLOYER

_Juell Bra_

FOR THE UNION

_[signature]_

24

## LETTER OF UNDERSTANDING NO.3

This Letter of Understanding is entered into between |  Heckary  | and Teamsters Local 727, and is hereby attached to the parties' collective bargaining agreement that is in effect from July 1, 2023 through June 30, 2027, commonly referred to as the "Valet Agreement".

The parties acknowledge that the obligation that dependent health care coverage be provided due to the enactment of the national healthcare legislation known as the Affordable Care Act is now in effect and agree that it has in fact had an impact on the cost of the healthcare coverage available from the Teamsters Local 727 Plan described in the Health and Welfare provisions of the Valet Agreement. In lieu of the Employer withdrawing from the Teamsters Local 727 Plan, the parties agree that so long as the Employer mandate remains in effect:

The Employer will withhold from the paychecks of bargaining unit members the monthly amount determined by the Trustees of the Teamsters Local 727 Plan as sufficient to provide ACA compliant dependent (children only) coverage for employees who enroll in the Teamsters Local 727 Plan which shall not be less than $380.00

For the duration of the Valet Agreement, the Employer shall make a monthly payment of $275.00 on behalf of each employee who participates in the Local 727 Plan and who selects dependent coverage applicable to a 6% annual increase.

The monthly amount the employee is obligated to contribute to the Local 727 Plan will be withheld in equal amounts from each anticipated paycheck based on the number of pay periods in a calendar month.

In the event an employee does not have sufficient earnings in a particular paycheck or does not receive a paycheck the Employer will not be under an obligation to withhold from that particular pay period. In that event, the employee will be obligated to make arrangements with the Fund Office to make the appropriate contribution to the Local 727 Plan.

Employees may continue to exercise the right to opt out of coverage.

Nothing within this Letter of Understanding shall be construed to alter or amend the terms of the parties' collective bargaining agreement, including, but not limited to, Article 7. All provisions of the parties' collective bargaining agreement shall remain in full force and effect through its expiration date of June 30, 2027.

EXECUTED at Chicago, Illinois, this ___ day of _____, 2023

FOR THE EMPLOYER

_Juel Bra_

FOR THE UNION

_____

25

## LETTER OF UNDERSTANDING NO. 4

This Letter of Understanding ("LOU") is entered into between Hecr Porkcy (the "Employer") and Teamsters Local 727 (the "Union") (collectively, the "Parties"), and is hereby attached to the Parties' valet collective bargaining agreement that is in effect from July 1, 2023-June 30, 2027 (the "Valet Agreement").

The Parties agree that, notwithstanding any provision to the contrary, Article 37.5 (the Most Favored Nations Clause) of the Valet Agreement shall not apply to any restaurant-only or retail-only location which: 1) as of July 1, 2023, is not currently covered by or operated under the Valet Agreement or the Commercial Parking Agreement; 2) does not provide any onsite physical parking lot or facility; and 3) does not provide for overnight stays or parking. Any other restaurant-only and/or retail-only location that is currently covered by or operated under the Valet or Commercial Agreements, as of July 1, 2023, shall retain its existing classification as either a Valet, Commercial, or Residential location and continue operating under the respective Valet or Commercial Parking Agreement. In order to monitor compliance with this LOU, the Parties further agree to the following:

(1)     The Union shall provide written notification (email is fine) to the Chicago Parking Association ("CPA") within seven calendar days of ratifying a restaurant-only or retail-only labor agreement under this exception to the Parties' "Most Favored Nations Clause" in Article 37.5 of the Valet Agreement, including providing CPA with a copy of such agreement.

(2)     The Employer shall have the option to sign on to the same terms and conditions of employment of any such restaurant-only or retail-only labor agreement provided that such shall apply only at locations that meet all of the same criteria enumerated above for a restaurant-only or retail-only agreement.

(3)     To qualify as a restaurant-only or retail-only location the valet parking operation may not be connected to any other operation or building that provides parking services under the Valet or Commercial Parking Agreement, or a location that would qualify as a Valet, Commercial, or Residential location under those Agreements. For example, a hotel restaurant would not qualify as a restaurant-only location. Further, for the avoidance of doubt, it is understood that valet service at special event venues, such as valet service at a banquet, wedding, or The Art Institute of Chicago, may be covered by such a retail-only or restaurant-only agreement provided the location meets the above requirements to be eligible.

(4)     Further, to qualify as a restaurant-only or retail-only location, the valet parking must directly serve the restaurant or retail establishment with which it is affiliated, including operating only during hours that coincide with the business being directly served. For example, a restaurant-only valet may not open its valet operations before the restaurant is open, or remain open after the restaurant is closed, and may not offer overnight parking. Accordingly, a location that advertises /markets for all-day or early bird parkers, which parking is not incidental to business with the associated restaurant or retail establishment, may not be classified as a restaurant-only or retail-only location under this LOU.

26

(5)     Temporary labor valets may provide supplemental staffing at a location for call-offs, vacation coverage, and/or special projects (e.g., a special event or construction project), such that there is no anticipated permanent position. Temporary labor valets shall receive the wages and benefits based on the classification of the location at which the temporary valet works, whether that be a restaurant-only or retail-only location, or a location covered by either the Valet Agreement or Commercial Parking Agreement; *provided, however*, that temporary valets may not displace an existing employee, nor may temporary labor valets replace the operator's need to fill a future permanent position.

(6)     Any location that falls within the definition of a Valet, Commercial, or Residential location under the Valet Agreement or another labor agreement with the Union shall not be operated under the more favorable terms of a restaurant-only or retail-only agreement but must be operated in full compliance with the terms set forth in those other Agreements.

(7)     No signatory employer to a restaurant-only or retail-only labor agreement with the Union shall be permitted to use lower cost labor from such a location to service or work at another location that falls within the definition of a Valet, Commercial, or Residential location under those other Agreements.

(8)     In order to monitor compliance with this LOU, any restaurant-only or retail-only labor agreement shall grant the Union and the affiliated Funds the right to audit the parking tickets and or any other records (whether hard or electronic) regarding the length of time a vehicle was continuously parked at a designated restaurant-only or retail-only location as well as any agreement with the establishment or establishments for which those services are offered.

(9)     If a signatory employer to a restaurant-only or retail-only agreement violates one or more of the conditions set forth above in paragraphs (3), (4), (5), (6), (7), or (8), then the offending employer's location(s) shall be operated in accordance with the terms of the Valet Agreement or Commercial Parking Agreement (as applicable).

(10)    As a condition of entering any restaurant-only or retail-only agreement covered by this LOU, the Union shall require that such signatory employer agree that, in the event it violates this LOU the Employer (in addition to the Union) may seek to recover monetary damages as well as any other relief to which the Employer may be entitled to recover from such violating, signatory employer.

FOR THE EMPLOYER

_Juell Bra_

FOR THE UNION

27

## EXTENSION AGREEMENT

This Extension Agreement is entered into between TEAMSTERS LOCAL 727 (the "Union") and _____Heat Parking_____(the "Employer").

Whereas, the Union and Employer are parties to collective bargaining agreements known as the Valet Agreement which is effective from July 1, 2018, to June 30, 2021, and therefore are scheduled to expire on June 30, 2021, (the "Agreement");

Whereas, the Employer previously agreed to extend the Agreement to June 30, 2022; and

Whereas, the Union and the Employer in recognition of the continuing impact COVID-19 has had on the Parking, Valet, and Hospitality Industries in the Chicago area have negotiated another one year extension of the Agreement and;

Now, therefore, in consideration of the mutual undertakings herein set forth, the Parties' agree as follows:

1. The Agreement in its entirety shall be extended one year from June 30, 2022, and shall continue in full force and effect until June 30, 2023, except as modified herein.

2. The Parties agree that Article 8.1 shall be amended to read as follows;

"8.1    Effective July 1, 2018 all employees covered by this Agreement are guaranteed to receive the following wage rates effective as indicated.

| July 1, 2018 | $11.00 | |
|---|---|---|
| July 1, 2019 | $12.00 | |
| July 1, 2020 | $13.00 | |
| July 1, 2021 | $13.40 | (Or the Inflation-adjusted minimum wage calculated by the Cook County Commission and announced on its website by June 1 of each year whichever is higher ) |
| July 1, 2022 | $13.80 | (Or the Inflation-adjusted minimum wage calculated by the Cook County Commission and announced on its website by June 1 of each year whichever is higher ) |

Employees employed in the City of Chicago covered by this Agreement are guaranteed to receive the following wage rates effective as indicated.

July 1, 2018    $12.00

-1-

### EXTENSION AGREEMENT

| | | |
|---|---|---|
| July 1, 2019 | $13.00 | |
| July 1, 2020 | $13.20 | (or an amount equal to the CPI for the prior 12 months-- not to exceed 2.5% -- whichever of the two amounts<br><br>is larger) |
| July 1, 2021 | $15.00 | |
| July 1, 2022 | $15.40 | (or an amount equal to the CPI for the prior 12 months—not to exceed 2.5%-- whichever of the two amounts is larger) |

Employees who make above the guaranteed wage rate set forth above on July 1 of the respective calendar year shall receive an increase in their wage rate as follows:

| | |
|---|---|
| July 1, 2018 | $.40 |
| July 1, 2019 | $.40 |
| July 1, 2020 | $.40 |
| July 1, 2021 | $.40 |
| July 1, 2022 | $.40 |

Employees shall not receive two increases on July 1 of any calendar year.

Employees hired after the effective date of this Agreement shall receive the guaranteed wage rate as set forth above and thereafter shall receive the wage rate increases provided herein."

3. The Parties' Letter Agreement dated February 4, 2020 regarding "Implementing Changes in the City of Chicago Minimum Wage" shall remain in full force and effect and will apply to the July 1, 2023, wage increase.

4. Each Employer in its sole discretion and without regard to the most favored nations' clause in Section 37.5 of the Parties' Agreement may adopt and implement a hazardous pay program for such locations as it shall designate on such terms and amounts for such period as it desires. The Employer retains the discretion to discontinue or change any such hazardous pay program at any time. Any decision by an Employer regarding the adoption, implementation, alteration, or termination of any such hazardous pay program are not subject to the grievance and arbitration procedure and may not be the cause of a work stoppage or other disruption in service. Provided, however, that the Employer may not discriminate among bargaining unit employees working at a location

-2-

## EXTENSION AGREEMENT

in its implementation, adoption, modification, alteration, or termination of any such hazard pay program. Instead, any hazard pay program, alteration or termination thereof must apply equally to all bargaining unit employees working at the location to which the hazard pay program applies.

5. The Union, the CPA, and the Employers hereby withdraw any notices of termination of the Agreement and it shall be of no force or effect.

**AGREED:**

Signed on behalf of the Union

By: _____

Signed on behalf of the Employer

By: _____

TEAMSTERS LOCAL UNION NO. 727 BENEFIT FUNDS
STATEMENT OF AUDIT PROCEDURES
April 22, 2024

OBJECTIVE

This document sets forth the procedures under which audits of employers will be conducted. This document sets forth the rights and responsibilities of employers under the Plan. Audits are performed to determine what moneys, if any are owed to the Funds. Audits will not determine if the employer has made any excessive contributions. Any potential excessive employer contributions will be handled pursuant to the "Teamsters Local Union. No. 727 Benefit Funds' policy for Erroneous Payments Made by an Employer." It is the intent of the Trustees that audit procedures be implemented so as to fulfill the statutory and fiduciary obligations of the Trustees and to maximize the receipts due the Funds pursuant to the collective bargaining agreements. The Trustees are confident that a substantial majority of contributing employers are making timely contributions to the Funds in accordance with the labor agreements and the Trust Agreements. It is hoped that active implementation of the following procedures will encourage all contributing employers to comply on a timely basis.

AUDIT PROCEDURES

I.      Employers will be selected for Audit on a routine basis or for cause. It is the goal of the Board of Trustees to conduct an audit of each contributing employer no less frequently than once every three (3) years, except as provided in D, below

        A.      FOR CAUSE: The Fund Office will direct the Contribution Compliance Department to perform audits on employers for cause. The Collection and Field Representatives will communicate the information that led to the audit.

        B.      ROUTINE: Each employer will be audited once approximately each three years. The Fund Office will promptly advise the Auditor by letter when such selection has been made.

        C.      NEW EMPLOYERS: The Fund Office will direct the Contribution Compliance Department to perform an audit on all new employers after they have contributed to the Benefit Funds for at least six (6) months.

        D.      An Employer performs work under a collective bargaining agreement for a short period of time (e.g., on a project basis), or who has not performed a substantial amount of work, will not be audited unless the

Audit and Collection Committee has reason to believe the required contributions have not been made.

## II.  PRE-AUDIT

A.  AUDIT FILE: Once an employer has been selected for audit by one of these processes, the Contribution Compliance Department will promptly open an audit file to compile information and to monitor the status of the audit.

B.  TOLLING AGREEMENTS: The Collection and Field Representative(s) will obtain tolling agreements for all audits with a risk of loss of claims due to the defense of the Statute of Limitations. The Fund Office will notify the Collection and Field Representative(s) at least one (1) month prior to the date the tolling agreement is needed, or as soon as is thereafter possible. If the Collection and Field Representative(s) is unable to obtain in a timely manner so as to eliminate the risk of loss, the matter will be referred to the Fund Manager, who will seek Trustees action.

C.  SCHEDULING OF AUDIT: Within seven (7) days after an employer has been selected for audit by either process above, the Contribution Compliance Department will send to the employer an initial contact letter to schedule an appointment for an audit.

1.  Within five (5) days after sending the letter, the Contribution Compliance Department will contact the employer by phone and/or email in order to schedule the audit.

2.  The Contribution Compliance Department will attempt to schedule an audit. If they are not able to do so within four (4) weeks, the auditor will request assistance from the Collection and Field Representative(s). The Collection and Field Representative(s), will then attempt to contact the employer to facilitate the scheduling of the audit. The Collection and Field Representative(s) will keep written records of all such attempts. If not successful within a two (2) week period, the Fund Office will send a letter to the Employer informing them that the matter will be referred to Fund Counsel and legal action will be initiated if the Employer fails to contact the auditor to schedule an audit within a

one (1) week period. A copy of that letter is attached as "Attachment A."

III.    AUDIT

A.      Once an audit is started, it is expected that the audit will be completed in a reasonable time frame. A reasonable time frame will be determined by factors such as the number of employees who performed bargaining unit work for the employer, the availability of records and the time period being audited. The Contribution Compliance Department shall include an estimate of the time needed to complete the audit in their regular updates on the status of audits. It is the expectation of the Trustees that the audit will be completed within ninety (90) days from the date the audit is assigned.

B.      If the employer fails to provide all the necessary records to complete the audit, the Contribution Compliance Department will notify the Fund Management, at the earliest possible date. Fund Management and Collection and Field Representative(s), will then attempt to contact the employer to facilitate the completion of the audit. If not successful within a two (2) week period, the matter will be presented to the Trustees at the next meeting for further direction.

IV.    DRAFT AUDIT REPORT

A.      The Contribution Compliance Department and the Collection and Field Representative assigned to the Employer will meet (if requested by employer) with the Employer to review the initial findings. The Collection and Field Representative will work with the employer to reach an agreement as to the  findings.  In doing this, they should use their knowledge of the Collective Bargaining Agreement and the industry and information obtained about the Employer in the course of their work as a Collection and Field Representative. They may also use internal files and/or consult with stewards and/or members and/or non-members.

B.      A draft audit report will be sent to the Collection and Field Representative(s) for review by Fund Management or their designee and appropriate Collection and Field Representative(s), the Collection and Field Representative will attempt to obtain a consensus on the findings within 30 days from the date the initial findings are provided to the employer.

1. The Collection and Field Representative(s), under the direction of Fund Management, will review the report for any apparent errors or potential problems. This review will be completed within two (2) weeks of receipt of the draft copy.

2. The results of the review by Fund Management will be communicated by email to the Contribution Compliance Department within four (4) weeks after the draft report is received by the Collection and Field Representative(s).

V. FINAL AUDIT REPORT

A. After receipt of the email from Fund Management, the Contribution Compliance Department will prepare a final report with corrections, updated interest/liquidated damages as of date, ninety (90) days after transmitted. A copy of the Final Report will be emailed to the Collection and Field Representative(s).

B. Within one (1) week of receipt of the final report from the Contribution Compliance Department, the Collection and Field Representative(s) will forward a copy to the employer along with a cover letter from Fund Management attached as "Attachment B."

C. Within ten (10) days after the final report is forwarded to the employer, the Collection and Field Representative(s) will contact the employer to begin attempts to collect the delinquencies. Recognizing that each situation is unique, the following are guidelines on collection attempts:

1. If attempts to contact the employer by phone are unsuccessful, the Collection and Field Representative(s) should visit the employer's office.

2. The Collection and Field Representative(s) should offer his/her availability, including at a meeting, to discuss the report and any questions or issues the employer may have concerning the report.

3.      If the employer disputes any of the findings, (the Collection and Field Representative(s) should investigate the employer's claims. This investigation must include requests for documentation from the employer, interviews of members and employees and research of internal Fund records. If the Collection and Field Representative(s) needs assistance in the investigation, he/she should consult with Fund Management for assistance.)

4.      It is essential that the Collection and Field Representative(s) continually follow up throughout the process and keep accurate records of collection attempts for a report to be given to Fund Management. The Collection and Field Representative(s) must keep contemporaneous notes on all conversations. While the Trustees rely on the professional judgment of the Contribution Compliance Department, all matters in dispute are subject to Trustees' final approval. The Collection and Field Representative(s) and Fund Management will file a report with the Trustees at the conclusion of their collection attempts. The report will summarize the status of the matter and request further direction from the Trustees. Preferably, this report will be filed at a Trustees meeting. In no event, however, shall collection attempts exceed two (2) months unless directed otherwise by the Trustees.

5.      Fund Management will send the Employer a letter by certified mail advising the employer that its payment has not been received. A copy of the letter is attached as "Attachment C." Fund Management will file a report with the Trustees at the conclusion of the collection attempts. The report will summarize the status of the matter and request further direction from the Trustees. Preferably, this report will be filed at a Trustees Meeting. In no event, however, shall collection attempts exceed two (2) months unless directed otherwise by the Trustees.

VI.    RESOLUTION OF THE AUDIT

A.      PAYMENT: If the employer has agreed to pay the delinquencies, the Fund Office will monitor the payment(s) including the distributions to the appropriate Funds. If the delinquency does not exceed $5,000, the Trustees will waive the audit fee as long as the delinquency is paid in full prior to referral to Fund Counsel. Once payment is made in full, the audit file will be closed.

B.      SETTLEMENT: The Trustees authorize the Fund Manager to negotiate a settlement prior to a matter being turned over to Fund Counsel.

-5-

The Trustees further authorize the Fund Manager to waive liquidated damages if he believes it appropriate. If a settlement is reached, the Fund Office will monitor the payment(s) including the distributions to the appropriate Funds. Once payment is made in full, the audit file will be closed.

C.      REFERRAL TO THE ATTORNEY: The Trustees may direct the matter to be referred to Fund Counsel for litigation and/or settlement. Once a matter is turned over to Fund Counsel, the Fund Office will not actively attempt to settle the matter.

VIII.    COLLECTION AND FIELD REPRESENTATIVE RESPONSIBILITIES

A.      AVAILABILITY: The Collection and Field Representative(s) will be made available to the Contribution Compliance Department and to Fund's Counsel concerning the payroll audit or any collection issues, including as a potential witness in litigation.
B.      PROVISIONS: The Collection and Field Representative(s) should be aware of all governing provisions not only in the Audit Procedures but also in the Trust Agreements and Collective Bargaining Agreements.

MONITORING AUDIT PROCEDURES

Generally, the entire audit procedure will be monitored by Fund Management. To keep the Trustees advised of the process, reports will be given at each Trustees Meeting. The Contribution Compliance Department, Fund Counsel and Fund Management will provide reports to the Trustees. These reports will be combined into a master report of the status of all audits. The Collection and Field Representative should monitor his or her own payroll audits, including tolling agreements until the payroll audit is resolved. As such, he or she should monitor its status, even if referred to Fund Management, Board of Trustees or Fund Counsel. The Collection and Field Representative should work with the Fund Office to obtain updates on the status of payroll audits.

The Trustees reserve the right to amend these procedures when the Trustees or their designee determine that the normal procedures are inappropriate to any particular matter. Audits may be handled in such a manner as determined appropriate by the Trustees or their designee, aside from the normal collection procedures.

Table of Contents for Exhibits

The following documents are only examples of communications used by the Funds. The Funds may use different communication when it is deemed appropriate to a particular circumstance.

Attachment A:
Notification Letter, used to inform an employer that records are needed for a payroll audit

Attachment B:
Report Transmittal Letter, sent to employer with completed audit report

Attachment C:
Final Notice Letter, sent to employer when the Fund Office cannot collect amounts due

ATTACHMENT A

January 1, 2024

John Smith
ABC Corporation
123 N. La Salle Street
Chicago, IL 60601-1234

Dear Mr. Smith:

The Teamsters Local Union No. 727 Benefit Funds Contribution Compliance Department has sent you a letter and contacted you by phone and/or email to schedule an audit. In addition, I have contacted you to schedule an audit. However, you have not complied with their request. If you fail to contact the Contribution Compliance Department and schedule an audit within a one (l) week period, this matter may be referred to the Funds' Attorney for resolution.

Sincerely,

Ben Affetto
Collection and Field Representative

ATTACHMENT  B

January 1, 2024

John Smith
ABC Corporation
123 N. La Salle Street
Chicago, IL 60601-1234

Dear Mr. Smith:

Enclosed please find the audit report prepared by the Contribution Compliance Department of ABC Corporation reflecting amounts due the Health and Welfare, Pension and Legal and Educational Assistance Funds for the period January 1, 2004 through March 31, 2008.

After you review this report, contact our office to discuss payment of the delinquent contributions and the associated amounts for interest, liquidated damages and audit fees. We must hear from you by November 17, 2008 in order for you to avoid unnecessary expenses and litigation.

Our Collection and Field Representative, Ben Affetto, is  available to discuss any questions you may have regarding the audit report, as well as the payment of the delinquent contributions and associated fees.

Sincerely,

Robert Laino
Fund Manager

cc:    Ben Affetto, Collection and Field Representative

Enclosure

-9-

ATTACHMENT  C

January 1, 2024

John Smith
ABC Corporation
123 N. La Salle Street
Chicago, IL 60601-1234

Dear Mr. Smith:

On November 3, 2008, our office forwarded a copy of the audit report for ABC Corporation prepared by the Contribution Compliance Department reflecting amounts due to the Teamsters Local Union No. 727 Benefit Funds for the period January 1, 2004 through March 31, 2008. We have made several attempts to collect the delinquent contributions and the associated amounts for interest, liquidated damages and audit fees. You have, however, failed to pay the amounts owed.

Please be advised that this is your final notice to settle the matter without proceeding to litigation. If we do not hear from you by January 26, 2009, I will recommend to the Trustees that the matter be referred to litigation and no further attempts at settlement will be considered.

Sincerely,

Robert Laino
Fund Manager

Cc:    Ben Affetto, Collection and Field Representative

-10-

STATEMENT OF COLLECTION PROCEDURES
TEAMSTERS LOCAL UNION NO. 727 BENEFIT FUNDS
April 22, 2024

**OBJECTIVE**

It is the intent of the Trustees that the following procedure be implemented so that the Trustees may fulfill their statutory and fiduciary obligations. The Trustees also intend to ensure that each employer is following the requirements of its Collective Bargaining Agreement and the Restated Agreement and Declaration of Trust.

**COLLECTION PROCEDURE**

1. Due Date

   **Contributions and signed remittance reports are due by the 10th day of the month following the month in which the work was performed.** If **a pay period ends in a month, other than the month in which work is performed, the employer may remit its payment for such work in the next month.**

   **References in this statement to receipt by a particular date shall mean by the close of business on that day, or by the close of business on the last business day prior to that day in the case of a Saturday, Sunday or holiday.**

2. Delinquent Payments

   A. The Fund Office will provide the Collection and Field Representative responsible for the employer with a monthly report showing delinquencies by the 15th of the month. The Collection and Field Representative will immediately begin collection efforts. If **the payment has not been received by the last business day of the month, interest at a rate of 0.75% per month of the delinquent contribution will be assessed. Interest will be compounded monthly with a minimum charge of $25.00 per month per Fund.** In no event will the amount of interest charged for a particular month exceed the amount of the contributions due for that month for that Fund.

   B. If the employer does not pay the entire amount due by the 15th day of the month following the month in which it was due, the Fund Office will notify the Collection and Field Representative responsible for the employer. **If the payment has not been received by the 20th of the month, liquidated damages in the amount of 5% of the contribution owed**

**will be added to the delinquency.** In **addition, interest at the rate of 0.75% per month of the delinquent contribution will continue to accrue with a minimum charge of $25.00 per month per Fund.** In no event will the amount of interest charged for a particular month exceed the amount of the contributions due for that month for that Fund. The Fund Office will also advise the employer of the imposition of these additional charges for a continued delinquency.

C.     If the employer does not pay the entire amount due by the 15th day of the second month following the month in which it was due, the Fund Office will notify the Fund Manager. If **the employer does not make its payment by the 20th of the month, liquidated damages in the amount of 10% of the contribution owed will be added to the delinquency (5% for each month delinquent). In addition, interest at the rate of 0.75% per month of the delinquent contribution will continue to accrue with a minimum charge of $25.00 per month per Fund.** In no event will the amount of interest charged for a particular month exceed the amount of the contributions due for that month for that Fund. The Fund Manager will also advise the employer of the impositions of these additional charges for a continued delinquency. If the Employer has not paid the entire amount after the above procedure, the Fund Manager will refer the matter to the Trustees for further action.

**D.** If after following the above procedure, the employer still has not paid the delinquency, the Trustees may refer the matter to Fund Counsel, or take any other action available to collect the delinquency. If so referred to Fund Counsel, Fund Counsel may pursue collection efforts without litigation, recommend that a lawsuit be filed or recommend that other appropriate action be taken. Fund Counsel, if so instructed, will be responsible for pursuing collection efforts against the employer until the delinquency has been paid and contributions are current, or the Trustees determine that delinquency is not collectable. **All payments by the employer on account of the delinquency shall also include all attorney's fees and costs associated with the collection of the delinquency, including losses to the employees as a result of the delinquency and a result of any action taken to collect the delinquency.**

**E.** If, upon the recommendation of Fund Counsel, the Trustees decide to file a lawsuit to compel payment, the Fund Office will order a full audit of the employer's payroll records. **All payments by the employer on account of the delinquency shall also include all attorney's fees and costs associated with the collection of the delinquency, including the cost of the audit of the employer's payroll records and losses to the employees as a result of the delinquency and a result of any action taken to collect the delinquency.**

3.   Reports by Fund Counsel

Fund Counsel shall report to the Trustees monthly as to the status of matters Fund Counsel is handling.

4.   Separate Delinquency

If the employer owes contributions to more than one Fund, the payment due to each Fund will be considered a separate delinquency. In addition, the contribution report of an employer, for each month, will be considered a separate delinquency subject to the interest charges and liquidated damages as set forth above. Whenever an employer's account is turned over to Fund Counsel, all past and future reports may be combined for collection purposes and amounts then owed by the employer will include attorney's fees and all other costs associated with collecting the delinquency.

5.   Waivers of Interest and Liquidated Damages

The Trustees reserve the right to waive interest, liquidated damages and other delinquent amounts, provided such a waiver is in the best interest of the Funds and is consistent with the Trustees fiduciary duties.

6.   The Trustees will review the rate of interest assessed against delinquent contributions in January of each year to ensure that it meets the Trustees' intent.

7.   The Trustees are not bound to follow the procedures as set forth herein, when the Trustees or their designee determine that normal procedures are inappropriate to any particular matter, and that the matter may be handled in such manner as is determined appropriate by the Trustees or their designee, aside from the normal collection procedures.

# Exhibit J

Case: 1:26-cv-08963 Document #: 1 Filed: 07/30/26 Page 278 of 280 PageID #:278

**CTM LEGAL GROUP**

ATTORNEYS AT LAW

77 W. Washington Street • Suite 2120
Chicago, IL 60602



FIRST-CLASS

US POSTAGE IMI PITNEY BOWES

ZIP 60602
02 7H
0006049701

$ 000.74

MAR 02 2026

Jermell Brown, President
Heat Valet Parking Service Inc.
2601 E. 92nd Street
Chicago, IL 60617





February 12, 2026

***SENT VIA CERTIFIED MAIL RETURN RECEIPT REQUESTED AND VIA EMAIL***

Heat Valet Parking Service Inc.
c/o Jermell L. Brown, Reg. Agent/Pres.
5726 W. Washington, Apt. 206
Chicago, Il 60644
*heatvaletparkinginc@gmail.com*

Jermell Brown
5726 W. Washington, Apt. 206,
 Chicago, Il 60644
*heatvaletparkinginc@gmail.com*

   **Re:** <u>**Teamsters Local Union No. 727 Benefit Funds'**</u>
      <u>**NOTICE OF DEFAULT and FINAL DEMAND**</u>
      <u>**for Payment of Delinquent Contributions**</u>

Mr. Brown:

This letter constitutes written notice to Heat Valet Parking Service Inc. ("Heat Parking") and you that you are in default of your payment obligations set forth in the November 7, 2025 Settlement Agreement with Teamsters Local Union No. 727 Health and Welfare Fund and Legal and Educational Assistance Fund, and the Parking Industry Labor Management Committee (collectively the "Funds"), and our demand for payment of all monies now due.

Pursuant to your collective bargaining agreement ("CBA") with Teamsters Local 727, you are obligated to make contributions to the Funds on behalf of your employees covered by the CBA. The audit of Heat Parking's payroll for the period October 1, 2022 through August 31, 2023 ("Audit") determined that Heat Parking owes the Funds a total of $36,215.93 for delinquent contributions, interest, liquidated damages and audit fees. The Funds, Heat Parking, and Jermell Brown later agreed to settle the Audit for $30,000.

The Settlement Agreement required you to pay the $30,000 by making two initial payments of $6,000, then 18 monthly payments of $1,000 each month. The first payment was received on or around November 10, 2025. On more than one occasion, you requested and received extensions and other modifications to your payment obligations. Despite these accommodations, the Funds have received only the first lump sum payment. The second $6,000 lump sum payment and the

$1,000 monthly installment for January 2026 are past due. February's payment of $1,000.00 is due on or before February 20, 2026.

Your failure to timely make the second lump sum payment and the January monthly installment constitutes a default under the terms of Settlement Agreement. You have ability to cure this default by paying the full amount due within ten-calendar (10) days. Upon your failure to cure said default within the ten-calendar (10) day period following this written notice, the Funds shall be entitled to bring suit or motion in Federal Court against Heat Parking and shall be immediately entitled to judgment of the full audit balance less payments made and any other amounts due, plus any additional amounts due the Funds including, without limitation, interest, liquidated damages, the Funds' attorney fees and court costs, and further audit expenses. *See Employee Retirement Income Security Act ("ERISA"), 29U.S.C. § 1132(g).* In the event of the employer's failure to timely cure the default, the Funds can also initiate collection efforts against Jermell Brown, personally, for the unpaid balance and the Funds may also recover all reasonable attorneys' fees and costs incurred in collecting said balance. **This letter serves as the Funds' FINAL DEMAND for prompt payment of the aforementioned amounts due ($7,000 past due + $1,000 due by 2/20/2026) pursuant to the Settlement Agreement within ten (10) days of receipt of this letter.**

It is imperative that you give this matter your prompt attention. Your payment should be delivered to the CTM Legal Group, LLC's office.

Sincerely,

*/s/ Thomas E. Moss*
Attorney At Law

CC:
Bobby Laino, Fund Administrator (bobbyl@727benefitfunds.com)
Zach Frankenbach, Assistant Fund Administrator (zachf@727benefitfunds.com)
Ben Affetto, Lead Collection and Field Representative (bena@727benefitfunds.com)
Jonathan Magna, Fund Counsel (jmagna@ctmlegalgroup.com)
James Beall, Fund Counsel (jbeall@wwdlaw.com)

Page **2** of **2**